# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

**UNITED STATES OF AMERICA**,

*Plaintiff*, *ex rel.*

[Filed Under Seal],

*Plaintiff-Relators*,

*v.*

[Filed Under Seal],

*Defendant*.

Civil Action No. _____

**COMPLAINT**
**(Jury Trial Demanded)**

# FILED IN CAMERA AND UNDER SEAL PURSUANT TO 31 U.S.C. § 3730(b)(2) (Exempt from ECF)

## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| **UNITED STATES OF AMERICA**, | **FILED UNDER SEAL** |
| *Plaintiff*, *ex rel*. | |
| | Civil Action No. _____ |
| **JENNIFER WHITE, BRIAN DALY, M.D., and ANDREW STONE, M.D., M.P.H.,** | |
| *Plaintiff-Relators*, | **COMPLAINT** |
| *v.* | **(Jury Trial Demanded)** |
| **GAINWELL TECHNOLOGIES LLC, formerly known as Hewlett Packard Enterprise Services, LLC, and DXC Technology Co.,** | |
| *Defendant*. | |

## **Table of Contents**

I.     INTRODUCTION ...............................................................................................1

II.    JURISDICTION AND VENUE ......................................................................4

III.   PARTIES .........................................................................................................6

    A.  Plaintiffs.....................................................................................................6

    B.  Defendant.................................................................................................10

IV.    LEGAL BACKGROUND ..............................................................................11

    A.  Medicaid ..................................................................................................11

    B.  The False Claims Act ..............................................................................12

V.     FACTUAL ALLEGATIONS .........................................................................12

    C.  Gainwell's Obligations as Rhode Island's FA .......................................13

    D.  Gainwell Recklessly Performed Many of its Obligations to CMS ................16

        1.   Gainwell Permitted ESH – Licensed by the State as a Hospital – to Bill Medicaid as a Nursing Home. .......................................................................20

        2.   Gainwell Permitted ESH to use an Inflated Billing Methodology That was Inconsistent With Legal Requirements ...........................................................25

        3.   Gainwell Failed to Perform Adequate Audits, Prior Authorizations, Utilization Reviews, and Other Procedural Billing Review Requirements ......29

        4.   Gainwell Failed to Deny Other Claims That did not Meet Screening Criteria ............................................................................................................30

    E.  Gainwell's Conduct was Knowing or Reckless ............................................36

        1.   Gainwell did not Require ESH to Satisfy the Federal PASRR Requirements Applicable to Nursing Homes Because It Knew it did not Apply to ESH as a Hospital ............................................................................................................37

        2.   Gainwell did not Require Medication Monitoring Mandated by OBRA for Nursing Homes or Comply with other OBRA requirements ..........................39

    F.  Gainwell Accepted Substantial Federal Funds as Partial Payment for its Services ...........................................................................................................41

    G.  Gainwell's Reckless Conduct was Material to the Government's Decision to pay ESH's False Claims and Gainwell's Fees....................................................43

VI.    COUNTS ........................................................................................................44

VII.   PRAYER FOR RELIEF .................................................................................48

VIII.  REQUEST FOR TRIAL BY JURY ...............................................................48

# I.  <u>INTRODUCTION</u>

1.      Medicaid – funded with federal and state dollars – is a public assistance program that pays medical expenses primarily for low-income patients.[1] Each state administers its own Medicaid program subject to the requirements of federal rules and regulations and the State Plan it files with the federal Centers for Medicare and Medicaid Services ("CMS").

2.      Between 2010 and 2020 alone, the federal government spent in excess of $3.7 trillion to fund its share of Medicaid.[2] Billions of federal dollars went to the State of Rhode Island, including for services purportedly provided by the state-run Eleanor Slater Hospital ("ESH").[3]

3.      The gatekeepers for the disbursement of these Medicaid dollars are private contractors known as Fiscal Agents ("FAs"). These FAs are charged with safeguarding government coffers filled by taxpayers.

4.      Although the FA is selected by the state, the federal government pays anywhere from 50% up to 90% of the FA's fees. In accepting federal funds as part of their fees, FAs certify to the federal government that they will comply with their

---

[1] Medicaid was created in 1965 when Congress added Title XIX, § 1905, to the Social Security Act, 42 U.S.C. §§ 1395, *et seq.*  *See* Pub. L. 89–97, title I, § 121(a), July 30, 1965, 79 Stat. 351.

[2] See https://www.cbo.gov/data/budget-economic-data#2 ("Historical Budget Data," as of Feb 2021. Sheet 5 (Mandatory Outlays)).

[3] *See* https://www.cms.gov/Research-Statistics-Data-and-Systems/Statistics-Trends-and-Reports/NationalHealthExpendData/NationalHealthAccountsStateHealthAccountsResidence.

contractual obligations, including complying with federal and state law.

5.      FAs are the federal government's primary defense against fraud, waste, and abuse in the Medicaid system. They are expected to exercise diligence to ensure providers adhere to government standards for eligibility, level and quality of care, and services that do no harm to patients.

6.      Between 2013 and 2020, Gainwell Technologies LLC[4] and its predecessors-in-interest, HP Enterprise Services LLC ("HPES") and DXC Technology Co. ("DXC") (hereinafter collectively "Gainwell") were paid more than $150 million, mostly by the federal government,[5] to exercise contractual and regulatory diligence over the processing of Rhode Island's Medicaid claims.[6]

7.      Pursuant to its contract with Rhode Island, Gainwell was charged with providing Program Integrity, Claims Review, and Surveillance and Utilization Review among other services.  Gainwell specifically "warrant[ed] and certifie[d] that in the performance of this Contract, it will comply with all applicable statutes, rules, regulations and orders of the United States and the State of Rhode Island." [7]

---

[4] Gainwell and its predecessors-in-interest have been the Rhode Island Medicaid FA for nearly 30 years.

[5] *See* https://www.medicaid.gov/medicaid/financial-management/state-expenditure-reporting-for-medicaid-chip/expenditure-reports-mbescbes/index.html.

[6] Gainwell continues to be paid in part with federal taxpayer money.

[7] *See* Dec. 20, 2012, Rhode Island-HPES Agreement ("2012 Agreement"), Section 9.2.7, Compliance with Statutes and Regulations, *available at* http://www.transparency.ri.gov/contracts/bids/3306094_7449255.pdf.

8.    In contravention of its obligations, Gainwell knowingly processed for payment thousands of non-reimbursable Medicaid claims submitted by ESH. Although ESH is licensed only as a hospital by the State of Rhode Island, Defendant knowingly processed for payment claims representing ESH to be a nursing home.

9.    Defendant greenlighted those payments even though ESH failed to meet nursing home requirements that protected those with mental illness from being warehoused. The average length of stay for ESH's roughly 200 patients as of July 2021 was an extraordinary 9.3 years; many of those patients did not have any medical or psychiatric condition justifying their extended hospitalization.  But because ESH was only masquerading as a nursing home for payment purposes it never endeavored to comply with any nursing home regulations.

10.    Gainwell had a duty to confirm ESH's status and eligibility as a Medicaid provider.  It should have been aware that ESH was a hospital, not a nursing home, and that it was unlawfully warehousing patients.

11.    Gainwell also allowed ESH to use an inflated billing rate that permitted ESH to charge Medicaid an average of $516,000 per patient per year.

12.    Between 2016 and 2021, alone, Gainwell approved the payment of close to $500 million in Medicaid claims submitted by ESH. As Gainwell should have known, all of those claims were false.

13.    Defendant was also submitting invoices for its own services as Rhode Island's Fiscal Agent and receiving significant federal dollars as partial payment. These claims for payment were also false claims because Gainwell certified that it would comply with federal law and it knowingly failed to do so.

14.    Relators Jennifer White, Dr. Brian Daly, and Dr. Andrew Stone are former administrative and medical leaders at both ESH and the state agency responsible for operating ESH, the Rhode Island Department of Behavioral Healthcare, Developmental Disabilities, and Hospitals ("BHDDH"), they witnessed the conduct alleged herein and acted to halt, at least temporarily, the false Medicaid billing.

15.    Through its knowing and reckless conduct, Gainwell has violated the False Claims Act, 31 U.S.C. § 3729, *et. seq.* (the "FCA"). Accordingly, Relators bring this case on behalf of themselves and the United States to recover treble damages, civil penalties, and such other relief as accorded by law.

