

Henry Gaylord
**hgaylord@burnslev.com**
617.345.3321

<p style="color:red; text-align:center"><strong>FILING UNDER SEAL AND IN CAMERA:  PLEASE DO NOT POST TO CM/ECF</strong></p>

*VIA HAND DELIVERY*

Office of the Clerk
U.S. District Court for the District of Massachusetts
John Joseph Moakley U.S. Courthouse
1 Courthouse Way
Boston, MA 02210

Re:     *United States of America, Plaintiff, ex rel. Jennifer White, Brian Daly, M.D., and Andrew Stone, M.D., M.P.H., Plaintiff-Relators, vs. Gainwell Technologies LLC, f/k/a Hewlett Packard Enterprise Services, LLC and DXC Technology Co.*
        Docket No. **1:22-CV-10953-LTS**

Dear Sir or Madam:

  Pursuant to the Court's order on Plaintiff-Relators' Motion to Impound Amended Complaint and For Leave to File In Camera (ECF #27-28), enclosed for filing in the above-referenced action please find the attached Amended Complaint to be **FILED UNDER SEAL AND IN CAMERA** pursuant to 31 U.S.C. § 3730(b)(2).

  Please contact me if you have any questions and thank you for your assistance.

         Very truly yours,

         */s/ Henry T. Gaylord*

         Henry T. Gaylord

cc: Steven Sharobern, Esq. (via email)
  Benjamin K. Symons, Esq. (via email)
  Bethany Wong, Esq. (via email)
  Reuben Guttman, Esq. (via email)
  Traci Buschner, Esq. (via email)
  Liz Shofner, Esq. (via email)
  Beth Myers, Esq. (via email)
  Paul Mastrocola, Esq. (via email)

**TO BE FILED UNDER SEAL AND IN CAMERA**

**PLEASE DO NOT POST TO CM/ECF**

# IN THE UNITED STATES DISTRICT COURT
## FOR MASSACHUSETTS

| | |
|---|---|
| **UNITED STATES OF AMERICA**, | |
| *Plaintiff*, *ex rel.* | Civil Action No. 22-CV-10953-LTS |
| [Filed Under Seal], | |
| *Plaintiff-Relators*, | **AMENDED COMPLAINT** |
| *v.* | **(Jury Trial Demanded)** |
| [Filed Under Seal], | |
| *Defendant*. | |

## FILED IN CAMERA AND UNDER SEAL PURSUANT TO 31 U.S.C. § 3730(b)(2) (Exempt from ECF)

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| **UNITED STATES OF AMERICA**, <br><br>         *Plaintiff*, *ex rel*. <br><br> **JENNIFER WHITE, BRIAN DALY, M.D., and ANDREW STONE, M.D., M.P.H.,** <br><br>         *Plaintiff-Relators*, <br><br>    *v.* <br><br> **GAINWELL TECHNOLOGIES LLC,** formerly known as Hewlett Packard Enterprise Services, LLC, and DXC Technology Co., <br><br>         *Defendant*. | **FILED IN CAMERA AND UNDER SEAL** <br><br> Civil Action No. 22-CV-10953-LTS <br><br><br> **AMENDED COMPLAINT** **(Jury Trial Demanded)** |

# TABLE OF CONTENTS

I.   INTRODUCTION ...................................................................................1

II.  JURISDICTION AND VENUE.............................................................6

III. PARTIES ...............................................................................................7

   A.  Plaintiffs...........................................................................................7

   B.  Defendant..........................................................................................9

IV. LEGAL BACKGROUND .....................................................................10

   A.  Medicaid .........................................................................................10

   B.  The False Claims Act .....................................................................13

   C.  The Medicare and Medicaid Fraud and Abuse Statute ..................13

V.   FACTUAL ALLEGATIONS ................................................................14

   A.  Gainwell's Obligations as Rhode Island's FA ...............................15

   B.  Gainwell failed to perform many of its obligations to CMS.........18

      1.   Gainwell permitted ESH to bill Medicaid as a nursing home....................22

      2.   Gainwell permitted ESH to use an inflated and illegal billing method. .....25

      3.   Gainwell failed to perform adequate audits, prior authorizations, utilization reviews, and other procedural billing review requirements regarding ESH. ....29

      4.   Gainwell failed to deny other payment claims from ESH that did not meet legal requirements............................................................................30

   C.  Gainwell's conduct was knowing or reckless. ...............................36

      1.   Gainwell did not require ESH to satisfy federal regulatory requirements applicable to nursing homes because it knew ESH was not a nursing home....37

      2.   Gainwell did not require medication monitoring or other requirements mandated by federal law for nursing homes.......................................39

   D.  Gainwell accepted substantial federal funds as partial payment for its services.............................................................................................41

   E.  Gainwell's reckless conduct was material to the Government's decision to pay ESH's false claims and Gainwell's fees. ......................................43

VI. Causes of Action..................................................................................45

   Count One *(Violation of 31 U.S.C. § 3729(a)(1)(A))* ...........................45

Count Two *(Violation of 31 U.S.C. § 3729(a)(1)(B))* ...........................................46

Count Three *(Violation of 31 U.S.C. § 3729(a)(1)(G))* .......................................47

Count Four *(Violation of 31 U.S.C. § 3729(a)(1)(C))* .........................................48

VII. PRAYER FOR RELIEF ...................................................................................50

VIII. REQUEST FOR TRIAL BY JURY ................................................................51

# I.    __INTRODUCTION__

1.      The former Chief Medical Officer of both the Rhode Island Department of Behavioral Healthcare, Developmental Disabilities and Hospitals ("BHDDH") and Eleanor Slater Hospital ("ESH"), a Rhode Island state hospital, the former Chief of Medical Services at ESH, and the former Chief Financial Officer/Chief Operating Officer for BHDDH and Chief Executive Officer of ESH collectively bring this case as Relators under the False Claims Act, 31 U.S.C. § 3729, *et seq.* ("FCA"). What they saw at ESH, and what they uncovered, goes beyond the typical FCA case: The amounts involved were staggering and the patient abuses they witnessed were horrifying.

2.      ESH is licensed as a hospital, not a nursing home. But it masqueraded as a nursing home in its bills to the government, bills that a government contractor, Defendant Gainwell Technologies LLC ("Gainwell"), approved. Even the "nursing home" label was a ruse. The reimbursement rate it sought was far, far more than would have been allowed had ESH played by the rules, neither the usual nursing home rate nor the usual hospital rate.

3.      Worse, by disguising what it was really doing, ESH escaped virtually all of the regulations applicable to both hospitals and nursing homes.  It evaded hospital rules – rules concerning length of stay and the adequacy of care and costs. And it evaded the rules applicable to a nursing home – rules aimed at reducing

institutionalization and protecting the most vulnerable patients by requiring a detailed initial screening to determine whether institutional placement was even necessary or community services were adequate.

4.      And in this rules-free zone patients were grievously harmed. Psychiatric and developmentally disabled patients were warehoused in ESH, a physically deteriorating state hospital, often for years or decades. For example, when Relator Brian Daly, M.D., assumed his position as Chief Medical Officer for the BHDDH and ESH in August 2018,  he was shocked to encounter a patient who had been housed in ESH since 1958 – sixty years of hospitalization. There simply is no medical or psychiatric illness that would require anyone to be in a hospital for 60 years, especially an LTACH, which ESH was supposed to be.  That patient, however, was just the tip of the iceberg. Patients were locked in rooms, held in physical and chemical restraints, and subjected to physical and sexual harm.  Some were restrained in "TAT" belts – a wrist to waist restraint like the shackles and handcuffs used in jails and prisons – all day, every day, for years, including sleeping hours. Some were subjected to physical and sexual abuse by dangerous criminals who were transferred to ESH from prison simply because the State had nowhere else to put them.

5.      The hospital wrongfully billed all of these "services" to Medicaid, to the tune of hundreds of millions of federal and state health care dollars – bills

Gainwell approved. But patients were not held in ESH for their own medical need and these dollars were not spent for the patients' benefit; rather the patients were held – indeed held hostage – to generate revenue to fund labor contracts with unions whose interest was to see the hospital remain open.

6.      Gainwell and its predecessors-in-interest, HP Enterprise Services LLC and DXC Technology Co. (collectively "Gainwell") were hired by the State of Rhode Island as its Fiscal Agent ("FA") – the intermediary responsible for reviewing requests for healthcare reimbursement and paying out Medicaid dollars, approximately half of which are federal. Its fee was paid in large measure by the federal government.  Its job was to exercise diligence and weed out fraud, to ensure providers adhered to government standards for eligibility, level and quality of care, and services that do no harm to patients.  It was supposed to be the federal government's primary defense against fraud, waste, and abuse in the Medicaid system. In fact, it specifically "warrant[ed] and certifie[d] that in the performance of this Contract, it will comply with all applicable statutes, rules, regulations and orders of the United States and the State of Rhode Island."[1]

7.      Instead, Gainwell regularly approved submissions for payment that it knew, as a matter of law, should have been categorically rejected. What relators

---

[1] *See* Dec. 20, 2012, Rhode Island-HPES Agreement ("2012 Agreement"), Section 9.2.7, Compliance with Statutes and Regulations, *available at* http://www.transparency.ri.gov/contracts/ bids/3306094_7449255.pdf.

saw, and saw immediately, should have been apparent to Gainwell and – indeed – to anyone who looked at the bills.