## II.    <u>JURISDICTION AND VENUE</u>

16.    This Court has federal subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 and 31 U.S.C. § 3732.

17.    This Court has personal jurisdiction over the Defendant pursuant to 31 U.S.C. § 3732(a) because the Defendant can be found in or transacts business in

this District.[8]

18.     Venue is proper in this District pursuant to 31 U.S.C. § 3732(a)

because Defendant transacts business in this District.[9]

19.     Relators' claims and this Complaint are not based upon prior public

disclosures of allegations or transactions in a federal criminal, civil, or

administrative hearing in which the Government is already a party, or in a

congressional, Government Accountability Office, or other federal report, hearing,

audit, or investigation, or from the news media, as enumerated in 31 U.S.C. §

3730(e)(4)(A).

20.     To the extent there has been any public disclosure of the allegations

herein, the Relators are "original sources" under 31 U.S.C. § 3730(e)(4)(B).

Beginning in 2018 and continuing into 2021 – *i.e.*, prior to any possible public

disclosure – Relators voluntarily disclosed the information on which the

Complaint's allegations are based to government officials, including the Rhode

Island Attorney General and the Inspector General for the United States

Department of Health and Human Services. *See* 31 U.S.C. § 3730(e)(4)(B)(i).

Further, the Relators have direct and independent material knowledge of the

---

[8] HP was a Massachusetts FA between 2005 and 2021, *see* https://www.hp.com/ee-et/hp-news/press-release.html?id=1815966#.YktnCdvMKHs, when Gainwell became a Massachusetts FA, *see* https://www.medicaid.gov/medicaid/data-and-systems/mmis/contract-status-report/index.html#Massachusetts.

[9] *Id.*

information on which the allegations are based. *See* 31 U.S.C. § 3730(e)(4)(B)(2).

21.     Relators have served a written disclosure of substantially all material evidence and information they possess on the federal government pursuant to Rule 4(d)(4) of the Federal Rules of Civil Procedure before filing this *qui tam* action. *See* 31 U.S.C. § 3730(b)(2).

### III.    PARTIES

#### A. PLAINTIFFS

22.     The **United States of America** is the Plaintiff and real party in interest in this litigation.

23.     Plaintiff-Relator **Jennifer White ("Ms. White")**, a citizen of the State of Connecticut, was the Chief Financial Officer ("CFO") for BHDDH from May of 2019 to July of 2021. From May of 2020 to April of 2021, she also acted as the Interim Hospital Chief Executive Officer ("CEO") at ESH – a 230-bed public Long-Term Acute Care Hospital ("LTACH") run by BHDDH.  Prior to her roles for BHDDH, she worked as COO, CFO, or other executive officer at several health systems and health carriers. These include UHG-Optum Wyoming Insight Program (WY) from 2017-2018, Health Plan of San Joaquin (CA) from 2014-2015, Bakersfield Family Medical Group/Heritage Physicians Network/Costal Communities Physician Network (CA) from 2013-2014, and United Healthcare Community and State-Rocky Hill (CT) from 2008-2012. Ms. White earned a

Master of Business Administration/Healthcare Administration from Bryant University. She holds a Bachelor of Science/Human Development Counseling and Family Studies from the University of Rhode Island and a Bachelor of Science/Nursing from Rhode Island College. She completed the EDX Certification Program provided by Harvard University, Yale, and MIT. In addition to her years of experience as a health care industry executive, since 2012 she has served as a Council Member/Subject Matter Expert Consultant at Gerson Lehrman Group Healthcare & Biomedical Council of Austin, TX.

24. Plaintiff-Relator **Brian Daly, M.D. ("Dr. Daly")**, is a citizen of the State of Rhode Island and a physician licensed in Rhode Island and the Commonwealth of Massachusetts. He is Board Certified by the American Board of Psychiatry and Neurology in General Adult Psychiatry and the American Board of Psychiatry and Neurology in Forensic Psychiatry. From September of 2018 through July 31, 2021, Dr. Daly was employed by RI BHDDH as Chief Medical Officer ("CMO") of RI BHDDH and ESH, a position that formed a dyad of leadership at ESH with the CEO via "dotted line" relationship. In his role, he also served as a cabinet-level leadership position to the Director of RI BHDDH and supervised all of BHDHH's clinical services. During his tenure with RI BHDDH, Dr. Daly also served as an Assistant Professor of Medicine at Brown University Medical School. Since September of 2021, he has held a role as CMO at UMass

Memorial Healthcare – Community Healthlink, in addition to Associate Professor at the UMass Medical School Department of Psychiatry. Prior to employment at ESH, Dr. Daly practiced psychiatry and served as the Director of Forensic Psychiatry Services and Assistant Professor of Medicine at the Geisel School of Medicine of Dartmouth College from 2017-2018. From 2014 to 2017, he practiced at the Southwest Centre for Forensic Mental Health Care in London, Ontario, while serving as Program Director for the University of Western Ontario Forensic Psychiatry Subspecialty Residency. During this time, Dr. Daly held an assistant professorship at the Department of Psychiatry at the University of Western Ontario, Schulich School of Medicine. He earned his medical degree from the University of Rochester School of Medicine and Dentistry, and he completed a residency at the Brown University Department of Psychiatry. Dr. Daly completed a Forensic Psychiatry Fellowship at the University of Michigan from 2011 to 2012. In addition to his practice and academic duties, Dr. Daly has been admitted as an expert witness in court several times and has served on numerous professional medical committees. He is a member of the Canadian Academy of Psychiatry and the Law, the American Academy of Psychiatry and the Law, and the American Psychiatric Association.

25.     Plaintiff-Relator **Andrew Stone, M.D., M.P.H. ("Dr. Stone"),** is a resident of the Commonwealth of Massachusetts and a licensed physician in the

State of Rhode Island. He is Board Certified in Internal Medicine, Pulmonary

Medicine, and Addiction Medicine. From November of 2018 through October of

2021, Dr. Stone was employed as a physician of Internal Medicine, Pulmonary

Medicine, and Addiction Medicine at ESH. In addition to his clinical duties, he

served as the Chief of Medical Services of RI BHDDH and Assistant Chief

Medical Officer ("CMO") of ESH from October of 2020 through October of 2021.

He is currently the Medical Director at CODAC (Providence, RI), a part-time

inpatient Addiction Physician on the addiction clinic medicine service at Roger

Williams Hospital, and a part-time Primary Care Physician at the Rhode Island

Free Clinic of Providence. Prior to his time at ESH, Dr. Stone practiced addiction

medicine and served as Medical Director at the Discovery House Northern Rhode

Island. He served as a Supervising Resident at Brown University, a Clinical

Instructor in Medicine at Brown Medical School, and a Lecturer at the Annual

Psychiatry Didactic Lecture Series at Brown University. He earned a B.A. in

Biology from Johns Hopkins University and an M.P.H. from Columbia

University's School of Public Health. He received his M.D. from the University of

Vermont and spent seven years in residency and fellowship training at Brown

University. Dr. Stone serves on multiple professional societies and committees

including the American College of Chest Physicians, American Thoracic Society,

and American Society of Addiction Medicine. In addition to authoring numerous

scientific publications, Dr. Stone has presented or spoken at health care conferences and panel series across the country and internationally.

**B. DEFENDANT**

26.    Defendant **Gainwell Technologies LLC, ("Gainwell")**, formerly known as Hewlett Packard Enterprise Services, LLC, ("HP Enterprise" or "HPES") and then DXC Technology Co. ("DXC"),[10] is a California limited liability company with its principal place of business located at 355 Ledgelawn Drive, Conway, AR 72034. Gainwell transacts business in Rhode Island and its registered agent is CT Corporation System, 450 Veterans Memorial Parkway, Suite 7A, East Providence, RI 02914.

27.    Gainwell is the longtime Medicaid FA for Rhode Island. Gainwell is also an FA for Medicaid and transacts business in the Commonwealth of Massachusetts, where its registered agent is CT Corporation System, 155 Federal Street, Suite 700, Boston, MA 02110.[11]

---

[10] As discussed further below, in 2012, HP Enterprise entered into an agreement to be Rhode Island's FA.  *See* 2012 Agreement, http://www.transparency.ri.gov/contracts/bids/3306094_7449255.pdf.

In 2016, HP Enterprise initiated a merger with Computer Science Corporation to create DXC Technology Co. ("DXC"), which continued the Rhode Island contract. *See* https://www.sec.gov/Archives/edgar/data/0001688568/000119312516757162/d93234d1012g.htm (initial registration of DXC under name "Everett Spinco, Inc."). On October 1, 2020, Veritas Capital acquired the state and local health and human services business of DXC for $5 billion and renamed it Gainwell Technologies LLC. *See* https://dxc.com/us/en/about-us/newsroom/press-releases/10012020.

[11] *See* https://www.medicaid.gov/medicaid/data-and-systems/mmis/contract-status-report/index.html (Gainwell Technologies is Massachusetts Medicaid DDI vendor).