8.      Government reimbursement at ESH was at an annual rate of almost $550,000 per patient. The average length of stay for each patient was an extraordinary 9.3 years.  Gainwell approved these claims year in and year out *for the same patients*.  It allowed ESH to bill the government as a nursing home while ignoring nursing home regulations aimed at protecting patients' civil rights, such as screening reimbursement requests for medications that were unnecessary, not validated as required by law, and medically dangerous.  It approved claims even where the diagnosis codes – which Gainwell was also required to review – would never justify spending a lifetime in a hospital, such as diagnoses for hypertension, obesity, and developmental disability. *See Health & Hosp. Corp. of Marion Cnty. v. Talevski*, 599 U.S. 166, 184 (2023) (holding nursing home patients have an enforceable right to be free from physical or mental abuse). As a result, patients' civil rights were violated while federal and state taxpayers were, on average, being defrauded out of an astounding $4.8 million per patient.

9.      The fact that no federal official balked is irrelevant. Gainwell's derelictions violated the law.  Violations, especially civil rights violations, are simply not susceptible to ratification by a government employee at either the state or the federal level.

4

10.     Gainwell submitted invoices for its own services as Rhode Island's FA. Between 2013 and 2020 alone, Gainwell was paid more than $150 million, mostly by the federal government,[2] for the contractual and regulatory diligence it represented it would exercise over the processing of Rhode Island's Medicaid claims.

11.     But instead of exercising the promised diligence, Gainwell knowingly approved the payment of thousands of non-reimbursable Medicaid claims submitted by ESH – almost $500 million between 2016 and 2021 alone.  Gainwell knew all those claims were false**,** that ESH was a hospital, not a nursing home, and that ESH's outrageous bills of almost $550,000 per patient per year were not reimbursable. Gainwell's claims for payment were false claims because Gainwell certified that it would comply with federal law and then knowingly failed to do so.

12.     Relators Jennifer White, Dr. Brian Daly, and Dr. Andrew Stone are former administrative and medical leaders at both ESH and the state agency responsible for operating ESH, BHDDH.  They witnessed the conduct alleged herein and acted to halt, at least temporarily, the false Medicaid billing.

13.     Through its knowing and reckless conduct, Gainwell has violated the FCA.  Accordingly, Relators bring this case on behalf of themselves and the United

---

[2] *See* https://www.medicaid.gov/medicaid/financial-management/state-expenditure-reporting-for-medicaid-chip/expenditure-reports-mbescbes/index.html.

States to recover treble damages, civil penalties, and such other relief as accorded by law.

## II.   <u>JURISDICTION AND VENUE</u>

14.    This Court has federal subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 and 31 U.S.C. § 3732.

15.    This Court has personal jurisdiction over the Defendant pursuant to 31 U.S.C. § 3732(a) because the Defendant can be found in or transacts business in this District.[3]

16.    Venue is proper in this District pursuant to 31 U.S.C. § 3732(a) because Defendant transacts business in this District.

17.    Relators' claims and this Amended Complaint are not based upon prior public disclosures of allegations or transactions in a federal criminal, civil, or administrative hearing in which the Government is already a party, or in a congressional, Government Accountability Office, or other federal report, hearing, audit, or investigation, or from the news media, as enumerated in 31 U.S.C. § 3730(e)(4)(A).

---

[3] HP was a Massachusetts FA between 2005 and 2021, *see* https://www.hp.com/ee-et/hp-news/press-release.html?id=1815966#.YktnCdvMKHs, when Gainwell became a Massachusetts FA, *see* https://www.medicaid.gov/medicaid/data-and-systems/mmis/contract-status-report/index.html#Massachusetts.

18.    To the extent there has been any public disclosure of the allegations herein, the Relators are "original sources" under 31 U.S.C. § 3730(e)(4)(B). Beginning in 2018 and continuing into 2021 – before any possible public disclosure – Relators voluntarily disclosed the information on which the Amended Complaint's allegations are based to government officials, including the Rhode Island Attorney General and the Inspector General for the United States Department of Health and Human Services. *See* 31 U.S.C. § 3730(e)(4)(B)(i). Further, the Relators have direct and independent material knowledge of the information on which the allegations are based. *See* 31 U.S.C. § 3730(e)(4)(B)(2).

19.    Relators have served a written disclosure of substantially all material evidence and information they possess on the federal government pursuant to Rule 4(d)(4) of the Federal Rules of Civil Procedure before filing this *qui tam* action. *See* 31 U.S.C. § 3730(b)(2).

### III.    PARTIES

#### A. PLAINTIFFS

20.    The **United States of America** is the Plaintiff and real party in interest in this litigation.

21.    Plaintiff-Relator **Jennifer White**, a citizen of the State of Connecticut, was the Chief Financial Officer ("CFO") and Chief Operating Officer ("COO") for BHDDH from May of 2019 to July of 2021.  From May of 2020 to April of 2021,

she also acted as the Interim Hospital Chief Executive Officer ("CEO") at ESH – a state-run 230-bed Long-Term Acute Care Hospital ("LTACH").  Prior to her roles for BHDDH, she worked as a senior executive officer at several other health systems and health carriers. Ms. White earned a Master of Business Administration in Healthcare Administration from Bryant University, a Bachelor of Science in Human Development Counseling and Family Studies from the University of Rhode Island, and a Bachelor of Science in Nursing from Rhode Island College.

22.    Plaintiff-Relator **Brian Daly, MD**, is a citizen of the State of Rhode Island and a physician licensed in the Commonwealth of Massachusetts.  He is certified by the American Board of Psychiatry and Neurology in general adult psychiatry and forensic psychiatry.  From September of 2018 through July 31, 2021, Dr. Daly was employed by BHDDH as Chief Medical Officer ("CMO") for both BHDDH and ESH.  In his role, he supervised BHDHH's clinical services.  Dr. Daly also served as an Assistant Professor of Medicine at Brown University Medical School.  Since September of 2021, he has been CMO at UMass Memorial Healthcare – Community Healthlink and an Associate Professor at the UMass Medical School Department of Psychiatry.  And since October 2022, he has been Vice Chair for Public Sector Psychiatry in the Department of Psychiatry at UMass Chan Medical School. Prior to employment at ESH, Dr. Daly practiced psychiatry and served as the Director of Forensic Psychiatry Services and Assistant Professor of Medicine at

the Geisel School of Medicine of Dartmouth College from 2017–2018. Dr. Daly earned his medical degree from the University of Rochester School of Medicine and Dentistry and completed a residency at the Brown University Department of Psychiatry and a forensic psychiatry fellowship at the University of Michigan from 2011 to 2012.

23.  Plaintiff-Relator **Andrew Stone, M.D., M.P.H.**, is a citizen of the Commonwealth of Massachusetts and a physician licensed by the State of Rhode Island. He is board certified in Internal Medicine, Pulmonary Medicine, and Addiction Medicine. From November 2018 through October 2021, Dr. Stone was employed as a physician at ESH. In addition to his clinical duties, he served as the Chief of Medical Services of ESH and Assistant CMO of BHDDH from October 2020 through October 2021. Dr. Stone earned a Bachelor of Arts in Biology from Johns Hopkins University and an M.P.H. from Columbia University's School of Public Health. He earned his medical degree from the University of Vermont and spent seven years in residency and fellowship training at Brown University.

**B. DEFENDANT**

24.  Defendant **Gainwell Technologies LLC**, formerly known as Hewlett Packard Enterprise Services, LLC, ("HP Enterprise" or "HPES") and then DXC

Technology Co. (DXC),[4] is a California limited liability company with its principal place of business located at 5615 High Point Drive, Irving, Texas, 75038.  Gainwell transacts business in Rhode Island and its registered agent is CT Corporation System, 450 Veterans Memorial Parkway, Suite 7A, East Providence, Rhode Island 02914.

25.     Gainwell is the longtime Medicaid FA for Rhode Island.  Gainwell is also an FA for Medicaid and transacts business in the Commonwealth of Massachusetts, where its registered agent is CT Corporation System, 155 Federal Street, Suite 700, Boston, MA 02110.

## IV.     LEGAL BACKGROUND

### A. MEDICAID

26.     Congress created Medicaid in 1965, when Title XIX was added to the Social Security Act.  Medicaid is a public assistance program that provides payment of medical expenses primarily for low-income patients.  Funding for Medicaid is

---

[4] As discussed further below, in 2012, HP Enterprise entered into an agreement to be Rhode Island's FA. *See* 2012 Agreement, http://www.transparency.ri.gov/contracts/bids/3306094 _7449255.pdf.   In 2016, HP Enterprise initiated a merger with Computer Science Corporation to create DXC Technology Co., which continued the Rhode Island contract. *See* https://www.sec.gov/archives/edgar/data/0001688568/000119312516757162/d932 34d1012g.htm (initial registration of DXC under name "Everett Spinco, Inc."). On October 1, 2020, Veritas Capital acquired the state and local health and human services business of DXC for $5 billion and renamed it Gainwell Technologies LLC. *See* https://dxc.com/us/en/about-us/newsroom/press-releases/10012020.

10

shared between the federal government and state governments. The federal government also separately matches certain state expenses incurred in administering the Medicaid program.

27. Medicaid pays for services pursuant to plans developed by the states and approved by the U.S. Department of Health and Human Services ("HHS") through CMS. 42 U.S.C. §§ 1396a(a)-(b). After states pay doctors, hospitals, pharmacies, and other providers and suppliers of medical items and services according to rates the states establish, the federal government then pays each state a statutorily established share of "the total amount expended ... as medical assistance under the State plan." *See* 42 U.S.C. §§ 1396b(a)(1), 1396b(a)(1), and 1903(a)(1). This federal-to-state payment is known as federal financial participation ("FFP").