# IV.   LEGAL BACKGROUND

## A. MEDICAID

28.     Medicaid coverage, although with greater limitations, is generally modeled after Medicare coverage, another federally funded government health program created by Congress in 1965 that primarily benefits the elderly and the disabled. Both Medicaid and Medicare are administered by the Centers for Medicare and Medicaid Services ("CMS") and are subject to certain conditions of participation and conditions of coverage. According to CMS, "[w]hen services are furnished through institutions that must be certified for Medicare, the institutional standards must be met for Medicaid as well."[12]

29.     While Rhode Island Medicaid offers both managed care ("MCO") and fee-for-service options ("FFS"), MCO beneficiaries who become patients at ESH may be disenrolled from the MCO. *See* 210-30-05 R.I. Code R. § 2.50 ("Reasons for Disenrollment" expressly providing for disenrollment upon permanent placement at ESH).

30.     Funding for Medicaid is shared between the federal and state governments.  The federal government also contributes to certain state expenses incurred in administering the Medicaid program.

---

[12] *See* http://www.cms.gov/Medicare/Provider-Enrollment-and-Certification/CertificationandComplianc/index.html?redirect=/certificationandcomplianc/02_ascs.asp.

31.     While Medicaid coverage varies from state to state, in accordance with the State Plans each state agrees to with the federal government, there are several general proscriptions to coverage imposed by the Medicaid statute itself.

### B. THE FALSE CLAIMS ACT

32.     The federal False Claims Act provides that any person who (1) knowingly presents or causes another to present a false or fraudulent claim for payment or approval by a government payor, or (2) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim is liable for a civil penalty of not less than $11,803 and not more than $23,607[13] for each such claim, plus three times the amount of the damages sustained by the government.  31 U.S.C. § 3729(a)(1)(A) & (B).

## V.     FACTUAL ALLEGATIONS

33.     Medicaid is the single largest programmatic activity of Rhode Island. In 2014, for example, Medicaid incurred $2.3 billion in annual state and federal expenditures, representing 38% of the State's General Fund expenditures.[14] Likewise, in SFY 2019, Rhode Island spent approximately $1.0 billion on

---

[13] As adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990, 28 U.S.C. § 2461; *see also* 86 F.R. 236, at 1765 (DOJ Dec. 13, 2021) (setting forth penalties effective after December 13, 2021, for conduct occurring after November 2, 2015).

[14] Finding 2014-005 of 2014 RI Audit, at D-11.
http://www.oag.ri.gov/reports/RI2014_FinStmt_Findings.pdf.

Medicaid while the federal government paid approximately $1.6 billion.[15]

### C. GAINWELL'S OBLIGATIONS AS RHODE ISLAND'S FA

34.    Gainwell, albeit in several incarnations,[16] has been Rhode Island's

Medicaid FA for nearly 30 years.  In late 2012, Gainwell was awarded a new five-

year contract, to begin January 1, 2013, with three one-year options to extend.[17]

The contract was valued at $89.5 million.[18] A new sole-source contract worth $104

million was executed between Rhode Island and Gainwell in April 2021.[19]

35.    Gainwell was hired to act as Rhode Island's FA as well as upgrade

and operate the state's Medicaid Management Information System ("MMIS"), the

system used to process Medicaid claims.[20] As noted above, Gainwell's obligations

also included Program Integrity, Claims Review, Pharmacy Review, and

Surveillance and Utilization Review.[21]  In particular, Gainwell was expressly

---

[15] *See* https://eohhs.ri.gov/sites/g/files/xkgbur226/files/2021-05/RIMedicaidExpenditureReport_SFY19.pdf, at p. 10.

[16] *See supra* ¶ 26 & n.10.

[17] *See* 2012 Agreement, http://www.transparency.ri.gov/contracts/bids/3306094_7449255.pdf.

[18] *Id.*

[19] Available at http://www.transparency.ri.gov/contracts/bids/3717560_3717560.pdf.

[20]  "The MMIS is conventionally organized into six core subsystems or functional areas.  They are:  Recipient; Provider; Claims Processing; Reference File; Surveillance and Utilization Review; and Management and Administrative Reporting." State Medicaid Manual § 11110. *See* https://www.cms.gov/Regulations-and-Guidance/Guidance/Manuals/Paper-Based-Manuals-Items/CMS021927.

[21] *See* 2011 Request for Proposal, https://purchasing.ri.gov/rivip/stateagencybids/7449255.pdf, at 102-04, 105-06, 117, 473-74.

tasked to take actions "to proficiently and proactively detect"

- Potential fraud, abuse or misuse by all providers and members

- Inappropriate billings and over payments, and violations by providers.[22]

36.      Gainwell agreed that it would "perform all of its functions according to the terms required by the State Medicaid Manual, Part 11 ("SMM"),"[23] a federal guidance manual by which CMS "issues mandatory, advisory, and optional Medicaid policies and procedures to the Medicaid State agencies."[24]  Among the primary obligations under the SMM, Gainwell was required to review each Medicaid claim it received to ensure it met the following criteria:

- It contains all the required information;

- The information is internally consistent;

- The recipient who received the service and the provider who submitted the claim were certified as eligible to participate in the program on the date(s) of service;

---

[22] *See id.*, at 128, SUR.18.3.2-18.3.3.

[23]   *See id* at 9.2.77. HHS Sanctions. The SMM is located at https://www.cms.gov/Regulations-and-Guidance/Guidance/Manuals/Paper-Based-Manuals-Items/CMS021927.

[24] SMM Foreword. The Foreword also explains that

> [t]he manual provides instructions, regulatory citations, and information for implementing provisions of Title XIX of the Social Security Act (the Act). ***Instructions are official interpretations of the law and regulations, and, as such, are binding on Medicaid State agencies***.  This authority is recognized in the introductory paragraph of State plans.  Interpretations and instructions relating to common policy under Titles I, IV-A, X, XIV, XVI, and XIX of the Act are also included.

*Id.* (emphasis added).

- The service provided is covered under the program;

- The service does not exceed frequency limitations;

- Any required prior authorizations or certifications have been obtained.

SMM § 11600; *see also* CMS Checklist at CA2-CA4; incorporated into RFP at p. 232.

37.     Further, the SMM required Gainwell to "[e]nsure that all recipients for whom input is submitted were eligible for the type of service at the time the service was rendered" and to "[v]erify that charges submitted by providers are reasonable and within acceptable limits." SMM § 11325(A).

38.     Section 11335(A) of the SMM required Gainwell to "[i]nvestigate and reveal misutilization of the State's Medicaid program by individual participants" and to "[p]rovide information [that] reveals and facilitates investigation of potential defects in the level of care and quality of service provided under the Medicaid program."

39.     In short, Gainwell was responsible for rejecting claims not meeting the federal screening criteria set forth in the SMM and elsewhere by CMS.

40.     Gainwell was also responsible for provider enrollment, including the enrollment of ESH.[25] According to SMM § 11320, the Provider Subsystem of the

---

[25] Provider Enrollment involves receiving and processing provider enrollment and reenrollment information, including reviewing for completeness, obtaining missing information, performing eligibility approval, and entering approved data into the provider file. *See also* RFP,

MMIS was required to, *inter alia*:

- Ensure that providers are qualified to render specific services under the Medicaid program by screening applicants for State license and certification, by Specialty Board certification if appropriate, and by visit to the provider by a review team if necessary.

- Build and maintain a computerized file of provider data for claims processing, administrative reporting, and surveillance and utilization review.

- Review enrolled providers on a continuing basis to ensure that they continue to meet provider eligibility requirements.

41.     Gainwell failed to properly perform these functions with regard to claims from ESH.

### D. GAINWELL RECKLESSLY PERFORMED MANY OF ITS OBLIGATIONS TO CMS

42.     ESH is a public hospital operated by BHDDH. It treats patients with "acute and long-term medical illnesses, as well as patients with mental health conditions."[26] Among the services provided, ESH lists comprehensive mental health services, physical, occupational, speech, and respiratory therapies, ventilator care, and acute brain injury care.

43.     An ESH brochure states that its "focus is on recognizing each

---

https://purchasing.ri.gov/rivip/stateagencybids/7449255.pdf, p. 237, at MITA.50. Provider Management – Disenroll RI Medicaid Provider; MITA.51. Provider Management – Enroll RI Medicaid Provider.