28. Medicaid coverage, although with greater limitations, is generally modeled after Medicare coverage, another federally funded government health program created by Congress in 1965 that primarily benefits the elderly and the disabled. Both Medicaid and Medicare are administered by the Centers for Medicare and Medicaid Services ("CMS") and are subject to certain conditions of participation and conditions of coverage. According to CMS, "[w]hen services are furnished

11

through institutions that must be certified for Medicare, the institutional standards must be met for Medicaid as well."[5]

29.     Rhode Island Medicaid offers both managed care (MCO) and fee-for-service options (FFS), but MCO beneficiaries who become patients at ESH may be disenrolled from the MCO.  *See* 210-30-05 R.I. Code R. § 2.50 ("Reasons for Disenrollment" expressly providing for disenrollment upon permanent placement at ESH).

30.     There are several general proscriptions to coverage imposed by the Medicaid statute itself as well as the State Medicaid Manual ("SMM") applicable to all states.[6]   The SMM is a federal guidance manual by which CMS "issues mandatory, advisory, and optional Medicaid policies and procedures to the Medicaid State agencies."[7]   But Medicaid coverage varies from state to state in accordance

---

[5] *See* http://www.cms.gov/Medicare/Provider-Enrollment-and-Certification/ CertificationandCompliance/index.html?redirect=/certificationandcomplianc/02_ascs.asp.

[6] The SMM is located at https://www.cms.gov/Regulations-and-Guidance/Guidance/Manuals/Paper-Based-Manuals-Items/CMS021927.

[7] SMM Foreword.  The Foreword also explains that

> [t]he manual provides instructions, regulatory citations, and information for implementing provisions of Title XIX of the Social Security Act (the Act). Instructions are official interpretations of the law and regulations, and, as such, are binding on Medicaid State agencies.  This authority is recognized in the introductory paragraph of State plans.  Interpretations and instructions relating to common policy under Titles I, IV-A, X, XIV, XVI, and XIX of the Act are also included.

with the State Plan that each state submits to the federal government and the federal government approves.  The State Plan sets forth the particulars of how the state will administer Medicaid and, upon federal approval, effectuates a contract between the state and the federal government.

## B. THE FALSE CLAIMS ACT

31.     The FCA provides that any person who (1) knowingly presents or causes another to present a false or fraudulent claim for payment or approval by a government payor, (2) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim, (3) knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay money to the Government, or (4) conspires to do any of the foregoing acts, is liable for a civil penalty of not less than \$11,803 and not more than \$23,607 for each such claim,[8] plus three times the amount of the damages sustained by the government.  31 U.S.C. § 3729(a)(1)(A), (B), (C), & (G).

## C. THE MEDICARE AND MEDICAID FRAUD AND ABUSE STATUTE

32.     The Medicare and Medicaid Fraud and Abuse Statute provides, in part,

Whoever knowingly and willfully makes or causes to be made, or induces or seeks to induce the making of, any false statement or representation of a material fact with respect to the conditions or

---

[8] As adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990, 28 U.S.C. § 2461; *see also* 86 Fed. Reg. 70,741–46 (Dec. 13, 2021) (setting forth penalties effective after December 13, 2021, for conduct occurring after November 2, 2015).

operation of any institution, facility, or entity in order that such institution, facility, or entity may qualify (either upon initial certification or upon recertification) as a hospital, critical access hospital, skilled nursing facility, nursing facility, intermediate care facility for the mentally retarded, home health agency, or other entity (including an eligible organization under section 1395mm(b) of this title) for which certification is required under subchapter XVIII or a State health care program (as defined in section 1320a-7(h) of this title), or with respect to information required to be provided under section 1320a-3a of this title, shall be guilty of a felony and upon conviction thereof shall be fined not more than $100,000 or imprisoned for not more than 10 years, or both.

42 U.S.C. § 1320a-7b(c).

33.    Claims for payment that result from a violation of 42 U.S.C. § 1320a-7b(c) constitute false or fraudulent claims under the FCA.  42 U.S.C. § 1320a-7b(g). A violation of 42 U.S.C. § 1320a-7b(c) is a *per se* false or fraudulent claim under the FCA, and it is not necessary to plead or prove the violation was material to the Government's payment decision.  *See Guilfoile v. Shields*, 913 F.3d 178, 190 (1st Cir. 2019).

## V.    **FACTUAL ALLEGATIONS**

34.    Medicaid is the single largest programmatic activity of Rhode Island. In 2014, for example, Medicaid incurred $2.3 billion in annual state and federal expenditures, representing 38% of the State's General Fund expenditures.[9] Likewise,

---

[9] Finding 2014-005 of 2014 RI Audit, at D-11.   http://www.oag.ri.gov/reports/RI2014_FinStmt_Findings.pdf.

in fiscal year 2019, Rhode Island spent approximately $1.0 billion on Medicaid while the federal government paid approximately $1.6 billion.[10]

## A. GAINWELL'S OBLIGATIONS AS RHODE ISLAND'S FA

35.     Gainwell, albeit in several incarnations,[11] has been Rhode Island's Medicaid FA for nearly 30 years.  In late 2012, Gainwell was awarded a new five-year contract, to begin January 1, 2013, with three one-year options to extend.[12]  The contract was valued at $89.5 million.[13]  A new sole-source contract worth $104 million was executed between Rhode Island and Gainwell in April 2021.[14]

36.     Gainwell was hired to act as Rhode Island's FA and to upgrade and operate the state's Medicaid Management Information System (MMIS), the system used to process Medicaid claims.[15]  Gainwell's obligations included Program Integrity, Claims Review, Pharmacy Review, and Surveillance and Utilization

---

[10] *See* https://eohhs.ri.gov/sites/g/files/xkgbur226/files/2021-05/RIMedicaidExpenditureReport_SFY19.pdf, at p. 10.

[11] *See supra* ¶ 26 & n.4.

[12] *See* 2012 Agreement, http://www.transparency.ri.gov/contracts/bids/3306094_7449255.pdf.

[13] *Id.*

[14] http://www.transparency.ri.gov/contracts/bids/3717560_3717560.pdf.

[15] "The MMIS is conventionally organized into six core subsystems or functional areas.  They are:  Recipient; Provider; Claims Processing; Reference File; Surveillance and Utilization Review; and Management and Administrative Reporting."  State Medicaid Manual § 11110.  *See* https://www.cms.gov/Regulations-and-Guidance/Guidance/Manuals/Paper-Based-Manuals-Items/CMS021927.

Review.[16]   In particular, Gainwell was expressly tasked to take actions "to proficiently and proactively detect"

- Potential fraud, abuse or misuse by all providers and members
- Inappropriate billings and over payments, and violations by providers.[17]

37.     Gainwell agreed that it would "perform all of its functions according to the terms required by the SMM, Part 11."[18] Among the primary obligations under the SMM, Gainwell was required to review each Medicaid claim it received to ensure it met the following criteria:

- It contains all the required information;
- The information is internally consistent;
- The recipient who received the service and the provider who submitted the claim were certified as eligible to participate in the program on the date(s) of service;
- The service provided is covered under the program;
- The service does not exceed frequency limitations; and
- Any required prior authorizations or certifications have been obtained.

---

[16]  *See* 2011 Request for Proposal, https://purchasing.ri.gov/rivip/stateagency bids/7449255.pdf, at 102-04, 105-06, 117, 473-74.

[17] *See id*., at 128, SUR.18.3.2-18.3.3.

[18]  *See id* at 9.2.77.  HHS Sanctions.   The SMM is located at https://www.cms.gov/Regulations-and-Guidance/Guidance/Manuals/Paper-Based-Manuals-Items/CMS021927.

SMM § 11600; *see also* CMS Checklist at CA2-CA4; incorporated into RFP at p. 232.

38.     Further, the SMM required Gainwell to "[e]nsure that all recipients for whom input is submitted were eligible for the type of service at the time the service was rendered" and to "[v]erify that charges submitted by providers are reasonable and within acceptable limits." SMM § 11325(A).

39.     Section 11335(A) of the SMM required Gainwell to "[i]nvestigate and reveal misutilization of the State's Medicaid program by individual participants" and to "[p]rovide information [that] reveals and facilitates investigation of potential defects in the level of care and quality of service provided under the Medicaid program."

40.      In short, Gainwell was responsible for rejecting claims not meeting the federal screening criteria set forth in the SMM and elsewhere by CMS.

41.      Gainwell was also responsible for provider enrollment, including the enrollment of ESH.[19] According to SMM § 11320, the Provider Subsystem of the MMIS was required to, *inter alia*:

---

[19] Provider Enrollment involves receiving and processing provider enrollment and reenrollment information, including reviewing for completeness, obtaining missing information, performing eligibility approval, and entering approved data into the provider file.   *See also* RFP, https://purchasing.ri.gov/rivip/stateagencybids/7449255.pdf, p. 237, at MITA.50.  Provider Management – Disenroll RI Medicaid Provider; MITA.51.  Provider Management – Enroll RI Medicaid Provider.

- Ensure that providers are qualified to render specific services under the Medicaid program by screening applicants for State license and certification, by Specialty Board certification if appropriate, and by visit to the provider by a review team if necessary.