[26] https://bhddh.ri.gov/sites/g/files/xkgbur411/files/documents/ESH-Brochure-02.18.2021.pdf.

patient's individuality and their right to dignified and high-quality care."[27] The hospital is licensed to operate 230 beds across two campuses,[28] with its primary location at 111 Howard Avenue, Cranston, Rhode Island, 02920.[29] As of May 2021, ESH housed 188 patients, 96 of whom were classified as psychiatric patients.[30]

44.    Despite its critical role as an institution for vulnerable mental health patients, the hospital has struggled with financial woes for years. These problems came to a head in 2019 when Ms. White, in her capacity as BHDDH's Chief Financial Officer and ESH's Interim Chief Executive Officer, raised concerns with Rhode Island state leaders that ESH was out of compliance with federal billing requirements and ordered that billing to Medicaid be stopped, resulting in a loss to Rhode Island of approximately $60 million in annual federal funding from CMS.[31]

45.    Between 2019 and 2021, Relators raised several billing concerns to BHDDH leaders including that: (1) ESH was a hospital, not a nursing home, as it was billing Medicaid, and (2) ESH was billing Medicaid on the basis of an

---

[27] *Id.*

[28] *See* https://health.ri.gov/find/licensees/results.php?id=5368&license=HOS00102&prof=207.

[29] *Id.*

[30] https://eohhs.ri.gov/sites/g/files/xkgbur226/files/2021-09/esh-independent-review-final_public-version_no-phi.pdf

[31] *See* https://eohhs.ri.gov/sites/g/files/xkgbur226/files/2021-05/RIMedicaidExpenditureReport_SFY19.pdf, at 32.

17

unapproved – and exorbitant – cost-based payment methodology.[32] Relators raised

a litany of other concerns as well, including that (1) ESH qualified as an Institute

of Mental Diseases and, therefore, was prohibited from seeking Medicaid

reimbursement for services to certain patients; (2) ESH was incapable of providing

adequate LTACH care; and (3) very few of the patients actually needed the higher

level of care for which ESH was billing.

46.    There has been a flurry of official activity concerning ESH following

Relators' raising their concerns about the hospital.  A September 2021 CMS Audit

confirmed many of Relators' concerns.  CMS found that ESH was not in

compliance with 42 C.F.R. Part 482 because, among other reasons, ESH was

"failing to operate as a Long-Term Care Hospital" and more than half of the

patients that ESH cared for had a primary admitting diagnosis related to a

psychiatric condition, making ESH an "Institute for Mental Disease."[33] Thereafter,

CMS informed ESH that if it did not address the deficiencies found in the 2021

CMS Audit by April 14, 2022, CMS may terminate ESH's Medicare agreements.[34]

In April 2022, although ESH made progress on some of the non-compliance issues

---

[32] Relators also became aware of numerous other improper and illegal practices occurring at ESH in the areas of patient care, drug utilization, and compliance, and also sought to rectify these violations.

[33] *See* Sept. 17, 2021, Center for Medicare & Medicaid Services OMB No. 0938-0391 ("2021 CMS Audit"), p. 1-6.

[34] *See* CMS January 14, 2022, Letter to ESH.

identified in the 2021 CMS Audit, CMS also found additional problems related to patients' rights and gave ESH until August 15, 2022 to address the new deficiencies.[35]

47.    Multiple legislative actions have been taken in response to the concerns the Relators raised. To address the patient-mix ratio that prevents ESH from billing Medicaid when it is considered an "Institute for Mental Disease," the State of Rhode Island has proposed to separate out ESH's Benton Facility and transform it into a stand-alone psychiatric hospital.[36] To address the concerns that Relators raised that most ESH patients did not need hospital-level care, the State of Rhode Island has proposed creating  "community mental health facilities."[37] Finally, to address the improper billing methods, the State of Rhode Island has proposed a new behavioral health *per diem* reimbursement method.

---

[35] *See* https://www.wpri.com/target-12/feds-threaten-to-pull-funding-unless-eleanor-slater-fixes-violation/.

[36] *See generally* State Budget Office's April 29, 2022, Memorandum re: New Article – Relating to the Rhode Island State Psychiatric Hospital (22-H-7123), *available at* https://omb.ri.gov/sites/g/files/xkgbur751/files/2022-05/GBA%2010_New%20Article%20Relating%20to%20The%20Rhode%20Island%20State%20Psychiatric%20Hospital%20%20%2822-H-7123%29.pdf.

[37] *See generally* State of Rhode Island – An Act Relating to Behavioral Healthcare, Development Disabilities, and Hospital, *available at* https://webserver.rilegislature.gov/BillText22/SenateText22/S2469.pdf.

### 1. Gainwell Permitted ESH – Licensed by the State as a Hospital – to Bill Medicaid as a Nursing Home.

48.     As shown below, ESH has been licensed by the State of Rhode Island as a hospital since October 17, 1994.



https://health.ri.gov/find/licensees/results.php?id=5368&license=HOS00102&prof=207.



https://health.ri.gov/lists/licensees/.

49.    Significantly, Rhode Island has ***never*** licensed ESH as a nursing

facility.

21



https://health.ri.gov/lists/licensees/; *see also* https://healthri.mylicense.com/verification/ (search showing both active and inactive nursing facility licenses does not show ESH); *see also* https://www.medicare.gov/care-compare/?providerType=NursingHome&redirect=true#search (ESH does not appear as a nursing facility in Rhode Island).

50.    Nevertheless, as the screenshot below shows, ESH has represented itself to be a nursing home on its Medicaid claims for decades, which Gainwell allowed.



Example of ESH Medicaid billing.

51.    ESH even claimed to be a nursing home when it re-enrolled in

Medicaid on its 2019 Medicaid application, declaring it had been one since 1993.[38]

```
Rhode Island Executive Office of Health and Human Services

Provider Enrollment Application:    4102001
Application Status:  Revalidate
Request Date:   10/04/2019            Reject Reason:
_____
Request Information
_____
Provider Enrollment Type:  Facility
                          Provider Type: Rhode Island State Nursing Home
            Requesting Enrollment
                          Effective Date: 04/01/1993
                          Contact Name: godiva laliberte
                          Contact Phone: 401-462-1405
                Ext:
                          Contact Email: godiva.laliberte@bhddh.ri.gov
            Preferred Method of
                          Communication: Email
_____
Specialties
_____
Specialty: No Provider specialty designated.      Taxonomy:282E00000X
Effective Date: 12/01/1993
Specialty: No Provider specialty designated.      Taxonomy:282N00000X
Effective Date: 12/01/1993
_____
Provider Identification
_____
            Provider Legal Name: ELEANOR SLATER HOSPITAL
                    Gender: Not Specified
                Birth Date:
                Ownership: Gov/profit
            Business Name:
                    Tax ID: 056000522
            Tax ID Type: EIN
            Effective Date: 04/01/1993            End Date:
12/31/2382
```

ESH's 2019 Medicaid re-enrollment application.

52.    But its licensure was never consistent with this claim.

---

[38] Notably, this conduct likely violates Rhode Island law as well.  *See* 216 R.I. Code R. 40-10-1.5 ("No person or governmental unit acting severally or jointly with any other person or governmental unit shall conduct, maintain or operate a [sic] or hold itself out as a nursing facility without a license in accordance with the requirements of R.I. Gen. Laws Chapter 23-17.").

53.     There were many reasons ESH sought to disguise itself as a nursing home.  In particular, ESH was able to avoid CMS scrutiny of its extended lengths of stay, inadequate care, and inflated costs. Such scrutiny would ordinarily have been applied to a hospital or other provider with annual Medicaid claims of approximately $100 million.

54.     Despite Gainwell's detailed obligations to process provider enrollment by performing eligibility approval for all Medicaid providers and to verify their eligibility to submit claims to Medicaid, it improperly enrolled ESH as a nursing home and allowed ESH to submit claims to Medicaid.  Gainwell's actions were plainly reckless and otherwise knowing.

55.     Had Gainwell not acted intentionally or recklessly in disregarding ESH's provider status and eligibility to bill Medicaid – clearly a key responsibility of any FA[39] – ESH would have been precluded from billing as a nursing home.

### 2. Gainwell Permitted ESH to use an Inflated Billing Methodology That was Inconsistent With Legal Requirements

56.     ESH also did not comply with the approved Medicaid reimbursement policies for either hospitals or nursing homes. Instead, ESH created its own "all-cost" *per diem* reimbursement method, which it sought to legitimize retroactively – with limited success – with the 2021 SPA, made retroactive to April 2020.

---

[39] *See* RFP, https://purchasing.ri.gov/rivip/stateagencybids/7449255.pdf, at PRV §§ 13.2, 13.4 (requiring review and approval of provider eligibility and enrollment).