- Build and maintain a computerized file of provider data for claims processing, administrative reporting, and surveillance and utilization review.

- Review enrolled providers on a continuing basis to ensure that they continue to meet provider eligibility requirements.

42.    Gainwell failed to properly perform these functions with regard to claims from ESH.

### B. GAINWELL FAILED TO PERFORM MANY OF ITS OBLIGATIONS TO CMS

43.    ESH is a public hospital operated by BHDDH.  It purportedly treats patients with "acute and long-term medical illnesses, as well as patients with mental health conditions."[20] Among the services provided, ESH lists comprehensive mental health services, physical, occupational, speech, and respiratory therapies, ventilator care, and acute brain injury care.

44.    An ESH brochure states that its "focus is on recognizing each patient's individuality and their right to dignified and high-quality care."[21] At times relevant to this action, ESH was licensed to operate 230 beds across two campuses, with its

---

[20]    https://bhddh.ri.gov/sites/g/files/xkgbur411/files/documents/ESH-Brochure-02.18.2021.pdf.

[21] *Id.*

primary location at 111 Howard Avenue, Cranston, Rhode Island, 02920.[22] As of May 2021, ESH housed 188 patients, 96 of whom were classified as psychiatric patients.[23]

45.    Despite its critical role as an institution for vulnerable mental health patients, the hospital has struggled with financial woes for years.  These problems came to a head in 2019 when Ms. White, in her capacity as BHDDH's Chief Financial Officer and ESH's Interim Chief Executive Officer, raised concerns with Rhode Island state leaders that ESH was out of compliance with federal billing requirements and ordered that billing to Medicaid be stopped, resulting in a loss to Rhode Island of approximately $60 million in annual federal funding from CMS.[24]

46.    Between 2019 and 2021, Relators raised several billing concerns to BHDDH leaders including that: (1) ESH was a hospital, not a nursing home, as it was billing Medicaid, and (2) ESH was billing Medicaid on the basis of an unapproved – and exorbitant – cost-based payment methodology.[25] Relators raised

---

[22] ESH is now licensed to operate 178 beds following the separate licensure of its Roosevelt Benter Center in October 2022.

[23]   https://eohhs.ri.gov/sites/g/files/xkgbur226/files/2021-09/esh-independent-review-final_public -version_no-phi.pdf

[24] *See* https://eohhs.ri.gov/sites/g/files/xkgbur226/files/2021-05/RIMedicaidExpenditureReport _SFY19.pdf, at 32.

[25] Relators also became aware of numerous other improper and illegal practices occurring at ESH in the areas of patient care, drug utilization, and compliance, and also sought to rectify these violations.

a litany of other concerns as well, including that (1) ESH qualified as an Institute of Mental Diseases and, therefore, was prohibited from seeking Medicaid reimbursement for services to certain patients; (2) ESH was incapable of providing adequate LTACH care; and (3) very few of the patients actually needed the higher level of care for which ESH was billing.

47.     There has been a flurry of official activity concerning ESH following Relators' raising their concerns about the hospital.  A September 2021 CMS Audit confirmed many of Relators' concerns.  CMS found that ESH was not in compliance with 42 C.F.R. Part 482 because, among other reasons, ESH was "failing to operate as a Long-Term Care Hospital" and more than half of the patients that ESH cared for had a primary admitting diagnosis related to a psychiatric condition, making ESH an "Institute for Mental Disease."[26] Thereafter, CMS informed ESH that if it did not address the deficiencies found in the 2021 CMS Audit by April 14, 2022, CMS may terminate ESH's Medicare agreements.[27] In April 2022, although ESH made progress on some of the non-compliance issues identified in the 2021 CMS Audit,

---

[26] *See* Sept. 17, 2021, Center for Medicare & Medicaid Services OMB No. 0938-0391 ("2021 CMS Audit"), p. 1-6.

[27] *See* CMS January 14, 2022, Letter to ESH.

CMS also found additional problems related to patients' rights and gave ESH until August 15, 2022 to address the new deficiencies.[28]

48.     Multiple legislative actions have been taken in response to the concerns the Relators raised.  To address the patient-mix ratio that prevents ESH from billing Medicaid when it is considered an "Institute for Mental Disease," the State of Rhode Island has proposed to separate out ESH's Roosevelt Benton Center and transform it into a stand-alone psychiatric hospital, and it has been licensed as a standalone state forensic psychiatric hospital since October 2022.[29] To address the concerns that Relators raised that most ESH patients did not need hospital-level care, the State of Rhode Island has proposed creating  "community mental health facilities."[30] Finally, to address the improper billing methods, the State of Rhode Island has proposed a new behavioral health *per diem* reimbursement method.

---

[28] *See* https://www.wpri.com/target-12/feds-threaten-to-pull-funding-unless-eleanor-slater-fixes-violation/.

[29] *See* https://bhddh.ri.gov/ri-state-psychiatric-hospital/about-us; *see also* Budget Office's April 29, 2022, Memorandum re: New Article – Relating to the Rhode Island State Psychiatric Hospital (22-H-7123), *available at* https://omb.ri.gov/sites/g/files/xkgbur751/files/2022-05/GBA%2010_ New%20Article%20Relating%20to%20The%20Rhode%20Island%20State%20Ps ychiatric%20Hospital%20%20%2822-H-7123%29.pdf.

[30] *See generally* State of Rhode Island – An Act Relating to Behavioral Healthcare, Development Disabilities, and Hospital, *available at* https://webserver. rilegislature.gov/BillText22/ SenateText22/S2469.pdf.

### 1. *Gainwell permitted ESH to bill Medicaid as a nursing home.*

49.     As shown below, ESH has been licensed by the State of Rhode Island as a hospital since October 17, 1994, when it was created by the merger of three hospitals into the Eleanor Slater Unified Hospital System.



https://health.ri.gov/find/licensees/results.php?id=41680&license=HOS00102&prof=207.

50.     Rhode Island has never licensed ESH as a nursing facility.

51.    Nevertheless, as the screenshot below shows, ESH has represented itself to be a nursing home on its Medicaid claims for decades, which Gainwell allowed.



Example of ESH Medicaid billing.

52.    ESH even claimed to be a nursing home when it re-enrolled in Medicaid on its 2019 Medicaid application, declaring it had been one since 1993.[31]

---

[31] This conduct likely violates Rhode Island law as well.  *See* 216 R.I. Code R. 40-10-1.5 ("No person or governmental unit acting severally or jointly with any other person or governmental unit shall conduct, maintain or operate a or hold itself out as a nursing facility without a license in accordance with the requirements of R.I. Gen. Laws Chapter 23-17.").

```
Rhode Island Executive Office of Health and Human Services

Provider Enrollment Application:   4102001
Application Status:  Revalidate
Request Date:   10/04/2019              Reject Reason:
```

Request Information

```
Provider Enrollment Type:  Facility
                           Provider Type: Rhode Island State Nursing Home
            Requesting Enrollment
                      Effective Date: 04/01/1993
                      Contact Name: godiva laliberte
                      Contact Phone: 401-462-1405
            Ext:
                      Contact Email: godiva.laliberte@bhddh.ri.gov
            Preferred Method of
                      Communication: Email
```

Specialties

```
Specialty: No Provider specialty designated.         Taxonomy:282E00000X
Effective Date: 12/01/1993
Specialty: No Provider specialty designated.         Taxonomy:282N00000X
Effective Date: 12/01/1993
```

Provider Identification

```
            Provider Legal Name: ELEANOR SLATER HOSPITAL
                     Gender: Not Specified
            Birth Date:
            Ownership: Gov/profit
       Business Name:
              Tax ID: 056000522
        Tax ID Type: EIN
      Effective Date: 04/01/1993                      End Date:
12/31/2382
```

ESH's 2019 Medicaid re-enrollment application.

53.     There were many reasons ESH sought to disguise itself as a nursing home.  In particular, ESH was able to avoid CMS scrutiny of its extended lengths of stay, inadequate care, and inflated costs.  Such scrutiny would ordinarily have been applied to a hospital or other provider with annual Medicaid claims of approximately $100 million.

54.     Despite Gainwell's detailed obligations to process provider enrollment by performing eligibility approval for all Medicaid providers and to verify their

eligibility to submit claims to Medicaid, it improperly enrolled ESH as a nursing home and allowed ESH to submit claims to Medicaid, even though Gainwell knew ESH was not a nursing home.  Gainwell's actions were knowing or reckless.

55.     Had Gainwell not acted knowingly or recklessly in disregarding ESH's provider status and eligibility to bill Medicaid – a key responsibility of any FA[32] – ESH would have been precluded from billing as a nursing home.

### 2. Gainwell permitted ESH to use an inflated and illegal billing method.

56.     ESH also did not comply with the approved Medicaid reimbursement policies for either hospitals or nursing homes.  Instead, ESH created its own "all-cost" *per diem* reimbursement method, which it sought to legitimize retroactively – with limited success – with the 2021 Medicaid State Plan Amendment (SPA), made retroactive to April 2020.