57.     Until the 2021 SPA was approved, Rhode Island's Medicaid State

Plan provided that all inpatient hospitals, including ESH, be paid on a Diagnosis-

Related Group ("DRG") reimbursement method, whereby a hospital is paid a fixed

amount based upon a patient's acuity (*i.e*., severity of his illness) and diagnosis

***regardless of the amount the hospital actually spends treating the patient or the***

***patient's actual length of stay in the hospital***.[40] If the actual costs of the hospital

stay are less than the reimbursement amount, the hospital gains further revenue.

However, if the actual costs of the hospital stay are more than the reimbursement

amount because a patient's length of stay is longer than expected, the hospital is

not reimbursed for the difference.

58.     In contrast to the use of DRGs for hospitals, nursing homes are

reimbursed based upon a patient's Resource Utilization Group ("RUG"), whereby

a nursing home is paid a "Base *Per Diem* Rate" for each day a patient is admitted

into the nursing home.[41]  The rate is based upon a patient's acuity and services

needed (*e.g*., minutes of physical therapy).  A patient's acuity is determined by a

patient's Minimum Data Set Assessment ("MDS Assessment") survey focusing on

a patient's functional capabilities and health needs that is completed upon a

---

[40] *See* Attachment 4.19-A (2019) to Rhode Island's Medicaid State Plan, *available at* RI-19-0006.pdf (medicaid.gov).

[41] "RUGs *Per Diem* Reimbursement Method" or just "RUGs." *See* Attachment 4.19-D (June 25, 2015) to Rhode Island's Medicaid State Plan, *available at* RI-13-006.pdf (medicaid.gov).

26

patient's admission and repeated at regular intervals thereafter.

59.    Whereas the DRG reimbursement method encourages hospitals to shorten stays and limit services, nursing homes using RUGs do not have an incentive to discharge patients because they are reimbursed for each day a patient is cared for.

60.    ESH's reimbursement methodology complied with neither the approved DRG Single-Stay Reimbursement Method nor RUG *Per Diem* Reimbursement Method. Because it is a hospital, ESH should have used the DRG method; instead, it billed as a nursing home on a *per diem* basis. Further, unlike the RUG method, ESH's *per diem* rate was set at an extraordinarily high level using an "All Cost" method, including a myriad of non-covered costs such as parties, baseball games, transportation, and other improper expenses.

61.    Nonetheless, Gainwell accepted ESH's payment methodology, processing claims at grossly excessive rates throughout the relevant period.[42]

62.    In March 2020, EOHHS sought to allow ESH to resume billing Medicaid by submitting a Medicaid State Plan Amendment (the "2020 SPA") to adopt a cost-based methodology that ostensibly applied to all "state run" hospitals, but, as indicated by the March 24, 2020, Public Notice issued in connection with

---

[42] *See* RFP,  https://purchasing.ri.gov/rivip/stateagencybids/7449255.pdf, at OPS 1.2 (duty to reject claims); *id*. at 9.2.77.

the 2020 SPA, was specifically sought to "codify the existing cost-based payment method for Eleanor Slater Hospital."[43] CMS did not approve the 2020 SPA until March 25, 2021, but it was applied – and Medicaid was billed – retroactively to April 1, 2020.[44]

63.    Notably, then, prior to April 2020, ESH was not eligible for FFP when billing through its *sui generis* cost-based payment methodology. Even after April 2020, moreover, the SPA method only allows for the "all cost" method for patients "awaiting discharge."

64.    The motivation for ESH's fraudulent billing practices is patent: in 2019, ESH typically charged Medicaid around $43,000 a month, or $516,000 a year, per patient. *See* Ex.3, ESH_002770 – Nursing Home Claims.  This is more than four times the average annual cost for a patient in a Rhode Island nursing home, approximately $120,000,[45] and much more than the approximately $47,000 that is the average total charge for a patient in an LTACH under a DRG reimbursement method.[46] Given ESH's average length of stay, 9.3 years, Medicaid

---

[43] *See* March 24, 2020, Public Notice of 2020 SPA, *available at* https://eohhs.ri.gov/sites/g/files/xkgbur226/files/Portals/0/Uploads/Documents/Notice-to-Public_ESH-combined-for-posting.pdf.

[44] CMS March 25, 2021 Approval of 2020 SPA, *available at* RI-20-0008.pdf (medicaid.gov).

[45] *See* https://www.medicaidplanningassistance.org/nursing-home-costs/.

[46] *See* https://www.medpac.gov/wp-content/uploads/2021/11/medpac_payment_basics_21_ltch_final_sec.pdf.

was charged an average of $4.8 million a patient. This large per-patient cost is a direct result of ESH's *per diem* billing method as well as ESH's extended length of stay. It allowed ESH to charge Medicaid approximately $100 million a year for fewer than 200 patients.

65.    ESH's fraud would not have been possible without Gainwell's approval of the claims for inflated *per diem* rates set by ESH that did not conform to any lawful reimbursement method included in the Rhode Island Medicaid policies.  Gainwell recklessly processed thousands of these "all cost" claims and paid ESH millions of dollars for expenses that were not reimbursable.

### 3. Gainwell Failed to Perform Adequate Audits, Prior Authorizations, Utilization Reviews, and Other Procedural Billing Review Requirements

66.    Although Gainwell agreed to perform various Medicaid processes that are designed to ensure the appropriateness of billing and compliance with law and prevent fraudulent claims from being paid by the government, it did not adequately conduct or verify that these procedures were being followed.  For example, it did not adequately perform Utilization Review, a core FA function, to ensure that the services being paid for were medically necessary, leading to the payment of numerous unnecessary services.[47]

---

[47] *See* RFP,  https://purchasing.ri.gov/rivip/stateagencybids/7449255.pdf, at 4.3.5 at p. 64 (Utilization management part of core MMIS functions).

67.     Similarly, according to the SMM, Gainwell was required to examine the claim to ensure that "any required prior authorizations or certifications were obtained."  SMM Sec. 11600. This was another core MMIS function under the Agreement.[48]  Indeed, prior authorization for admission to ESH was specifically required by the Rhode Island Medicaid program.[49] Gainwell never reviewed whether there was prior authorization to be admitted to ESH.

68.     In short, Gainwell agreed – but failed – to perform activities to proficiently and proactively detect potential fraud, abuse or misuse by providers and beneficiaries.  As a result, it processed thousands of inappropriate billings and overpayments and facilitated multiple ongoing violations by ESH.

### 4.  *Gainwell Failed to Deny Other Claims That did not Meet Screening Criteria*

69.     Gainwell breached numerous other duties it owed to the federal government.  These breaches were frequently helpful or convenient for the State of Rhode Island where political leaders were under pressure by ESH employee unions to keep the facility open.

---

[48] *Id.*

[49] *See* March 24, 2020, Public Notice of 2020 SPA, at 2, https://eohhs.ri.gov/sites/g/files/xkgbur226/files/Portals/0/Uploads/Documents/Notice-to-Public_ESH-combined-for-posting.pdf, at p. 2.

a. **Gainwell Failed to Pursue Third-Party Liability for ESH Patients as Promised in the Agreement**

70.    Medicaid is the payor of last resort.[50]  If a patient is eligible for Medicaid but has some other type of coverage including Medicare or private insurance, those payers must be billed first.  Such patients are referred to as "dual-eligible" and the private insurance coverage as Third-Party Liability coverage or "TPL."

71.    Gainwell did not properly assess coverage for dual-eligible patients and, thus, incorrectly billed Medicaid for costs that Medicare or a TPL should have paid.  This failure violated Gainwell's promise to manage Rhode Island's TPL efforts.[51]

72.    In its Agreement with the State, Gainwell promised to undertake detailed activities with regard to TPL.  For example, Gainwell agreed to perform

---

[50] "A. Medicaid is the payor of last resort. Community, public, and private resources such as federal Medicare, Blue Cross/Blue Shield, Veteran's Administration benefits, accident settlements, or other health insurance plans must be utilized fully before payment from the Medicaid program can be authorized." 210 R.I. Code R. 20-00-1.3.

"A. Medicaid is always the payer of last resort. Accordingly, EOHHS considers all other health insurance or coverage provided to a Medicaid-eligible individual as third-party liability (TPL) coverage. EOHHS reserves the right to disenroll Medicaid beneficiaries with TPL from Medicaid managed care and enroll them in RIte Share. This is called RIte Share Zero Premium." 210 R.I. Code R. 30-05-3.14.

"Third party liability" or "TPL" means other health insurance coverage. This insurance is in addition to Medicaid and is usually provided through an employer. Since Medicaid is always payer of last resort, the TPL is always the primary coverage." 210 R.I. Code R. 30-05-3.3.