57.     Until the 2021 SPA was approved, Rhode Island's Medicaid State Plan provided that all inpatient hospitals, including ESH, be paid on a Diagnosis-Related Group ("DRG") reimbursement method, whereby a hospital is paid a fixed amount based upon a patient's acuity (*i.e.*, severity of his illness) and diagnosis regardless of the amount the hospital actually spends treating the patient or the patient's actual

---

[32] *See* RFP, https://purchasing.ri.gov/rivip/stateagencybids/7449255.pdf, at PRV §§ 13.2, 13.4 (requiring review and approval of provider eligibility and enrollment).

length of stay in the hospital.[33] If the actual costs of the hospital stay are less than the reimbursement amount, the hospital gains further revenue. However, if the actual costs of the hospital stay are more than the reimbursement amount because a patient's length of stay is longer than expected, the hospital is not reimbursed for the difference.

58.   In contrast to the use of DRGs for hospitals, nursing homes are reimbursed based upon a patient's Resource Utilization Group ("RUG"), whereby a nursing home is paid a "Base *Per Diem* Rate" for each day a patient is admitted into the nursing home.[34]  The rate is based upon a patient's acuity and services needed (*e.g.*, minutes of physical therapy).  A patient's acuity is determined by a patient's Minimum Data Set Assessment ("MDS Assessment") survey focusing on a patient's functional capabilities and health needs that is completed upon a patient's admission and repeated at regular intervals thereafter.

59.   Whereas the DRG reimbursement method encourages hospitals to shorten stays and limit services, nursing homes using RUGs do not have an incentive to discharge patients because they are reimbursed for each day a patient is cared for.

---

[33] *See* Attachment 4.19-A (2019) to Rhode Island's Medicaid State Plan, *available at* RI-19-0006.pdf (medicaid.gov).

[34] "RUGs *Per Diem* Reimbursement Method" or just "RUGs." *See* Attachment 4.19-D (June 25, 2015) to Rhode Island's Medicaid State Plan, *available at* RI-13-006.pdf (medicaid.gov).

60.     ESH's reimbursement methodology complied with neither the approved DRG Single-Stay Reimbursement Method nor RUG *Per Diem* Reimbursement Method.  Because it is a hospital, ESH should have used the DRG method; instead, it billed as a nursing home on a *per diem* basis.  Further, unlike the RUG method, ESH's *per diem* rate was set at an extraordinarily high level using an "All Cost" method, including a myriad of non-covered costs such as parties, baseball games, transportation, and other improper expenses.

61.     Nonetheless, Gainwell accepted ESH's payment methodology, processing claims at grossly excessive rates throughout the relevant period.[35]

62.     In March 2020, EOHHS sought to allow ESH to resume billing Medicaid by submitting a Medicaid State Plan Amendment (the "2020 SPA") to adopt a cost-based methodology that ostensibly applied to all "state run" hospitals, but, as indicated by the March 24, 2020, Public Notice issued in connection with the 2020 SPA, was specifically sought to "codify the existing cost-based payment method for Eleanor Slater Hospital."[36] CMS did not approve the 2020 SPA until

---

[35] *See* RFP,  https://purchasing.ri.gov/rivip/stateagencybids/7449255.pdf, at OPS 1.2 (duty to reject claims); *id*. at 9.2.77.

[36] *See* March 24, 2020, Public Notice of 2020 SPA, https://eohhs.ri.gov/sites/g/files/xkgbur226/files/Portals/0/Uploads/Documents/Notice-to-Public_ESH-combined-for-posting.pdf.

March 25, 2021, but it was applied – and Medicaid was billed – retroactively to April 1, 2020.[37]

63.    Notably, then, prior to April 2020, ESH was not eligible for FFP when billing through its *sui generis* cost-based payment methodology.  Even after April 2020, moreover, the SPA method only allows for the "all cost" method for patients "awaiting discharge."

64.    The motivation for ESH's fraudulent billing practices is patent: in 2019, ESH typically charged Medicaid around $43,000 a month, or $516,000 a year, per patient.  This is more than four times the average annual cost for a patient in a Rhode Island nursing home, approximately $120,000,[38] and much more than the approximately $47,000 that is the average total charge for a patient in an LTACH under a DRG reimbursement method.[39]  Given ESH's average length of stay, 9.3 years, Medicaid was charged an average of $4.8 million a patient. This large per-patient cost is a direct result of ESH's *per diem* billing method as well as ESH's extended length of stay.  It allowed ESH to charge Medicaid approximately $100 million a year for fewer than 200 patients.

---

[37] CMS March 25, 2021, Approval of 2020 SPA, *available at* RI-20-0008.pdf (medicaid.gov).

[38] *See* https://www.medicaidplanningassistance.org/nursing-home-costs/.

[39] *See* https://www.medpac.gov/wp-content/uploads/2021/11/medpac_payment_basics_21_ltch__final_sec.pdf.

65.    ESH's fraud would not have been possible without Gainwell's approval of the claims for inflated *per diem* rates set by ESH that did not conform to any lawful reimbursement method included in the Rhode Island Medicaid policies. Gainwell knowingly or recklessly processed thousands of these "all cost" claims and paid ESH millions of dollars for expenses that were not reimbursable.

### 3. Gainwell failed to perform adequate audits, prior authorizations, utilization reviews, and other procedural billing review requirements regarding ESH.

66.    Although Gainwell agreed to perform various Medicaid processes that are designed to ensure the appropriateness of billing and compliance with law and prevent fraudulent claims from being paid by the government, it did not adequately conduct or verify that these procedures were being followed with regard to billing from ESH.  For example, it did not adequately perform Utilization Review, a core FA function, to ensure that the services being paid for were medically necessary, leading to the payment of numerous unnecessary services at ESH.[40]

67.    Similarly, according to the SMM, Gainwell was required to examine the claim to ensure that "any required prior authorizations or certifications were obtained."  SMM Sec. 11600.  This was another core MMIS function under the

---

[40] *See* RFP,  https://purchasing.ri.gov/rivip/stateagencybids/7449255.pdf, at 4.3.5 at p. 64 (Utilization management part of core MMIS functions).

Agreement.[41]   Indeed, prior authorization for admission to ESH was specifically required by the Rhode Island Medicaid program.[42] Gainwell never reviewed whether there was prior authorization to be admitted to ESH.

68.     Although Gainwell agreed to perform activities to detect potential fraud by providers and beneficiaries, it knowingly or recklessly did not perform those activities regarding claims from ESH.   Rather, Gainwell knowingly facilitated ESH's efforts to fraudulently bill Medicaid by processing thousands of inappropriate billings and overpayments and allowing multiple ongoing violations at ESH to continue unabated.

### 4. Gainwell failed to deny other payment claims from ESH that did not meet legal requirements.

69.     Gainwell breached numerous other duties it owed to the federal government regarding ESH's billing.  These breaches were helpful to Rhode Island political leaders, who controlled renewals of Gainwell's lucrative FA contract with Rhode Island, and who were under pressure by ESH employee unions to keep the facility open.

---

[41] *Id.*

[42] *See* March 24, 2020, Public Notice of 2020 SPA, at 2, https://eohhs.ri.gov /sites/g/files/xkgbur226/files/Portals/0/Uploads/Documents/Notice-to-Public_ESH-combined-for-posting.pdf, at p. 2.

### a. **Gainwell failed to pursue third-party Liability for ESH patients as promised.**

70.     Medicaid is the payor of last resort.[43]   If a patient is eligible for Medicaid but has some other type of coverage including Medicare or private insurance, those payers must be billed first.   Such patients are referred to as "dual-eligible" and the other insurance coverage as Third-Party Liability coverage (TPL).

71.     Gainwell did not assess coverage for dual-eligible patients and, thus, incorrectly billed Medicaid for costs that Medicare or a TPL should have paid.  This failure violated Gainwell's promise to manage Rhode Island's TPL efforts.[44]

---

[43] "A. Medicaid is the payor of last resort.  Community, public, and private resources such as federal Medicare, Blue Cross/Blue Shield, Veteran's Administration benefits, accident settlements, or other health insurance plans must be utilized fully before payment from the Medicaid program can be authorized." 210 R.I. Code R. 20-00-1.3.

"A. Medicaid is always the payer of last resort.  Accordingly, EOHHS considers all other health insurance or coverage provided to a Medicaid-eligible individual as third-party liability (TPL) coverage.   EOHHS reserves the right to disenroll Medicaid beneficiaries with TPL from Medicaid managed care and enroll them in RIte Share.  This is called RIte Share Zero Premium." 210 R.I. Code R. 30-05-3.14.

"Third party liability" or "TPL" means other health insurance coverage.  This insurance is in addition to Medicaid and is usually provided through an employer. Since Medicaid is always payer of last resort, the TPL is always the primary coverage." 210 R.I. Code R. 30-05-3.3.

[44]   *See*   RFP,   https://purchasing.ri.gov/rivip/stateagencybids/7449255.pdf,   at OPS.3.7; *see also* ESH_002641 – July-Dec 2020 Medicaid Billing, attached as Exhibit 21 (reflecting further Medicaid charges from Patient No. X020082 during July-Dec. 2020).

72.    In its Agreement with the State, Gainwell promised to undertake detailed activities with regard to TPL.  For example, Gainwell agreed to perform Data Matching with health plans to identify unreported health plans and to provide pay and recover activities with third parties including identifying and billing all pay and recover claims.[45]

73.    Gainwell also agreed that it would "implement functionality to support enhancement of TPL identification and recovery efforts, application of cost recoveries, accounts receivable processing, and the development of a multi-use Case Tracking tool for immediate use in Casualty and Estate Recovery efforts and SURS Integrity case tracking."[46]

74.    Gainwell also promised that it would "Obtain the maximum cost avoidance and reimbursement for Medicaid Beneficiaries covered by other insurance."[47]

75.    As to claims from ESH, Gainwell failed to perform these services regarding claims from ESH.

76.    The reason Gainwell failed to perform the TPL identification and recovery services, which it promised to perform and for which the Government paid,

---

[45] *See id.*, at p. 459-61, OPS 3.0, 3.1 and 3.7.