[51] *See* RFP,  https://purchasing.ri.gov/rivip/stateagencybids/7449255.pdf, at OPS.3.7; *see also* ESH_002641 – July-Dec 2020 Medicaid Billing, attached as Exhibit 21 (reflecting further Medicaid charges from Patient No. X020082 during July-Dec. 2020).

Data Matching with health plans to identify unreported health plans and to provide pay and recover activities with third parties including identifying and billing all pay and recover claims.[52]

73.    Gainwell also agreed that it would "implement functionality to support enhancement of TPL identification and recovery efforts, application of cost recoveries, accounts receivable processing, and the development of a multi-use Case Tracking tool for immediate use in Casualty and Estate Recovery efforts and SURS Integrity case tracking."[53]

74.    Gainwell also promised that it would "Obtain the maximum cost avoidance and reimbursement for Medicaid Beneficiaries covered by other insurance."[54]

75.    At least as to claims from ESH, Gainwell failed to perform these activities.

### b.  Gainwell Permitted ESH to Bill for Inappropriate Civil Psychiatric Admissions

76.    For years and likely decades ESH admitted and billed for civil psychiatric patients that came to the hospital after having been stabilized as an inpatient at a psychiatric facility. None of these patients was acute at the time of

---

[52] *See id.*, at p. 459-61, OPS 3.0, 3.1 and 3.7.

[53] *See id.*, at p. 169, Section 6.2.2, Detailed Requirements for Third Party Liability.

[54] *See id.*

admission, so billing under ESH's acute licensure was inappropriate and resulted in false claims.

77.    Gainwell's failure to deny these false claims violated several of its claims review obligations as set forth above.

### c. **Gainwell's Malfeasance Permitted Numerous Other False Claims to be Processed and Paid**

78.    Gainwell's failure to provide proper oversight of claims submitted by ESH permitted the hospital's rampant abuse of the Medicaid program and misuse of federal funds. Other examples of false claims include Medicaid claims for

- "forensic" patients and Rhode Island state prisoners, who are not eligible for Medicaid;[55]

- patients who were ineligible for care in a nursing home, much less hospital care, including for a discharged patient who was re-admitted due to "loneliness" or others who were kept at ESH due to a fear of leaving;

- the perpetrators of horrific crimes in Rhode Island who had served their sentences but who were kept at ESH without medical need so that state government did not need to deal with their potentially complicated re-entry into society;

- undocumented immigrants who were not eligible for Medicaid;

---

[55] Pursuant to Rhode Island law, it is the duty of the fiscal agent to investigate whether prisoners transferred to ESH had an estate that could otherwise cover the cost of their care. R.I. Gen. Laws 1956, § 40.1-5.3-12.

- patient care for adult patients aged 21 to 64 even though ESH in fact was an Institute for Mental Disease ("IMD") and so those patients were ineligible for Medicaid coverage;[56]

- ostensibly "medical" patients admitted to ESH without requiring hospital level care, but kept there in an effort to maintain ESH's ostensible IMD balance in order to allow billing to Medicaid to continue.

- people admitted to ESH by court order for competency restoration, who were not eligible for Medicaid.

79.     Gainwell knowingly or recklessly failed to deny Medicaid claims

- with insufficient detail to properly process. All of ESH's claims were processed with just one of four revenue codes, all of which were ER codes, without specifying any encounters;

---

[56] *See* SMM § 4390(A)(1). IMDs are facilities that primarily treat patients with mental diseases. *Id.* at § 4390(A)(3).  The so-called IMD Exclusion prohibits Medicaid payments for services provided to adults aged 21 to 64 years old who are patients of IMDs, *Id.* at § 4390(A)(2) "Mental disease" is an antiquated term used in the statute. It comprises "diseases listed as mental disorders in the International Classification of Diseases, with the exception of mental retardation, senility, and organic brain syndrome.  The Diagnostic and Statistical Manual of Mental Disorders (DSM) is a subsection of the mental disorder chapter of the ICD and may also be used to determine whether a disorder is a mental disease." https://www.cms.gov/Regulations-and-Guidance/guidance/Manuals/Paper-Based-Manuals-Items/CMS021927.html; *see also* https://eohhs.ri.gov/sites/g/files/xkgbur226/files/Portals/0/Uploads/Documents/IMD210__ricr__new_imdregulationORR-APPROVED-REFORMATEDCLEAN-to-SoS-4.7.20.pdf.

Rate change request effective January 1, 2019.

Rates based the FY 2018 "as" filed Medicare Cost Report.

| Eleanor Slater Hospital - Provider # 410200 | EDS Bill Type | 1/1/19 - 12/31/19 New Rates | 1/1/18 - 12/31/18 Prior Rates | Difference |
|---|---|---|---|---|
| ~~Medicaid~~ *Medicaid HA-5* | | | | |
| All Inclusive Rate ~~Part A, B & D~~ | 253 | $ 1,512.13 | $ 1,465.42 | $ 46.71 |
| Bill Type 253 ~~minus Part B "Physician Only"~~ *Bonly* | 273 | $ 1,436.50 | $ 1,409.73 | $ 26.77 |
| Bill Type 253 ~~minus Part D~~ *A only* | 293 | $ 1,477.33 | $ 1,427.36 | $ 49.97 |
| Bill Type 253 ~~minus Part D & B~~ *A + B* | 263 | $ 1,401.70 | $ 1,371.67 | $ 30.03 |

| Zambarano Group Homes | Provider # | | | |
|---|---|---|---|---|
| East Wallum Lake | EW12083 | $ 805.14 | $ 1,057.26 | $ (252.12) |
| Mowry Avenue | LC1616 | $ 808.68 | $ 834.80 | $ (26.12) |

- for days the patients were not at ESH;

- when patient's "go on vacation" (e.g., attending a Patriots game). Instead, Gainwell processed claims for staff to attend the event and continue to get overtime pay;

- for transportation services provided via cab and other questionable expenses, such as funeral expenses, hair dressing, and Halloween candy;

- for "direct admits" when "observation status" would have been more appropriate because ESH had no "observation status" beds or documentation process.

80.    In sum, Gainwell's actions with respect to detecting and preventing fraudulent claims submitted by ESH were neither proficient nor proactive.[57] Rather, defendant facilitated wrongful payments in excess of approximately $100 million a year.

---

[57] *See* RFP,  https://purchasing.ri.gov/rivip/stateagencybids/7449255.pdf, at p. 128, SUR.18.3.2-18.3.3.

### E. GAINWELL'S CONDUCT WAS KNOWING OR RECKLESS

81.    Gainwell was aware or should have been aware of the foregoing improper billing practices. For example, among the reasons Gainwell should have known ESH was improperly billing as a nursing home, was that ESH did not undertake to satisfy several federal and state nursing home requirements aimed at reducing institutionalization and protecting "those patients that must be institutionalized. Sadly, ESH was, in reality, just such an institution, but one licensed as a hospital and masquerading as a nursing home. Because it was licensed as a hospital, it was not held to nursing home standards, leaving the most vulnerable patients unprotected. Gainwell knowingly facilitated this fraudulent charade.

82.    Gainwell would also receive notice annually of which nursing facilities are eligible for payment under Medicaid.[58] Because ESH was never certified as a nursing facility, it did not forward its license renewal as a nursing facility to Gainwell, which overlooked this failure.

---

[58] *See* https://eohhs.ri.gov/ProvidersPartners/ProviderManualsGuidelines/MedicaidProviderManual/LongTermCare/LongTermCarePolicy.aspx#15.9 ("Providers obtain license renewal through RIDOH and then forward a copy of the renewal documentation to DXC Technology [Gainwell].")

### 1. *Gainwell did not Require ESH to Satisfy the Federal PASRR Requirements Applicable to Nursing Homes Because It Knew it did not Apply to ESH as a Hospital*

83.    Preadmission Screening and Resident Review ("PASRR") is a federal

requirement for nursing facilities to help ensure that individuals are not

inappropriately warehoused for long-term care.[59]

84.    RI BHDDH has explained that PASSR

> was created [in 1987] as a way to protect individuals with Mental Illness (MI), Intellectual/Developmental Disabilities (I/DD), or related conditions (RC) from inappropriate placement in nursing facilities. These individuals go through an intensive screening process, first to determine whether or not they have mental illness, intellectual/developmental disabilities, or related conditions, then again to decide whether they belong in a Medicaid-certified nursing facility. PASRR determinations must consider all possible community services first and recommend institutional placement only when appropriate.

*See* https://bhddh.ri.gov/mental-health/provider-and-professional-

information/preadmission-screening-and-resident-

review#:~:text=In%201987%2C%20Preadmission%20Screening%20and,inapprop

riate%20placement%20in%20nursing%20facilities.