[46] *See id.*, at p. 169, Section 6.2.2, Detailed Requirements for Third Party Liability.

[47] *See id.*

is that TPL coverage providers have their own processes to detect fraud and abuse. The TPL coverage providers would have detected and rejected ESH's fraudulent billing, and they likely would have alerted others as to ESH and Gainwell's fraud.

### b. Gainwell permitted ESH to bill for inappropriate civil psychiatric admissions.

77.    For years and likely decades ESH admitted and billed for civil psychiatric patients that came to the hospital after having been stabilized as an inpatient at a psychiatric facility. None of these patients was acute at the time of admission, so billing under ESH's acute licensure was inappropriate and resulted in false claims.

78.    Gainwell's failure to deny these false claims violated several of its claims review obligations as set forth above.

### c. Gainwell's malfeasance permitted numerous other false claims to be processed and paid.

79.    Gainwell's failure to provide proper oversight of claims submitted by ESH permitted the hospital's rampant abuse of the Medicaid program and misuse of federal funds.  Other examples of false claims include Medicaid claims for

- "forensic" patients and Rhode Island state prisoners, who are not eligible for Medicaid;[48]

---

[48] Pursuant to Rhode Island law, it is the duty of the fiscal agent to investigate whether prisoners transferred to ESH had an estate that could otherwise cover the cost of their care.  R.I. Gen. Laws 1956, § 40.1-5.3-12.

- patients who were ineligible for care in a nursing home, much less hospital care, including for a discharged patient who was re-admitted due to "loneliness" or others who were kept at ESH due to a fear of leaving;

- the perpetrators of horrific crimes in Rhode Island who had served their sentences but who were kept at ESH without medical need so that state government did not need to deal with their potentially complicated re-entry into society;

- undocumented immigrants who are not eligible for Medicaid;

- patient care for adult patients aged 21 to 64 even though ESH in fact was an Institute for Mental Disease ("IMD") and so those patients were ineligible for Medicaid coverage;[49]

- ostensibly "medical" patients admitted to ESH without requiring hospital-level care but kept there in an effort to maintain ESH's ostensible IMD balance in order to allow billing to Medicaid to continue; and

- people admitted to ESH by court order for competency restoration, who were not eligible for Medicaid.

80.     Gainwell knowingly or recklessly failed to deny Medicaid claims:

---

[49] *See* SMM § 4390(A)(1).  IMDs are facilities that primarily treat patients with mental diseases.  *Id.* at § 4390(A)(3).  The so-called IMD Exclusion prohibits Medicaid payments for services provided to adults aged 21 to 64 years old who are patients of IMDs, *Id*. at § 4390(A)(2) "Mental disease" is an antiquated term used in the statute.  It comprises "diseases listed as mental disorders in the International Classification of Diseases, with the exception of mental retardation, senility, and organic brain syndrome.  The Diagnostic and Statistical Manual of Mental Disorders (DSM) is a subsection of the mental disorder chapter of the ICD and may also be used to determine whether a disorder is a mental disease." https://www.cms.gov/Regulations-and-Guidance/guidance/Manuals/Paper-Based-Manuals-Items/CMS021927.html; *see also* https://eohhs.ri.gov/sites/g/files/xkgbur226/files/Portals/0/Uploads/Documents/IMD210__ricr__new_imdregulationORR-APPROVED-REFORMATEDCLEAN-to-SoS-4.7.20.pdf.

- that lacked sufficient detail to properly process.  All of ESH's claims were processed with just one of four revenue codes, all of which were ER codes, without specifying any encounters;

Rate change request effective January 1, 2019.

Rates based the FY 2018 "as" filed Medicare Cost Report.

| Eleanor Slater Hospital - Provider # 410200 | EDS Bill Type | 1/1/19 - 12/31/19 New Rates | 1/1/18 - 12/31/18 Prior Rates | Difference |
|---|---|---|---|---|
| All Inclusive Rate ~~Part A, B & D~~ *#A-5 Medicare ∅* | 253 | $ 1,512.13 | $ 1,465.42 | $ 46.71 |
| Bill Type 253 ~~minus Part B "Physician Only"~~ *B only* | 273 | $ 1,436.50 | $ 1,409.73 | $ 26.77 |
| Bill Type 253 ~~minus Part D~~ *A only* | 293 | $ 1,477.33 | $ 1,427.36 | $ 49.97 |
| Bill Type 253 ~~minus Part B & D~~ *A + B* | 263 | $ 1,401.70 | $ 1,371.67 | $ 30.03 |

| Zambarano Group Homes | Provider # | | | |
|---|---|---|---|---|
| East Wallum Lake | EW12083 | $ 805.14 | $ 1,057.26 | $ (252.12) |
| Mowry Avenue | LC1616 | $ 808.68 | $ 834.80 | $ (26.12) |

- for days the patients were not at ESH;

- when patient's "go on vacation" (*e.g.*, attending a Patriots game). Instead, Gainwell processed claims for staff to attend the event and continue to get overtime pay;

- for transportation services provided via cab and other questionable expenses, such as funeral expenses, hair dressing, and Halloween candy;

- for "direct admits" when "observation status" would have been more appropriate because ESH had no "observation status" beds or documentation process.

81.     Gainwell did nothing to detect and prevent fraudulent claims submitted by ESH.[50]  Instead, Gainwell knowingly or recklessly facilitated wrongful payments in excess of approximately $100 million a year.

## C. GAINWELL'S CONDUCT WAS KNOWING OR RECKLESS.

82.     Gainwell was aware or should have been aware of the foregoing improper billing practices.  For example, among the reasons Gainwell must have known that ESH was improperly billing as a nursing home was that ESH did not undertake to satisfy several federal and state nursing home requirements aimed at reducing institutionalization and protecting those patients that must be institutionalized.  Sadly, ESH was, in reality, just such an institution, but one licensed as a hospital and masquerading as a nursing home.  Because it was licensed as a hospital, it was not held to nursing home standards, leaving the most vulnerable patients unprotected.  Gainwell knowingly facilitated this fraudulent charade.

83.     Gainwell would also receive notice annually of which nursing facilities are eligible for payment under Medicaid.[51] Because ESH was never certified as a

---

[50] *Cf.* RFP,  https://purchasing.ri.gov/rivip/stateagencybids/7449255.pdf, at p. 128, SUR.18.3.2-18.3.3.

[51] *See* https://eohhs.ri.gov/ProvidersPartners/ProviderManualsGuidelines/ Medicaid ProviderManual/LongTermCare/LongTermCarePolicy.aspx#15.9          ("Providers obtain license renewal through RIDOH and then forward a copy of the renewal documentation to DXC Technology [Gainwell].")

nursing facility, it did not forward its license renewal as a nursing facility to Gainwell, which overlooked this failure.

> ### 1. *Gainwell did not require ESH to satisfy federal regulatory requirements applicable to nursing homes because it knew ESH was not a nursing home.*

84.    Preadmission Screening and Resident Review ("PASRR") is a federal requirement for nursing facilities to help ensure that individuals are not warehoused for long-term care.[52]

85.    BHDDH has explained that PASSR

was created [in 1987] as a way to protect individuals with Mental Illness (MI), Intellectual/Developmental Disabilities (I/DD), or related conditions (RC) from inappropriate placement in nursing facilities. These individuals go through an intensive screening process, first to determine whether or not they have mental illness, intellectual/developmental disabilities, or related conditions, then again to decide whether they belong in a Medicaid-certified nursing facility.

---

[52] *See* https://www.medicaid.gov/medicaid/long-term-services-supports/institutional-long-term-care/preadmission-screening-and-resident-review/index.html (stating that "PASRR is an important tool for states to use in rebalancing services away from institutions and towards supporting people in their homes, and to comply with the Supreme Court decision, *Olmstead vs L.C.* (1999), under the Americans with Disabilities Act, individuals with disabilities cannot be required to be institutionalized to receive public benefits that could be furnished in community-based settings. PASRR can also advance person-centered care planning by assuring that psychological, psychiatric, and functional needs are considered along with personal goals and preferences in planning long-term care."); 42 U.S.C. § 1396r(e)(7).

PASRR determinations must consider all possible community services first and recommend institutional placement only when appropriate.[53]

86.     The July 2019 Rhode Island Medicaid Program Provider Update provides information about the requirement of PASRR review in order to secure Medicaid reimbursement.  "PASRR - Level I Screen - It is mandatory for a nursing facility that receives federal dollars, regardless of a patient's insurance, to conduct a Level I PASRR screening either before or on the day of admission . . . . Please note that if a PASRR has not been submitted, the nursing facility will not be eligible for payment (due to PASRR Non-Compliance) and cannot bill the client or their family for those dates of service."[54]

87.     Curiously, however, the Update – which is neither regulatory nor authoritative and appears to be a joint publication of FA DXC, Gainwell's immediate predecessor, and Rhode Island EOHHS[55] – expressly exempts ESH from the PASRR requirements: "This requirement excludes Eleanor Slater Hospital, The Tavares Pediatric Center and RICLASS facilities."[56]

---

[53] *See* https://bhddh.ri.gov/mental-health/provider-and-professional-information/pre admission-screening-and-resident-review#:~:text=In%201987%2C%20Preadmission%20Screening%20and,inappropriate%20placement%20in%20nursing%20facilities.