---

[59] *See* https://www.medicaid.gov/medicaid/long-term-services-supports/institutional-long-term-care/preadmission-screening-and-resident-review/index.html (stating that "PASRR is an important tool for states to use in rebalancing services away from institutions and towards supporting people in their homes, and to comply with the Supreme Court decision, *Olmstead vs L.C*. (1999), under the Americans with Disabilities Act, individuals with disabilities cannot be required to be institutionalized to receive public benefits that could be furnished in community-based settings. PASRR can also advance person-centered care planning by assuring that psychological, psychiatric, and functional needs are considered along with personal goals and preferences in planning long-term care."); 42 U.S.C. § 1396r(e)(7).

85.    The July 2019 Rhode Island Medicaid Program Provider Update provides information about the requirement of PASRR review in order to secure Medicaid reimbursement.  "PASRR - Level I Screen - It is mandatory for a nursing facility that receives federal dollars, regardless of a patient's insurance, to conduct a Level I PASRR screening either before or on the day of admission . . . . Please note that if a PASRR has not been submitted, the nursing facility will not be eligible for payment (due to PASRR Non-Compliance) and cannot bill the client or their family for those dates of service."[60]

86.    Curiously, however, the Update – which is neither regulatory nor authoritative and appears to be a joint publication of FA DXC, Gainwell's immediate predecessor, and Rhode Island EOHHS[61] – expressly exempts ESH from the PASRR requirements: "This requirement excludes Eleanor Slater Hospital, The Tavares Pediatric Center and RICLASS facilities."[62]

87.    Of course, ESH was a hospital and so not required to comply with these requirements in any event. But the fact that Gainwell knowingly allowed ESH to bill as a nursing home yet did not require ESH to satisfy the PASRR requirement demonstrates that Gainwell knew ESH was not, in fact, a nursing

---

[60] *See* https://eohhs.ri.gov/sites/g/files/xkgbur226/files/2021-03/pu318.pdf, at 3.

[61] On the first page, the newsletter notes that "To Subscribe or update your email address Send an email to: riproviderservices@dxc.com or click the subscribe button above."

[62] *See id*. at 8.

home.

### 2. Gainwell did not Require Medication Monitoring Mandated by OBRA for Nursing Homes or Comply with other OBRA requirements

88.    In 1987, the Federal Nursing Home Reform Act became law as part of the Omnibus Budget Reconciliation Act of 1987 ("OBRA"). It was the first major revision of the federal standards for nursing home care since the 1965 creation of both Medicare and Medicaid. 42 U.S.C § 1396r, 42 U.S.C. § 1395i-3. Nursing facilities participating in Medicaid or Medicare were now required to provide services so that each resident can "attain and maintain her highest practicable physical, mental, and psycho-social well-being."

89.    In particular, OBRA imposes strict restrictions and review procedures on the use of psychopharmacologic drugs on nursing home residents paid for by Medicaid. "Psychopharmacologic drugs may be administered only on the orders of a physician and only as part of a plan (included in the written plan of care described in paragraph (2)) designed to eliminate or modify the symptoms for which the drugs are prescribed and only if, at least annually an independent, external consultant reviews the appropriateness of the drug plan of each resident receiving such drugs." 42 U.S.C.A. § 1396r(c)(1)(D); *see also*, 42 U.S.C.A. § 1395i-3(c)(1)(D) (similar Medicare requirement).

90.    Regulations also require a "drug regimen review" on a monthly basis

by a licensed pharmacist, with a focus on psychotropic drugs, and a requirement to eliminate the prescription of "unnecessary drugs."   42 C.F.R. § 483.45(c) and (d).

91.     Specifically, under 42 C.F.R. § 483.45(e) "Based on a comprehensive assessment of a resident, the facility must ensure that –

(1) Residents who have not used psychotropic drugs are not given these drugs unless the medication is necessary to treat a specific condition as diagnosed and documented in the clinical record;

(2) Residents who use psychotropic drugs receive gradual dose reductions, and behavioral interventions, unless clinically contraindicated, in an effort to discontinue these drugs;

(3) Residents do not receive psychotropic drugs pursuant to a PRN order unless that medication is necessary to treat a diagnosed specific condition that is documented in the clinical record; and

(4) PRN orders for psychotropic drugs are limited to 14 days. Except as provided in § 483.45(e)(5), if the attending physician or prescribing practitioner believes that it is appropriate for the PRN order to be extended beyond 14 days, he or she should document their rationale in the resident's medical record and indicate the duration for the PRN order.

(5) PRN orders for anti-psychotic drugs are limited to 14 days and cannot be renewed unless the attending physician or prescribing practitioner evaluates the resident for the appropriateness of that medication.

42 C.F.R. § 483.45(e).

92.     In addition, OBRA also provided that

[a] nursing facility must protect and promote the rights of each resident, including each of the following rights: … (ii) Free from restraints; The right to be free from physical or mental abuse, corporal punishment, involuntary seclusion, and any physical or chemical restraints imposed for purposes of discipline or convenience and not required to treat the

resident's medical symptoms. Restraints may only be imposed-- (I) to ensure the physical safety of the resident or other residents, and (II) only upon the written order of a physician that specifies the duration and circumstances under which the restraints are to be used (except in emergency circumstances specified by the Secretary until such an order could reasonably be obtained).

42 U.S.C.A. § 1396r(c)(1)(A)(ii)

93.     Although ESH billed Medicaid as a nursing home, and was paid as such by Gainwell, ESH failed to comply with these patient protective rules.  As a result of Gainwell's reckless conduct, patients were over-medicated as well as chemically and physically restrained in violation of law.

### F.  GAINWELL ACCEPTED SUBSTANTIAL FEDERAL FUNDS AS PARTIAL PAYMENT FOR ITS SERVICES

94.     The fees Gainwell was paid for these services derived, in part, from federal funds. The federal matching rate, or FMAP,[63] for a state's expenditures on its Medicaid program ranges from a minimum of 50% to 90% for certain aspects of the program.[64]

95.     For Rhode Island, the FMAP paid by the federal government for actual Medicaid claims ranged between 50% and 60% from 2013 to 2021.[65]

---

[63] Pursuant to 42 C.F.R. § 400.203, "FMAP stands for the Federal medical assistance percentage, which is used to calculate the amount of Federal share of State expenditures for services."

[64] *See, e.g.*, https://www.kff.org/wp-content/uploads/2013/01/8352.pdf.

[65] *see* https://www.kff.org/medicaid/state-indicator/federal-matching-rate-and-multiplier/?activeTab=graph&currentTimeframe=0&startTimeframe=19&selectedRows=%7B%22states%22:%7B%22rhode-

96.     Among programs that give rise to higher federal participation rates is the MMIS – in particular, the costs of upgrading it.[66]  The federal share, called the FFP,[67] can be up to 75% for operation of the MMIS and up to 90% for the design, development, and installation of the upgraded MMIS. *Id*.

97.     The federal government and Rhode Island have incurred significant administrative expenses relating to the Rhode Island MMIS system in recent years as Rhode Island sought to upgrade the system. Gainwell's fees comprise the bulk of the "MMIS private" administrative expenses, which approach $195 million total, with a $153 million federal share, over the eight-year span 2013 to 2020.[68]

98.     In submitting its invoices for services and accepting federal funds as compensation, Gainwell impliedly certified that it was entitled to such payment and, further, that its services had been provided in compliance with its contractual obligations and federal and state law.

---

island%22:%7B%7D%7D%7D&sortModel=%7B%22colId%22:%22Location%22,%22sort%22:%22asc%22%7D.

[66] *See* https://www.medicaid.gov/medicaid/data-systems/medicaid-management-information-system/index.html.

[67] *Id*. ("Federal financial participation (FFP) means the Federal Government's share of a State's expenditures under the Medicaid program.").

[68] *See* https://www.medicaid.gov/medicaid/financial-management/state-expenditure-reporting-for-medicaid-chip/expenditure-reports-mbescbes/index.html.