[54] *See* https://eohhs.ri.gov/sites/g/files/xkgbur226/files/2021-03/pu318.pdf, at 3.

[55] On the first page, the newsletter notes that "To Subscribe or update your email address Send an email to: riproviderservices@dxc.com or click the subscribe button above."

[56] *See id*. at 8.

88.     Of course, ESH was a hospital and so not required to comply with these requirements in any event.  But the fact that Gainwell knowingly allowed ESH to bill as a nursing home yet did not require ESH to satisfy the PASRR requirement demonstrates that Gainwell knew ESH was not, in fact, a nursing home.

### 2. Gainwell did not require medication monitoring or other requirements mandated by federal law for nursing homes.

89.     In 1987, the Federal Nursing Home Reform Act (FNHRA) became law as part of the Omnibus Budget Reconciliation Act of 1987.  It was the first major revision of the federal standards for nursing home care since the 1965 creation of both Medicare and Medicaid.  42 U.S.C § 1396r, 42 U.S.C. § 1395i-3.  Nursing facilities participating in Medicaid or Medicare were now required to provide services so that each resident can "attain and maintain her highest practicable physical, mental, and psycho-social well-being."

90.     In particular, FNHRA imposes strict restrictions and review procedures on the use of psychopharmacologic drugs on nursing home residents paid for by Medicaid.  "Psychopharmacologic drugs may be administered only on the orders of a physician and only as part of a plan (included in the written plan of care described in paragraph (2)) designed to eliminate or modify the symptoms for which the drugs are prescribed and only if, at least annually an independent, external consultant reviews the appropriateness of the drug plan of each resident receiving such drugs."

42 U.S.C.A. § 1396r(c)(1)(D); *see also*, 42 U.S.C.A. § 1395i-3(c)(1)(D) (similar Medicare requirement).

91.    Regulations also require a "drug regimen review" on a monthly basis by a licensed pharmacist, with a focus on psychotropic drugs, and a requirement to eliminate the prescription of "unnecessary drugs."   42 C.F.R. § 483.45(c) and (d).

92.    Specifically, under 42 C.F.R. § 483.45(e) Based on a "comprehensive assessment" of each resident, the facility "must ensure" that

> (1) Residents who have not used psychotropic drugs are not given these drugs unless the medication is necessary to treat a specific condition as diagnosed and documented in the clinical record;
>
> (2) Residents who use psychotropic drugs receive gradual dose reductions, and behavioral interventions, unless clinically contraindicated, in an effort to discontinue these drugs;
>
> (3) Residents do not receive psychotropic drugs pursuant to a PRN order unless that medication is necessary to treat a diagnosed specific condition that is documented in the clinical record;
>
> (4) PRN orders for psychotropic drugs are limited to 14 days.  Except as provided in § 483.45(e)(5), if the attending physician or prescribing practitioner believes that it is appropriate for the PRN order to be extended beyond 14 days, he or she should document their rationale in the resident's medical record and indicate the duration for the PRN order; and
>
> (5) PRN orders for anti-psychotic drugs are limited to 14 days and cannot be renewed unless the attending physician or prescribing practitioner evaluates the resident for the appropriateness of that medication.

42 C.F.R. § 483.45(e).

93.    In addition, FNHRA also provides that

[a] nursing facility must protect and promote the rights of each resident, including each of the following rights: … (ii) Free from restraints; The right to be free from physical or mental abuse, corporal punishment, involuntary seclusion, and any physical or chemical restraints imposed for purposes of discipline or convenience and not required to treat the resident's medical symptoms. Restraints may only be imposed-- (I) to ensure the physical safety of the resident or other residents, and (II) only upon the written order of a physician that specifies the duration and circumstances under which the restraints are to be used (except in emergency circumstances specified by the Secretary until such an order could reasonably be obtained).

42 U.S.C.A. § 1396r(c)(1)(A)(ii)

94.     Although ESH billed Medicaid as a nursing home and was paid as such by Gainwell, ESH failed to comply with these patient protective rules. As a result of Gainwell's reckless conduct, patients were over-medicated as well as chemically and physically restrained in violation of law.

**D. GAINWELL ACCEPTED SUBSTANTIAL FEDERAL FUNDS AS PARTIAL PAYMENT FOR ITS SERVICES.**

95.     The fees Gainwell was paid for these services derived, in part, from federal funds. The federal matching rate, or FMAP,[57] for a state's expenditures on its Medicaid program ranges from a minimum of 50% to 90% for certain aspects of the program.[58]

---

[57] Pursuant to 42 C.F.R. § 400.203, "FMAP stands for the Federal medical assistance percentage, which is used to calculate the amount of Federal share of State expenditures for services."

[58] *See, e.g.*, https://www.kff.org/wp-content/uploads/2013/01/8352.pdf.

96.     For Rhode Island, the FMAP paid by the federal government for actual Medicaid claims ranged between 50% and 60% from 2013 to 2021.[59]

97.     Among programs that give rise to higher federal participation rates is the MMIS – in particular, the costs of upgrading it.[60]  The federal share, called the FFP,[61] can be up to 75% for operation of the MMIS and up to 90% for the design, development, and installation of the upgraded MMIS. *Id.*

98.     The federal government and Rhode Island have incurred significant administrative expenses relating to the Rhode Island MMIS system in recent years as Rhode Island sought to upgrade the system.  Gainwell's fees comprise the bulk of the "MMIS private" administrative expenses, which approach $195 million total, with a $153 million federal share, over the eight-year span 2013 to 2020.[62]

99.     In submitting its invoices for services and accepting federal funds as compensation, Gainwell impliedly certified that it was entitled to such payment and,

---

[59]   *See*   https://www.kff.org/medicaid/state-indicator/federal-matching-rate-and-multiplier/?ActiveTab=graph&currentTimeframe=0&startTimeframe=19&selected Rows=%7B%22states%22:%7B%22rhode-island%22:%7B%7D%7D%7D&sort Model=%7B%22colId%22: %22Location%22 ,%22sort%22:%22asc%22%7D.

[60]   *See*   https://www.medicaid.gov/medicaid/data-systems/medicaid-management-information-system/index.html.

[61] *Id.* ("Federal financial participation (FFP) means the Federal Government's share of a State's expenditures under the Medicaid program.").

[62] *See* https://www.medicaid.gov/medicaid/financial-management/state-expenditure-reporting-for-medicaid-chip/expenditure-reports-mbescbes/index.html.

further, that its services had been provided in compliance with its contractual obligations and federal and state law.

### E. GAINWELL'S RECKLESS CONDUCT WAS MATERIAL TO THE GOVERNMENT'S DECISION TO PAY ESH'S FALSE CLAIMS AND GAINWELL'S FEES.

100.   Because ESH's false claims for payment resulted from a violation of 42 U.S.C. § 1320a-7b(c) – ESH and Gainwell's false representation that ESH qualified as a nursing home for Medicaid billing – the claims were false or fraudulent *per se* and the Plaintiff-Relators do not need to plead or prove materiality to the government's decision to pay the claims. *See Guilfoile v. Shields*, 913 F.3d 178, 190 (1st Cir. 2019).

101.   Regardless, Gainwell's reckless and unlawful acts resulted in a substantial breach of safeguards intended to protect precious taxpayer dollars, maintain the integrity of the Medicaid program, and ensure the appropriate delivery of services to Medicaid clients.  As a result of the conduct of both Gainwell and ESH, the Medicaid program suffered a substantial loss of funds and was deeply compromised.

| Fiscal Year | ESH Claims | FMAP Rate | Federal Portion of ESH Claims |
|---|---|---|---|
| FY 2016 | $104,390,000 | 0.5042 | $52,633,438 |
| FY 2017 | $112,420,000 | 0.5102 | $57,356,684 |
| FY 2018 | $116,435,000 | 0.5145 | $59,905,807.5 |

| Fiscal Year | ESH Claims | FMAP Rate | Federal Portion of ESH Claims |
|---|---|---|---|
| FY 2019 | $116,435,000 | 0.5257 | $61,209.879.5 |
| FY 2020* | $  30,360,000 | 0.5915 | $17,957,940 |
| FY 2021^ | $  18,864,291 | 0.6029 | $11,373,281 |
| Totals: | $498,904,291 | | $260,437,030 |

*Stopped billing Medicaid October 2019 through April 2020, retroactively
^ July to December 2020 only.

102.   Gainwell's approval of ESH's false claims as a nursing home was material to CMS's decision to pay ESH more than $260 million over a six-year period.

103.   Gainwell's approval of ESH's false cost-based payment methodology was material to CMS's decision to pay ESH more than $260 million over a six-year period.

104.   But for Gainwell's reckless conduct, such claims would have been rejected and not paid.

105.   Gainwell's implied certification that it was complying with all of its obligations to the United States therefore was false.

106.   Gainwell's false implied certification was material to CMS's decision to pay more than $100 million for Gainwell's fees.

# VI.   CAUSES OF ACTION

## COUNT ONE
### (VIOLATION OF 31 U.S.C. § 3729(A)(1)(A))

107.   Relators re-allege and incorporate by reference the allegations contained in the preceding paragraphs of this Amended Complaint.