### G. GAINWELL'S RECKLESS CONDUCT WAS MATERIAL TO THE GOVERNMENT'S DECISION TO PAY ESH'S FALSE CLAIMS AND GAINWELL'S FEES

99.    Gainwell's reckless and unlawful acts resulted in a substantial breach

of safeguards intended to protect precious taxpayer dollars, maintain the integrity

of the Medicaid program, and ensure the appropriate delivery of services to

Medicaid clients. As a result of the conduct of both Gainwell and ESH, the

Medicaid program suffered a substantial loss of funds and was deeply

compromised.

| Fiscal Year | ESH Claims | FMAP Rate | Federal Portion of ESH Claims |
|---|---|---|---|
| FY 2016 | $104,390,000 | 0.5042 | $52,633,438 |
| FY 2017 | $112,420,000 | 0.5102 | $57,356,684 |
| FY 2018 | $116,435,000 | 0.5145 | $59,905,807.5 |
| FY 2019 | $116,435,000 | 0.5257 | $61,209.879.5 |
| FY 2020* | $  30,360,000 | 0.5915 | $17,957,940 |
| FY 2021^ | $  18,864,291 | 0.6029 | $11,373,281 |
| Totals: | $498,904,291 | | $260,437,030 |

*Stopped billing Medicaid October 2019 through April 2020, retroactively
^ July to December 2020 only.

100.    Gainwell's approval of ESH's false claims as a nursing home was

material to CMS's decision to pay ESH more than $260 million over a six-year

period.

101.   Gainwell's approval of ESH's false cost-based payment methodology was material to CMS's decision to pay ESH more than $260 million over a six-year period.

102.   But for Gainwell's reckless conduct, such claims would have been rejected and not paid.

103.   Similarly, Gainwell's implied certification that it was complying with all of its obligations to the United States was material to CMS's decision to pay more than $100 million for Gainwell's fees.

## VI.    COUNTS

### COUNT ONE

### *(Violation of the False Claims Act, 31 U.S.C. § 3729(a)(1)(A))*

104.   Relators re-allege and incorporate by reference the allegations contained in the preceding paragraphs of this Complaint.

105.   This is a claim for treble damages and civil penalties under the False Claims Act, 31 U.S.C. § 3729(a)(1).

106.   Eleanor Slater Hospital is a licensed hospital deemed a long-term acute care hospital ("LTACH") by CMS that, *inter alia*, falsely represented itself to be a nursing home and charged government payors improper and excessive fees for its services. Defendant Gainwell Technologies LLC and/or its predecessors and assigns should have known of this illegal scheme and prevented it pursuant to its

obligations under contract and under federal and state law.

107.    By virtue of the knowing and/or reckless conduct described above, Gainwell knowingly presented or caused to be presented false or fraudulent reimbursement claims for Eleanor Slater Hospital to the Rhode Island Medicaid program funded, in part, by the United States government.

108.    Further, having certified compliance with state and federal law, Gainwell knowingly presented or caused to be presented false or fraudulent claims for reimbursement for its services as a Fiscal Agent. Gainwell knowingly and intentionally submitted these false or fraudulent claims in order to seek payment from the United States government.

109.    The United States, unaware of the false or fraudulent nature of the claims that Gainwell caused to be submitted, paid for claims that otherwise would not have been allowed.

110.    By reason of these payments, the United States has been damaged, and continues to be damaged, in a substantial amount.

## COUNT TWO

### (Violation of the False Claims Act, 31 U.S.C. § 3729(a)(1)(B))

111.    Relators re-allege and incorporate by reference the allegations contained in the preceding paragraphs of this Complaint.

112.    This is a claim for treble damages and civil penalties under the False

45

Claims Act, 31 U.S.C. § 3729(a)(1)(B).

113.    Eleanor Slater Hospital is a licensed hospital deemed a long-term acute care hospital ("LTACH") by CMS that, *inter alia*, falsely represented itself to be a nursing home and charged government payors improper and excessive fees for its services. Defendant Gainwell Technologies LLC and/or its predecessors and assigns should have known of this illegal scheme and prevented it pursuant to its obligations under contract and under federal and state law.

114.    By virtue of the knowing and/or reckless conduct described above, Gainwell knowingly caused to be made or used false records or statements that caused false claims to be paid or approved by the Rhode Island Medicaid program funded, in part, by the United States government.

115.    The United States, unaware of the false or fraudulent nature of the claims that Defendant caused to be submitted, paid for claims that otherwise would not have been allowed, including payments to Eleanor Slater Hospital and payments for Gainwell's compensation as Fiscal Agent.

116.    By reason of these payments, the United States has been damaged, and continues to be damaged, in a substantial amount.

## COUNT THREE

### *(Violation of the False Claims Act, 31 U.S.C. § 3729(a)(7))*

117.    Relators re-allege and incorporate by reference the allegations

contained in the preceding paragraphs of this Complaint.

118.    This is a claim for treble damages and civil penalties under the reverse false claims provision of the False Claims Act, 31 U.S.C. § 3729(a)(7).

119.    Eleanor Slater Hospital is a licensed hospital deemed a long-term acute care hospital ("LTACH") by CMS that, *inter alia*, falsely represented itself to be a nursing home and charged government payors improper and excessive fees for its services. Defendant Gainwell Technologies LLC and/or its predecessors and assigns should have known of this illegal scheme and prevented it pursuant to its obligations under contract and under federal and state law.

120.    By virtue of the knowing and/or reckless conduct described above, Gainwell knowingly made, used, or caused to be made or used a false record or statement to conceal, avoid, or decrease an obligation to pay or transmit money or property to the Rhode Island Medicaid program funded, in part, by the federal government.

121.    The United States, unaware of the false or fraudulent nature of the claims that Defendant caused to be submitted, did not seek reimbursement for the false claims it paid.

122.    By reason of these payments, the United States has been damaged, and continues to be damaged, in a substantial amount.

47

## VII.    PRAYER FOR RELIEF

123.    **WHEREFORE:** Relators request that judgment be entered against

Gainwell, ordering that:

(i)    Gainwell cease and desist from violating the False Claims Act, 31 U.S.C. § 3729, *et seq*.;

(ii)    Gainwell pay the United States not less than $11,803 and not more than $23,607[69] for each violation of 31 U.S.C. § 3729, plus three times the amount of damages the United States has sustained because of Gainwell's actions;

(iii)    The Relators be awarded the maximum "relator's share" allowed pursuant to 31 U.S.C. § 3730(d);

(iv)    The Relators be awarded all costs of this action, including attorneys' fees, pursuant to 31 U.S.C. § 3730(d);

(v)    Gainwell be enjoined from concealing, removing, encumbering, or disposing of assets which may be required to pay the civil monetary penalties imposed by the Court;

(vi)    Gainwell disgorge all sums by which it has been enriched unjustly by their wrongful conduct; and

(vii)    The United States, the States, and the Relators recover such other relief as the Court deems just and proper.

## VIII.    REQUEST FOR TRIAL BY JURY

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff-

Relators hereby demand a trial by jury.

---

[69] As adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990, 28 U.S.C. § 2461; *see also* 86 F.R. 236, at 1765 (DOJ Dec. 13, 2021) (setting forth penalties effective after December 13, 2021, for conduct occurring after November 2, 2015).

Dated: June 17, 2022                Respectfully submitted,


                                    /s/ Howard J. Susser
                                    **BURNS & LEVINSON LLP**
                                    Howard J. Susser (BBO #636183)
                                    Beth R. Myers (BBO #676043)
                                    Paul R. Mastrocola (BBO #630664)
                                    125 High Street
                                    Boston, MA  02110
                                    Tel: 617.345.3000
                                    Fax: 617.345.3299
                                    hsusser@burnslev.com
                                    bmyers@burnslev.com
                                    pmastrocola@burnslev.com

                                    Reuben A. Guttman*
                                    Traci L. Buschner*
                                    Elizabeth H. Shofner*
                                    **GUTTMAN, BUSCHNER & BROOKS
                                    PLLC**
                                    1509 22nd Street, NW
                                    Washington, D.C. 20037
                                    Tel: 202-800-3001
                                    Fax: 202-827-0041
                                    rguttman@gbblegal.com
                                    tbuschner@gbblegal.com
                                    lshofner@gbblegal.com

                                    *Counsel for Relators*


* Admission *pro hac vice* to be sought.

49

## CERTIFICATE OF SERVICE

I hereby certify that a copy of this Complaint was served upon the following persons, via Certified Mail, return receipt requested, on June 17, 2022.

<u>/s/ Aaron Verosky</u>

**VIA CERTIFIED MAIL**
**RETURN RECEIPT REQUESTED**

| United States | U.S. Attorney General Merrick Garland<br>United States Department of Justice<br>950 Pennsylvania Ave, NW<br>Washington, DC 20530<br><br>Mr. Andy Mao<br>Deputy Director, Commercial Litigation Branch - Fraud Section<br>United States Department of Justice<br>175 N. Street, NE<br>Washington, DC 20002<br><br>Hon. Rachael S. Rollins<br>U.S. Attorney – District of Massachusetts<br>John Joseph Moakley U.S. Courthouse<br>1 Courthouse Way, Suite 9200<br>Boston, MA 02210 |
|---|---|