108.   This is a claim for treble damages and civil penalties under the False Claims Act, 31 U.S.C. § 3729(a)(1)(A).

109.   Eleanor Slater Hospital is a licensed hospital deemed a LTACH by CMS that, *inter alia*, falsely represented itself to be a nursing home and charged government payors improper and excessive fees for its services.  Gainwell knew or should have known of this illegal scheme and prevented it pursuant to its obligations under contract and under federal and state law.

110.   By virtue of the knowing or reckless conduct described above, Gainwell knew ESH presented or caused to be presented false or fraudulent reimbursement claims to the Rhode Island Medicaid program funded, in part, by the United States government.  Nevertheless, Gainwell processed ESH's false claims and caused them to be presented for payment in violation of state and federal law.

111.   Having certified compliance with state and federal law, Gainwell knowingly presented or caused to be presented false or fraudulent claims for reimbursement for its services as a Fiscal Agent.  Gainwell knowingly and

intentionally submitted these false or fraudulent claims in order to seek payment from the United States government.

112.   The United States, unaware of the false or fraudulent nature of the claims that Gainwell caused to be submitted, paid claims that otherwise would not have been allowed.

113.   By reason of these payments, the United States has been damaged, and continues to be damaged, in a substantial amount.

## COUNT TWO
### (VIOLATION OF 31 U.S.C. § 3729(A)(1)(B))

114.   Relators re-allege and incorporate by reference the allegations contained in the preceding paragraphs of this Amended Complaint.

115.   This is a claim for treble damages and civil penalties under the False Claims Act, 31 U.S.C. § 3729(a)(1)(B).

116.   By virtue of the knowing or reckless conduct described above, Gainwell knew ESH presented or caused to be presented false or fraudulent reimbursement claims to the Rhode Island Medicaid program funded, in part, by the United States government.  Nevertheless, Gainwell processed ESH's false claims and submitted them for payment using false records or statements material to the false or fraudulent claims submitted by ESH.

117.   Having certified compliance with state and federal law, Gainwell knowingly submitted false or fraudulent claims for reimbursement for its services

as a Fiscal Agent using false records or statements material to the false or fraudulent claims.  Gainwell knowingly and intentionally submitted these false or fraudulent claims in order to seek payment from the United States government.

118.  The United States, unaware of the false or fraudulent nature of the claims for which these false records or statements were material, paid claims that otherwise would not have been allowed.

119.  By reason of these payments, the United States has been damaged, and continues to be damaged, in a substantial amount.

## COUNT THREE
### *(VIOLATION OF 31 U.S.C. § 3729(A)(1)(G))*

120.  Relators re-allege and incorporate by reference the allegations contained in the preceding paragraphs of this Amended Complaint.

121.  This is a claim for treble damages and civil penalties under the False Claims Act, 31 U.S.C. § 3729(a)(1)(G).

122.  By virtue of the knowing and/or reckless conduct described above, Gainwell knowingly made, used, or caused to be made or used a false record or statement to conceal, avoid, or decrease its obligations and ESH's obligations to pay or transmit money or property to the Rhode Island Medicaid program funded, in part, by the federal government.

123.   The United States, unaware of the false or fraudulent nature of the claims for which these false records or statements were material, did not seek reimbursement for the false claims it paid.

124.   By reason of these payments, the United States has been damaged, and continues to be damaged, in a substantial amount.

### COUNT FOUR
### *(VIOLATION OF 31 U.S.C. § 3729(A)(1)(C))*

125.   Relators re-allege and incorporate by reference the allegations contained in the preceding paragraphs of this Amended Complaint.

126.   This is a claim for treble damages and civil penalties under the reverse false claims provision of the False Claims Act, 31 U.S.C. § 3729(a)(1)(C).

127.   By virtue of the knowing and/or reckless conduct described above, Gainwell conspired with ESH to submit false and fraudulent claims, to make, use, or cause to be made or used, false records or statements material to false and fraudulent claims, and to conceal obligations to pay money to the Government, in violation of 31 U.S.C. § 3729(a)(1)(A), (B), and (G).

128.   In particular, Gainwell and ESH agreed to get ESH's false and fraudulent Medicaid claims allowed or paid by the Government and committed multiple overt acts in furtherance of that agreement, to wit:

a.  Gainwell agreed to allow and did allow ESH to bill as a nursing home
despite actual knowledge that ESH was not a nursing home, because doing
so allowed ESH to overcharge Medicaid;

b.  Gainwell agreed to allow and did allow ESH to bill as a nursing home
under a hospital-appropriate DRG reimbursement method instead of the
RUG method used for actual nursing homes, because doing so allowed
ESH to overcharge Medicaid;

c.  Gainwell agreed not to enforce and did not enforce the legal requirement
of prior authorizations for ESH admissions, because doing so allowed ESH
to overcharge Medicaid;

d.  Gainwell agreed not to seek and did not seek to identify and recover TPL
coverage for ESH patients, as required by law, because doing so would
cause third-parties to become aware ESH was overcharging Medicaid; and

e.  As described in detail above, Gainwell additionally agreed to allow and
did allow ESH to bill for services not eligible for reimbursement and for
services provided to persons not eligible for Medicaid benefits, because
doing so allowed ESH to overcharge Medicaid.

129.  Gainwell's motive for entering into this illicit agreement to facilitate
ESH's false and fraudulent Medicaid billing, and for undertaking overt acts in
furtherance of the agreement, was money.  Gainwell conspired with ESH to defraud

Medicaid to keep its lucrative FA contract with Rhode Island, worth well over $100 million from 2013 to 2020.

130.   The United States, unaware of the false or fraudulent nature of the claims that Gainwell and ESH conspired to submit, or of the false records and statements Gainwell and ESH conspired to make or use, or cause to be made or used, that were material to the false and fraudulent claims submitted, paid claims that otherwise would not have been allowed and did not seek reimbursement for the false claims it paid.

131.   By reason of this conspiracy and these payments, the United States has been damaged, and continues to be damaged, in a substantial amount.

## VII.   <u>PRAYER FOR RELIEF</u>

132.   **WHEREFORE:**  Relators request that judgment be entered against Gainwell, ordering that:

(i)      Gainwell cease and desist from violating the False Claims Act, 31 U.S.C. § 3729, *et seq*.;

(ii)     Gainwell pay the United States not less than $11,803 and not more than $23,607[63] for each violation of 31 U.S.C. § 3729, plus three times the amount of damages the United States has sustained because of Gainwell's actions;

---

[63] As adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990, 28 U.S.C. § 2461; *see also* 86 F.R. 236, at 1765 (DOJ Dec. 13, 2021) (setting forth penalties effective after December 13, 2021, for conduct occurring after November 2, 2015).

(iii)   The Relators be awarded the maximum "relator's share" allowed pursuant to 31 U.S.C. § 3730(d);

(iv)   The Relators be awarded all costs of this action, including attorneys' fees, pursuant to 31 U.S.C. § 3730(d);

(v)   Gainwell be enjoined from concealing, removing, encumbering, or disposing of assets which may be required to pay the civil monetary penalties imposed by the Court;

(vi)   Gainwell disgorge all sums by which it has been enriched unjustly by their wrongful conduct; and

(vii)  The United States, the States, and the Relators recover such other relief as the Court deems just and proper.

## VIII.   REQUEST FOR TRIAL BY JURY

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff-Relators hereby demand a trial by jury.

Dated: September 13, 2024                Respectfully submitted,

*/s/ Henry T. Gaylord*
**BURNS & LEVINSON LLP**
Beth R. Myers (BBO #676043)
Paul R. Mastrocola (BBO #630664)
Henry T. Gaylord (BBO #713119)
125 High Street
Boston, MA  02110
Tel: 617.345.3000
Fax: 617.345.3299
bmyers@burnslev.com
pmastrocola@burnslev.com
hgaylord@burnslev.com

Reuben A. Guttman*
Traci L. Buschner*
Elizabeth H. Shofner*
**GUTTMAN, BUSCHNER & BROOKS PLLC**
1509 22nd Street, NW
Washington, D.C. 20037
Tel: 202-800-3001
Fax: 202-827-0041
rguttman@gbblegal.com
tbuschner@gbblegal.com
lshofner@gbblegal.com

Richard A. Harpootlian*
Phillip D. Barber*
**RICHARD A. HARPOOTLIAN, P.A.**
1410 Laurel Street (29201)
Post Office Box 1090
Columbia, SC 29201
(803) 252-4848
(803) 252-4810 (facsimile)
rah@harpootlianlaw.com
pdb@harpootlianlaw.com

*Counsel for Relators*

    * Admission *pro hac vice* to be sought.

## CERTIFICATE OF SERVICE

I hereby certify that a copy of this Amended Complaint was served upon the following persons, via Certified Mail, return receipt requested, on September 13, 2024.

*/s/ Henry T. Gaylord*

**VIA CERTIFIED MAIL**
**RETURN RECEIPT REQUESTED**

| United States | U.S. Attorney General Merrick Garland<br>United States Department of Justice<br>950 Pennsylvania Ave, NW<br>Washington, DC 20530<br><br>Mr. Andy Mao<br>Deputy Director, Commercial Litigation Branch - Fraud Section<br>United States Department of Justice<br>175 N. Street, NE<br>Washington, DC 20002<br><br>Hon. Joshua S. Levy<br>Acting U.S. Attorney – District of Massachusetts<br>John Joseph Moakley U.S. Courthouse<br>1 Courthouse Way, Suite 9200<br>Boston, MA 02210 |
| --- | --- |