UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA <u>ex rel.</u> JENNIFER WHITE, BRIAN DALY, M.D., and ANDREW STONE, M.D., M.P.H., <br><br>Plaintiff-Relators, <br><br>v. <br><br>GAINWELL TECHNOLOGIES LLC, f/k/a HEWLETT PACKARD ENTERPRISES, LLC, and DXC TECHNOLOGY CO., <br><br>Defendant. | Civil No. 22-10953-LTS |

ORDER ON PLAINTIFF-RELATORS' MOTION FOR LEAVE
TO FILE A SECOND AMENDED COMPLAINT (DOC. NO. 85)

December 5, 2025

SOROKIN, J.

Plaintiff-Relators Jennifer White, Brian Daly, and Andrew Stone (collectively,

"Relators") bring a qui tam action against Gainwell Technologies LLC ("Gainwell"), alleging

that Gainwell violated the False Claims Act ("FCA"), 31 U.S.C. § 3729. Relators allege that

Gainwell facilitated a years-long scheme by Eleanor Slater Hospital ("ESH"), a Rhode Island

state hospital, to submit false Medicaid reimbursement claims. The Court previously allowed

Gainwell's motion to dismiss Relators' First Amended Complaint. Doc. No. 81.[1] Since then,

---

[1] Citations to "Doc. No. __" reference items filed on the electronic docket ("ECF") in the action
that is the subject of this Order; pincites are to the page numbers in the ECF header or, where
applicable, to the paragraph numbering within the document.

Relators have moved for leave to file a Second Amended Complaint, which attempts to resolve the deficiencies that the Court identified in its dismissal order.  Doc. No. 85.  For the reasons that follow, the Court ALLOWS Relators' motion for leave to amend.

I.    BACKGROUND

Relators originally brought their Complaint on June 17, 2022, as a sealed qui tam action. Doc. No. 1.  Two years later, the United States declined to intervene.  Doc. No. 21.  Relators subsequently filed their First Amended Complaint, Doc. No. 31, and Gainwell moved to dismiss, Doc. No. 63.  The Court dismissed the First Amended Complaint upon finding that Relators had not sufficiently pled claims of fraud.  Doc. No. 81.  At the same time, the Court also rejected Relators' then-presented request for leave to amend, noting that "Relators did not identify in their Opposition how filing a second amended complaint would cure infirmities of the first or otherwise represent that they could plead additional facts which might cure its deficiencies."  Id. at 19.  However, the Court permitted Relators to "file a motion for leave to amend within thirty days" of the dismissal order.  Id.  Relators did so, filing the motion now pending along with their proposed Second Amended Complaint.  Doc. No. 85.

The following facts are drawn from the proposed Second Amended Complaint.  Doc. No. 85-1.[2]  In 2012, Rhode Island hired Gainwell to serve as the state's fiscal agent to administer its Medicaid program.  Id. ¶ 29.  In this role, Gainwell was charged with operating the state's Medicaid claims-processing system (Medicaid Management Information System or "MMIS"), reviewing and approving Medicaid claims, managing provider enrollment, and detecting potential fraud.  Id. ¶¶ 30-36.  However, Relators allege that instead of screening and rejecting

---

[2] Doc. No. 85-1 includes both the Second Amended Complaint and its attached exhibits. Therefore, citations to "Doc. No. 85-1 ¶ __" reflect citations to the complaint, whereas citations to "Doc. No. 85-1 at __" reflect citations to the exhibits by page number.

non-reimbursable Medicaid claims, Gainwell enabled ESH to submit thousands of false Medicaid claims to the federal government.  Id. ¶ 5.

Relators became alerted to this scheme through their positions as high-ranking officials at both ESH and the state agency responsible for operating ESH, the Rhode Island Department of Behavioral Healthcare, Developmental Disabilities and Hospitals ("BHDDH").  Id. ¶¶ 16-18. During their employment at ESH and BHDDH, Relators observed that ESH was enrolled in Medicaid as a nursing home, despite being licensed by the state of Rhode Island as a hospital. Id. ¶¶ 56-59, 66.  Relators allege that ESH's false enrollment as a nursing home opened the door to a wide-ranging scheme to defraud the Medicaid program.  Id. ¶ 69.  For one, Relators assert that ESH billed Medicaid using a "fraudulent nursing home per diem rate," id. ¶ 62, violating the requirement set out by Rhode Island's Medicaid State Plan (the "State Plan") that hospitals bill a fixed rate for hospital stays under the Diagnosis-Related Group ("DRG") reimbursement method, id. ¶¶ 72-73.  Relators also allege that ESH billed Medicaid for admissions without prior authorization, even though the State Plan required prior authorization for hospital stays.  Id. ¶¶ 45-49, 69.  Additionally, ESH did not follow the federally required Preadmission Screening and Resident Review for nursing facilities.  Id. ¶ 95.  Relators contend that this allowed ESH to receive Medicaid reimbursements for long-lasting hospital stays that would have never been authorized.  Id. ¶¶ 50-54.

Finally, Relators allege that a Medicaid exclusion for facilities designated as an Institution for Mental Disease ("IMD") barred ESH from seeking reimbursement for certain psychiatric patients; however, ESH evaded this designation and billed Medicaid for these patients.  Id. ¶¶ 87-90.  Relators contend that through all these fraudulent activities, ESH

managed to submit "thousands of non-reimbursable Medicaid claims" to the United States, totaling "almost $500 million between 2016 and 2021 alone."  Id. ¶ 5.

While articulating the same basic theory of fraud as the First Amended Complaint, Relators' Second Amended Complaint differs from the prior pleading in several ways.  First, Relators have eliminated several claims and causes of actions.  Doc. No. 85 at 4 (explaining that claims "regarding third party liability billing, forensic patients," and "[c]onspiracy and reverse false claims causes of actions have been removed").  Second, Relators have added several examples of false claims submitted by ESH.  Doc. No. 85-1 ¶¶ 52-53, 80-83, 86.  But the most notable change is how the Second Amended Complaint portrays Gainwell's involvement in the alleged fraud.  Instead of pinning ESH as the source of the fraudulent scheme, Relators now claim that Gainwell concocted and compelled all of ESH's fraudulent actions.  They assert that "[i]t was Gainwell's idea to represent ESH as a nursing home for Medicaid billing purposes," id. ¶ 59, that "Gainwell—not ESH—chose to classify ESH as a nursing home in the MMIS," id., that "Gainwell disguised ESH as a nursing home to avoid the prior authorizations required for admission to ESH," id. ¶ 69, that "Gainwell created [ESH's billing] methodology," id. ¶ 77, and that "Gainwell knowingly facilitated evading the [IMD] requirement" for ESH, id. ¶ 90.  According to Relators, Gainwell took these actions in order to retain its lucrative contract with Rhode Island as the state's fiscal agent.  Id. ¶¶ 6, 55.

The Second Amended Complaint advances two claims under the FCA.  First, Relators allege that Gainwell violated 31 U.S.C. § 3729(a)(1)(A) because it knowingly "caused to be presented false or fraudulent reimbursement claims for ESH to the Rhode Island Medicaid program funded, in part, by the United States government, in violation of state and federal law." Id. ¶ 108.  Second, Relators allege that Gainwell violated 31 U.S.C. § 3729(a)(1)(B) because it

"knowingly made, used, or caused to be made or used, false records or statements material to the false or fraudulent claims submitted by ESH."  Id. ¶ 113.

After Relators moved for leave to file the Second Amended Complaint, Gainwell filed an opposition, arguing that Relators' amendment is unduly delayed and futile.  Doc. No. 88. Relators filed a reply.  Doc. No. 89.  The Court held a hearing on the motion on November 19, 2025.

## II.    LEGAL STANDARD

Federal Rule of Civil Procedure 15(a)(2) states, "[t]he court should freely give leave [to amend a pleading] when justice so requires."  "Amendments may be permitted pre-judgment, even after a dismissal for failure to state a claim."  United States ex rel. Flanagan v. Fresenius Med. Care Holdings, Inc., 142 F.4th 25, 37 (1st Cir. 2025).  While the amendment rules are "liberal," district courts have "significant latitude in determining whether to allow leave to amend."  Id. at 38 (citation modified).  Courts have discretion to deny leave for various reasons, including "undue delay, bad faith or dilatory motive[,] repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party[,] and futility of amendment."  Id. (quoting Kader v. Sarepta Therapeutics, Inc., 887 F.3d 48, 60 (1st Cir. 2018)).

## III.    DISCUSSION

Because the parties raise the issues of undue delay and futility in their briefs, the Court addresses whether Relators' motion for leave to amend should be rejected on either of these grounds.  Gainwell has not argued other bases for denying Relators' motion and, thus, those arguments are deemed waived.  United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990) (citation modified) ("[A] litigant has an obligation to spell out its arguments squarely and distinctly, or else forever hold its peace.").

A.    Undue Delay

The Court begins by addressing whether the proposed Second Amended Complaint is unduly delayed.  "[U]ndue delay, on its own, may be enough to justify denying a motion for leave to amend."  Hagerty ex rel. United States v. Cyberonics, Inc., 844 F.3d 26, 34 (1st Cir. 2016).  The party seeking amendment "has [at the very least] the burden of showing some valid reason for his neglect and delay."  In re Lombardo, 755 F.3d 1, 3 (1st Cir. 2014) (citation modified).  For a delay to be undue, "the period of delay must be both substantial and unjustified."  Amyndas Pharms., S.A. v. Zealand Pharma A/S, 48 F.4th 18, 37 (1st Cir. 2022). "Determining how long is too long depends on the facts and circumstances of each particular case," including "the time between the filing of the motion for leave and a variety of points at which a party would become aware of a need to amend, such as the filing of a motion to dismiss, a dismissal order, or the discovery of new information that substantially alters the substance or viability of the claims."  Id.  Therefore, "[a]scertaining whether a delay is 'undue' is not simply a matter of counting days but, rather, depends on the 'totality of the circumstances' in the particular case."  Id. (quoting Palmer v. Champion Mortg., 465 F.3d 24, 31 (1st Cir. 2006)).

Although the Court recognizes the age of this case, the facts and circumstances here do not warrant a finding of undue delay.  While Relators, in all likelihood, had access to the information undergirding the proposed Second Amended Complaint at an earlier point of the litigation, Relators moved to amend after being apprised of the deficiencies in their First Amended Complaint by this Court's dismissal order.  See Doc. No. 85 at 4-7 (describing changes made to Complaint in response to issues raised in Court's order).  "Responding specifically to one of the district court's grounds for dismissal by realigning previously articulated facts . . . is a legitimate basis for amendment."  Amyndas, 48 F.4th at 39.  Thus, Relators' efforts to directly address the shortcomings identified by the Court pose a legitimate basis for amendment.

6

Furthermore, the Court's dismissal order invited "a motion for leave to amend within thirty days," Doc. No. 81 at 19, and Relators complied with that deadline, Doc. No. 85.

Gainwell vaguely complains that "prejudice . . . has accrued to Gainwell as a result of these delays," which "is only compounded by Relators' repeatedly shifting allegations even within the same pleading."  Doc. No. 88 at 18.  However, any prejudice to Gainwell based on Relators' delay is minimal given the fact that this case has not undergone discovery or other significant developments.  "While this case has been pending for years, it is still in its procedural infancy as discovery has not yet commenced, which weighs in favor of permitting amendment." Gusakovs v. Johnson & Johnson, No. 17-CV-11502-DJC, 2023 WL 4053059, at *6 (D. Mass. June 16, 2023).  Courts in this Circuit routinely refuse to find undue delay for cases in similar stages of litigation.  See, e.g., Meador v. United States, No. 22-CV-40024-DJC, 2024 WL 583687, at *3 (D. Mass. Feb. 13, 2024) (finding that amendment would not pose undue delay because "the Court had not yet set a schedule for proceeding with the merits of the case"); Ali v. Univ. of Mass. Med. Ctr., 140 F. Supp. 2d 107, 209 (D. Mass. 2001) (finding that amending complaint two years after filing of original complaint did not pose undue delay in part because there had "been no discovery" yet "thus lessening any prejudice to the defendants that might have otherwise arisen"); Klunder v. Brown Univ., 778 F.3d 24, 34-35 (1st Cir. 2015) (finding that allowing motion to amend did not prejudice defendant because amendment would not result in additional prolonged discovery, significant postponement of trial, or major alteration in trial strategy and tactics).  Therefore, the Court finds that Relators' amendment is not unduly delayed.

   B.   Futility of the FCA Claims

The Court now turns to whether the Second Amended Complaint is futile.  A district court may deny leave to amend on futility grounds if "the complaint, as amended, would fail to state a claim upon which relief could be granted."  Glassman v. Computervision Corp., 90 F.3d

617, 623 (1st Cir. 1996). Courts apply the standard of review for a Rule 12(b)(6) motion when assessing the futility of an amended complaint. Id. Therefore, to survive a futility challenge, the complaint must contain sufficient factual matter to "state a claim to relief that is plausible on its face." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009). Courts must "take all factual allegations [in the proposed amendment] as true and . . . draw all reasonable inferences in favor of the plaintiff." Rodriguez-Ortiz v. Margo Caribe, Inc., 490 F.3d 92, 96 (1st Cir. 2007). But "[t]he court need not accept a plaintiff's assertion that a factual allegation satisfies an element of a claim, . . . nor must a court infer from the assertion of a legal conclusion that factual allegations could be made that would justify drawing such a conclusion." Cordero-Hernandez v. Hernandez-Ballesteros, 449 F.3d 240, 244 n.3 (1st Cir. 2006).

Additionally, because this case involves claims of fraud under the FCA, Relators must "plead their claims with plausibility and particularity under Federal Rules of Civil Procedure 8 and 9(b)." Universal Health Servs. v. United States ex rel. Escobar, 579 U.S. 176, 195 n.6 (2016). The additional requirement under Rule 9(b) requires Relators to "set forth with particularity [at least] the who, what, when, where, and how of an actual false claim alleged to have been filed because of the defendant's actions." United States ex rel. Booker v. Pfizer, Inc., 847 F.3d 52, 57-58 (1st Cir. 2017) (citation modified) (citing Fed. R. Civ. P. 9(b)). In scenarios where the defendant allegedly induced third parties to file false claims, a complaint can satisfy Rule 9(b) by providing "factual or statistical evidence to strengthen the inference of fraud

beyond possibility without necessarily providing details as to each false claim." United States ex rel. Duxbury v. Ortho Biotech Prods., L.P., 579 F.3d 13, 29 (1st Cir. 2009).

In the proposed Second Amended Complaint, Relators raise various theories of fraud in support of their FCA claims. While many of Relators' arguments fail to state a claim for relief, some of their factual allegations piece together into an actionable theory of fraud. The Court first addresses Relators' futile theories before discussing their remaining allegations that warrant allowing the motion to amend.

          1.   *Relators' Futile Theories*

The Court originally dismissed Relators' First Amended Complaint because it failed to plead the existence of a false claim with particularity or plausibility.[3] Doc. No. 81 at 9. The Court explained then that Relators had not sufficiently explained how Gainwell's actions in abiding by Rhode Island's directives amounted to fraud:

> [T]he contract between Gainwell and Rhode Island establishes that the criteria Gainwell applied derived from the state of Rhode Island. . . . Relators pled Gainwell's contract bound it to follow Rhode Island's payment rules and that Rhode Island's Medicaid Plan was approved by the United States. And, they did not plead non-conclusory factual allegations that Gainwell deviated from the state plan or that the state plan violated federal law or any other particulars of the alleged fraud. For all of the above reasons, the Motion to Dismiss is ALLOWED as to the first theory of fraud under Count I.

Id. at 15. In their proposed Second Amended Complaint, Relators have papered over this shortcoming by adding language blaming Gainwell for improper conduct they previously imputed to ESH. For example, while the First Amended Complaint alleges "ESH has

---

[3] The Court notes here that the dismissal order resolved Relators' claims under Count I and Count II jointly because the parties treated those counts together. Doc. No. 81 at 16-17. The proposed Second Amended Complaint again advances the same facts in support of both Count I and Count II, and the parties addressed the counts together without distinction in their briefing and at the hearing. Accordingly, the Court follows the lead of the parties and considers the two claims together for the purposes of this Order.

represented itself to be a nursing home," Doc. No. 31 ¶ 51, the Second Amended Complaint states "Gainwell—not ESH—chose to classify ESH as a nursing home," and that "[i]t was Gainwell's idea to represent ESH as a nursing home for Medicaid billing purposes," Doc. No. 85-1 ¶ 59.  While the First Amended Complaint explains that "ESH created its own 'all-cost' per diem reimbursement method," Doc. No. 31 ¶ 56, the Second Amended Complaint asserts that Gainwell was the one who "created this methodology," Doc. No. 85-1 ¶ 77; <u>see also</u> Doc. No. 88 at 10-11 (providing a chart summarizing changes between First Amended Complaint and Second Amended Complaint).

These changes are concerning for several reasons.  For starters, Relators' new framing of Gainwell as the sole architect behind ESH's fraud is dubious given that Relators, all former senior ESH or BHDDH officers, alleged in the prior complaints that ESH, not Gainwell, engineered the fraudulent scheme.[4]  To make matters worse, Relators provide no basis or explanation for their drastic change of story.  Relators offer no non-conclusory factual details to support their new characterization of Gainwell's role in the alleged fraud.  Instead, Relators simply shrug away the changes, downplaying them as "semantic" differences that "recast[] and clarif[y] the details" of the fraudulent scheme.  Doc. No. 89 at 10-11.  But suddenly pointing the finger at Gainwell for ideating and driving the alleged fraud, without providing new facts to support those accusations, goes far beyond a mere "semantic" revision.  Thus, the Court declines

---

[4] For example, Relator Jennifer White "directly oversaw ESH's billing department and its interaction with Gainwell's Medicaid billing systems and operations" in her position at ESH. Doc. No. 85-1 ¶ 16.  Therefore, White presumably had insight into ESH's billing activities, and she initially alleged that it was ESH, not Gainwell, that created ESH's billing method.  Doc. No. 31 ¶ 56.  Yet, she and the other Relators now cast the blame on Gainwell for concocting ESH's billing scheme without providing any justification for this about-face.

to accept these new, unexplained, conclusory allegations introduced in the Second Amended Complaint as supporting a non-futile theory of liability.

Other theories by Relators are also futile.  In the Second Amended Complaint, Relators have added more detail to their allegations about ESH's status as an IMD, but these allegations, too, are unsupported by the facts in the proposed Complaint.  Relators contend that Gainwell violated the FCA by approving billing for ESH patients who should have been excluded from Medicaid participation under the IMD designation.  Doc. No. 85-1 ¶¶ 87-90.  For background, an IMD refers to "any hospital, nursing facility, or other facility with more than 16 beds 'that is primarily engaged in providing diagnosis, treatment, or care of persons with mental diseases, including medical attention, nursing care, and related services.'"  Id. ¶ 88 (quoting 42 U.S.C. § 1396d(i)).  Accordingly, the IMD determination applies to a facility "if mental disease is the current reason for institutionalization for more than 50% of the patients."  Id.  Section 1905 of the Social Security Act "prohibits the federal government from providing federal Medicaid funds to states for services rendered to patients in an IMD aged 21 to 64."  Id. ¶ 89.

Relators allege that Gainwell allowed ESH to bill Medicaid for patients aged 21 to 64 from 2018 through 2021 "even though ESH in fact was an [IMD]."  Id. ¶ 87.  But Relators' own facts poke holes in their assertion that ESH qualified as an IMD at times relevant to this action. Relators merely provide one data point of a singular moment in time when over 50% of hospitalized patients at ESH were psychiatric patients, noting that "[a]s of May 2021, ESH housed 188 patients, 96 of whom were classified as psychiatric patients."  Id. ¶ 39.  For this factual allegation, Relators cite to a report submitted to Rhode Island's Executive Office of Health and Human Services ("EOHHS"), id. ¶ 39 n.16, which details ESH's patient population on four dates: April 1, 2020, May 1, 2020, December 1, 2020, and May 1, 2021.  See Letter from

Ghulam Mustafa Surti, Stephanie Rendina, Carolyn Walsh, to Benjamin L. Shaffer, R.I. Medicaid Program Dir., Exec. Off. of Health & Hum. Servs. (Aug. 25, 2021), https://eohhs.ri.gov/sites/g/files/xkgbur226/files/2021-09/esh-independent-review-final_public-version_no-phi.pdf [https://perma.cc/E569-UPZH].  While that report does indicate that over 50% of ESH patients on May 1, 2021, were psychiatric patients, the report also shows that psychiatric patients made up <u>less</u> than 50% of ESH's patient population on each of the other three dates.  <u>Id.</u> at 2.  In the face of these countervailing facts, Relators have not advanced any non-conclusory factual allegations to support the inference that ESH plausibly qualified as an IMD on any date beside May 1, 2021, let alone done so with particularity.

Relators also have not sufficiently pled that Gainwell played any role in ESH's alleged evasion of the IMD designation.  For instance, Relators have not alleged facts to show that Gainwell knew or could have known the total patient mix at ESH (including Medicaid and non-Medicaid patients) on a day-to-day basis.  Nor have Relators pointed to anything in Gainwell's contract with Rhode Island or the State Medicaid Manual distributed by the Centers for Medicare & Medicaid Services ("CMS") deeming Gainwell responsible for checking the patient mixes of state facilities for IMD compliance.  Indeed, the Rhode Island regulation in effect on May 1, 2021, established that EOHHS, not Gainwell, was responsible for "ensuring compliance with federal regulations regarding whether a facility is excluded from the Medicaid program as an Institution for Mental Disease (IMD)."  210 R.I. Code R. § 10-00-7.1.  That regulation made clear that "EOHHS shall make the final determination as to whether any hospital, nursing facility, or other institution of more than sixteen (16) beds is an IMD and excluded from the Medicaid program."  <u>Id.</u> § 10-00-7.4.  Based on these facts, Relators have not sufficiently alleged (1) that ESH indeed qualified as an IMD during the times relevant to this action, or (2) that

Gainwell can be held liable for ESH's alleged non-compliance with the IMD requirement.  Thus, the Court finds that Relators' claims about the IMD designation are futile.

Turning to other new points advanced by Relators, their counsel also raised a general pattern of patient mistreatment at ESH during the motion hearing on November 19, 2025.  For example, Relators' counsel noted that ESH restrained patients from leaving the hospital and imposed medically unnecessary services onto its patients.  While that raises serious concerns about the standard of care at ESH, allegations of poor patient care are not included in the Second Amended Complaint, nor do they clearly articulate an FCA violation.  Therefore, this new theory raised during the motion hearing does not impact the Court's assessment of the present motion.

> 2.  *Relators' Remaining Theory*

With Relators' unsupported claims, theories, and arguments set aside, the Court assesses whether what remains in the Second Amended Complaint survives the futility analysis.  Upon careful review, the Court finds that the proposed Complaint raises one theory of fraud that passes muster.

The Second Amended Complaint lays out with some level of particularity the following story of fraud.  The state of Rhode Island received CMS approval for its official State Plan, which set out various requirements for hospitals and nursing homes participating in Medicaid.  For hospitals, the State Plan established that inpatient hospital care must be billed using a fixed amount calculated under the DRG method, except in certain enumerated circumstances (none of which apply to the claims in this case).  Doc. No. 85-1 at 52, 54.  The same provision of the State Plan also established that "all admissions [to hospitals] require authorizations," and that prior authorization for the length of stay is required "when payment for a mental health stay is by DRG and the length of stay" exceeds twenty days.  Id. at 54.  As for nursing homes, the State Plan mandated that nursing homes bill using the "RUG" per diem method, which adjusts the

13

daily rates that a nursing home can charge for a patient based on that patient's particular acuity and services.  Id. ¶ 74.  Furthermore, Relators allege that federal statutes imposed additional requirements on nursing homes, such as a Preadmission Screening and Resident Review ("PASRR") process for admitting long-term patients and medication monitoring standards.  Id. ¶ 95; see also 42 U.S.C. § 1396r(e)(7).

All these requirements were either set by Rhode Island's CMS-approved State Plan or by federal statute.  The factual allegations in the proposed Second Amended Complaint support the reasonable inference that, as far as CMS knew, Medicaid providers in Rhode Island conformed with these official procedures and requirements, especially in light of the fact that Gainwell was responsible for ensuring that Rhode Island's claims complied with Medicaid requirements set forth or approved by CMS.  Doc. No. 85-1 ¶ 34.  And yet, ESH billed Medicaid in ways that deviated from the State Plan and federally mandated procedures year after year, according to Relators.  Relators' factual allegations show that ESH was enrolled in the Medicaid program as a nursing home even though it has been licensed by Rhode Island as a hospital since its creation and characterized as a long-term acute care hospital ("LTACH") by CMS's National Provider Identifier.  Id. ¶¶ 38, 56-60.  By enrolling as a nursing home, ESH was able to bypass the State Plan's prior authorization and length of stay requirements for hospitals, leading to Medicaid reimbursements for patients who would never have been approved under the prior authorization process.  Id. ¶¶ 49-51.  Relators provide specific examples of patients who were hospitalized and billed in this manner, including a patient who was hospitalized for cannabis use for nearly two years even though "it would have been impossible" for a patient with that diagnosis "to obtain prior authorization for admission into an acute-care hospital," id. ¶ 52, as well as a patient who was admitted for paranoid schizophrenia for nearly eighteen years, id. ¶ 53, despite the fact that

"no psychiatric diagnosis meets the criteria for admission to an LTACH," id. ¶ 50.  ESH also billed for these unauthorized patients using an "inflated" per diem method rather than the DRG method required for hospitals.  Id. ¶¶ 72-77.

These actions by ESH perhaps would not have amounted to fraud if ESH was properly operating as a nursing facility and, thus, not subject to the State Plan's requirements for hospitals. But Relators—all experienced medical professionals who held supervisory responsibility for ESH (including one who served as ESH's Chief Medical Officer)—allege that ESH was "not a nursing home." Id. ¶¶ 17, 41.  Not to mention, ESH deviated from the established Medicaid requirements for nursing homes.  Relators allege that ESH did not screen their patients under the federally required PASRR process for nursing homes or abide by medication monitoring standards established by federal law.  Id. ¶ 95.  Furthermore, ESH did not follow the RUG per diem billing method for nursing homes set out in the State Plan.  Id. ¶ 76.  Instead, ESH used a unique "'all-cost' per diem billing method, under which all ESH's annual operating costs . . . were divided by the number of Medicaid-enrolled patients and then by 365 to produce a daily billing rate." Id. ¶ 72.  This method allowed ESH to bill a universal daily rate for all hospital stays without consideration of each patient's circumstances and needs, as required by the RUG billing method.  Id. ¶¶ 73-77.

Notably, Relators concede that CMS approved an amendment to the State Plan to "codify the existing cost-based payment method for [ESH]" starting in 2020.  Id. ¶ 78.  The fact that CMS reviewed and approved of ESH's per diem billing method, at first glance, casts doubt on Relators' argument that ESH's billing practices defrauded the Medicaid program.  But as Relators noted during the motion hearing, there is no indication that CMS approved ESH's billing method with the knowledge that ESH was already billing in this manner for long-term

patient stays that would have never been authorized under the established Medicaid protocols. And Gainwell offers no countervailing facts to indicate that ESH, the state, or Gainwell informed CMS about ESH's operations and received federal approval for such practices.

This brings us to the question of who was behind the fraud. The facts before the Court support the reasonable inference that Rhode Island not only knew about ESH's billing practices but played an affirmative role in perpetuating these practices. The state was well aware that ESH was billing as a nursing home and evading Medicaid requirements for hospitals. In fact, Relators notified BHDDH leaders from 2019 to 2021 that ESH was enrolled in Medicaid as a nursing home and was billing in a manner inconsistent with Medicaid billing practices. Id. ¶ 41. Instead of taking action to make ESH comply with the State Plan, the state enabled ESH to operate outside of the official rules. For example, the state promulgated a July 2019 Medicaid Program Update newsletter exempting ESH from federally mandated nursing home procedures. Exec. Off. Health & Hum. Servs., Rhode Island Medicaid Program Provider Update (July 2019), https://eohhs.ri.gov/sites/g/files/xkgbur226/files/2021-03/pu318.pdf [https://perma.cc/M5M4-6ZNM].[5] The newsletter acknowledged that "[i]t is mandatory for a nursing facility that receives

---

[5] Relators relied upon and incorporated this July 2019 Update document in their First Amended Complaint, Doc. No. 31 ¶¶ 86-87, but have eliminated their mention of this document from their Second Amended Complaint. Nonetheless, the document remains publicly available on EOHHS's website and is thus subject to judicial notice. See Lombardo v. CitiMortgage, Inc., No. 18-CV-10299-PBS, 2019 WL 3546630, at *1 (D. Mass. Mar. 4, 2019) (taking judicial notice of documents available on governmental website); In re Fruit Juice Prods. Mktg. & Sales Pracs. Litig., 831 F. Supp. 2d 507, 509 (D. Mass. 2011) (same). Furthermore, the Court informed the parties of its consideration of this document during the motion hearing, and neither party objected or disputed the document's authenticity. "It is only appropriate, however, to take judicial notice of government records . . . for the fact that they exist, the information they comprise, and their legal effect, but not the truth of their contents." Pietrantoni v. Corcept Therapeutics Inc., 640 F. Supp. 3d 197, 205 (D. Mass. 2022). Here, the Court takes judicial notice of the July 2019 Update document for the fact that EOHHS published these communications about ESH rather than for the veracity of the document's contents.

federal dollars, regardless of a patient's insurance, to conduct a Level I PASRR screening either

before or on the day of admission." Id. at 3.  But the newsletter also expressly excluded ESH

from complying with this "mandatory" requirement:

> In order for nursing home claims and hospice room and board claims to pay, a Pre-Admission Screening and Resident Review (PASRR) must be completed. . . . A Level 1 PASRR is required for all applicants to Medicaid certified nursing facilities, regardless of the payor.  A Level 2 Evaluation and Determination must be completed prior to admission if a serious mental illness and/or intellectual disability or related condition is identified through the Level 1 screening.  This requirement excludes Eleanor Slater Hospital.

Id. at 8.  This document reveals two things.  First, the document indicates that EOHHS knew that

ESH was participating in Medicaid as a nursing facility.  Otherwise, EOHHS would not have had

to specify that ESH was exempt from the screening requirements ordinarily imposed only on

Medicaid-certified nursing facilities.  Second, the document shows that the state allowed and

directed ESH to deviate from the federal PASRR requirement imposed on other Medicaid

nursing facilities.  And instead of establishing this special exemption through an amendment to

the State Plan or another official regulatory channel, EOHHS communicated this exemption in

an informal newsletter with no explanation or justification for ESH's special treatment.[6]

Similarly, the state carved out a special billing rate for ESH outside of the official billing

methods delineated in the CMS-approved State Plan.  EOHHS circulated "Interim [State Fiscal

Year] 2019" per diem rates for ESH, which Gainwell attached to its original motion to dismiss

---

[6] CMS's State Medicaid Manual, which is incorporated by reference, specifically prevents state Medicaid practices that conflict with CMS-approved State Plans or federal regulations. See State Medicaid Manual § 11604.1 ("In all instances where State practice conflicts with the State plan (or approvable amendments) State practice is not permissible . . . Plan amendments which conflict with Federal regulations are not approvable and cannot be honored for review purposes.").

and cited in its opposition brief.[7]  See Doc. No. 65-5; Doc. No. 88 at 12.  This document lists

specific per diem rates for ESH, which diverge from both the DRG and RUG billing methods

established in the State Plan.  Nothing before the Court suggests the state was authorized to

invent these interim billing rates for ESH in 2019 prior to CMS's approval of ESH's billing

method for 2020 onwards.  Drawing all reasonable inferences in favor of Relators, this document

offers another instance of the state sidestepping the rules established in the CMS-approved State

Plan to enable ESH's unauthorized billing practices.

　　　　Accordingly, the Second Amended Complaint makes out a claim with plausibility and

particularity that Rhode Island engaged in a back-door scheme to facilitate the filing of false

claims for Medicaid payment with the federal government.  The claims were false because, by

using various unofficial channels, Rhode Island enabled ESH to admit patients and bill for

hospitalizations without complying with the requirements of the State Plan and federal law.  As a

result, the state received large sums of federal money for claims that never would have been

authorized under established Medicaid procedures, according to Relators.  Doc. No. 85-1 ¶ 86.

　　　　Of course, Relators cannot (and have not) sued Rhode Island in a qui tam action for filing

false claims.  See Vt. Agency of Nat. Res. v. United States ex rel. Stevens, 529 U.S. 765, 783

(2000) (holding that states are not subject to qui tam liability).  Whether Relators have stated

such a claim against Gainwell presents a related but different issue.  To bring their FCA claim

against Gainwell, they must sufficiently plead that Gainwell acted with scienter, 31 U.S.C.

---

[7] The Court takes judicial notice of EOHHS's Interim 2019 Rates document, which is available
on EOHHS's website at https://eohhs.ri.gov/sites/g/files/xkgbur226/files/2021-
03/ESH_Rates_MP.pdf [https://perma.cc/3GEZ-8GFL].  Gainwell cited this document in its
motion to dismiss as well as in its opposition to the instant motion, and Relators did not object to
Gainwell's invocation of this document.  The Court also advised the parties of this document
during the motion hearing, and neither party objected to its consideration of the document or
disputed the document's authenticity.

§ 3729(b)(1), and caused false claims to be submitted to the government, see United States ex

rel. Carpenter v. Abbott Lab'ys, Inc., 723 F. Supp. 2d 395, 405 (D. Mass. 2010).

Beginning with the scienter requirement, Relators must sufficiently allege that Gainwell

acted with "actual knowledge of the information," "in deliberate ignorance of the truth of the

information," or "in reckless disregard of the truth or falsity of the information."  31 U.S.C.

§ 3729(b)(1).  At this stage of the proceedings, Relators need only plead scienter generally.  Fed.

R. Civ. P. 9(b).  While proof of scienter does not require "specific intent to defraud," 31 U.S.C.

§ 3729(b)(1)(B), "innocent mistakes and negligence are not offenses under the [FCA]," United

States v. President & Fellows of Harvard Coll., 323 F. Supp. 2d 151, 189 (D. Mass. 2004)

(quoting United States v. Taber Extrusions, LP, 341 F.3d 843, 845 (8th Cir. 2003)).

Here, the facts point to the state of Rhode Island, not Gainwell, as the source of ESH's

fraud.  Relators insist that Gainwell had actual knowledge of the fraud, but their claims fall short.

They assert that "Gainwell knew ESH was a hospital" rather than a nursing home because the

"RFP for the contract to be Rhode Island's FA stated that ESH was a hospital."  Doc. No. 85-1 ¶

60.  But this overstates what the RFP says.  The portion of the 2011 RFP that Relators rely on

simply states, "BHDDH is the State authority for mental health, substance abuse, and

developmental disabilities.  BHDDH manages inpatient hospital services provided by Eleanor

Slater Hospital . . . ."  State of Rhode Island, Request for Proposals for Transition, Enhancement,

Operation, and Maintenance of the Medicaid Management Information System 24 (2011),

https://purchasing.ri.gov/rivip/stateagencybids/7449255.pdf [https://perma.cc/YJ78-LPRC].  But

just because the RFP informed Gainwell that ESH provides "inpatient hospital services" does not

mean that Gainwell knew ESH was barred from enrolling in Medicaid as nursing home.  Nothing

prevents a medical facility from offering a range of services, and the language of the RFP does

not bar such a possibility. Other than this citation to the RFP, Relators point to no communication between the state and Gainwell that would support an inference that Gainwell was in on the state's scheme against the federal government and acted with direct knowledge of ESH's false enrollment as a nursing home.

However, the facts in the Second Amended Complaint plausibly allege that Gainwell acted with at least reckless disregard with respect to ESH's fraudulent Medicaid practices. Gainwell's job was to screen claims for eligibility and compliance with established Medicaid protocols before approving them for reimbursement. Doc. No. 85-1 ¶ 34. The State Medicaid Manual distributed by CMS required Gainwell to "[e]nsure that providers are qualified to render specific services under the Medicaid program by screening applicants for State license and certification, by Specialty Board certification if appropriate, and by visit to the provider by a review team if necessary." Id. ¶ 35. The manual also required Gainwell to "[r]eview enrolled providers on a continuing basis to ensure that they continue to meet provider eligibility requirements." Id. And the facts suggest that a simple review of ESH's operations would have rung the alarm on ESH's suspect nursing home designation. Relators allege that ESH has always been licensed by Rhode Island as a hospital rather than a nursing home, id. ¶¶ 56-58, and is registered in CMS's National Provider Identifier registry as an LTACH, not a nursing home, id. ¶¶ 57, 61. Indeed, on the MMIS, which Gainwell operated, ESH was coded both as a hospital and a nursing home. Id. ¶¶ 60-61. Despite these discrepancies, ESH was able to survive Gainwell's review process and submit thousands of Medicaid claims representing itself as a nursing home over several years. Id. ¶ 5.

Moreover, CMS's State Medicaid Manual required Gainwell to review every Medicaid claim to ensure that "[t]he service provided is covered under the program" and that "[a]ny

required prior authorizations or certifications have been obtained." Id. ¶ 31.  However, Relators

allege that Gainwell processed "every Medicaid patient hospitalized at ESH during at least 2018

through 2021," despite the absence of prior authorizations and preadmission screenings.  Id.

¶¶ 51, 62, 70, 95.  Taken together, these facts suggest that Gainwell acted beyond mere mistake

or negligence.  Gainwell, which has served as a "longtime" Medicaid fiscal agent for Rhode

Island and other states, presumably was well-versed in Medicaid requirements for patient

admissions and billing practices.  Id. ¶¶ 19-20.  But when it came to ESH, Gainwell did not

overlook just one or two unauthorized claims; rather, Relators allege that Gainwell "processed

for payment thousands of non-reimbursable Medicaid claims submitted by ESH."  Id. ¶ 5.

Relators' factual allegations suffice to plausibly allege that Gainwell acted with at least reckless

disregard toward ESH's fraudulent billing practices.[8]

Turning to causation, "[t]o 'cause' presentation of false claims under the FCA, some

degree of participation in the claims process is required."  Harvard Coll., 323 F. Supp. 2d at 186-

87.  "Generally, mere knowledge of the submission of claims and knowledge of the falsity of

---

[8] Relators also attempt to invoke 42 U.S.C. § 1320a-7b(c) to argue that Gainwell's representation of ESH as a nursing home presented a "per se" violation of the FCA.  Doc. No. 85-1 ¶ 100. Section 1320a-7b(c) is a provision of the Anti-Kickback Statute that imposes criminal penalties on:

> Whoever knowingly and willfully makes or causes to be made, or induces or seeks to induce the making of, any false statement or representation of a material fact with respect to the conditions or operation of any institution, facility, or entity in order that such institution, facility, or entity may qualify (either upon initial certification or upon recertification) as a . . . nursing facility . . . or other entity . . . .

42 U.S.C. § 1320a-7b(c).  However, Relators have not plausibly alleged that Gainwell acted "knowingly and willfully" of ESH's fraud simply by processing and approving ESH's claims as a nursing home.  Relators offer no non-conclusory facts to indicate that Gainwell acted with this heightened mens rea standard.  Therefore, the Court proceeds with the rest of the FCA analysis assuming, without deciding, that Gainwell's conduct did not constitute a "per se" violation of the FCA.

those claims is insufficient to establish 'causation' under the FCA." Id. at 186.  However,

causation may be satisfied "[w]here the defendant has an ongoing business relationship with a

repeated false claimant, and the defendant knows of the false claims, yet does not cease doing

business with the claimant or disclose the false claims to the United States." Id. at 187 (citation

modified).

Here, Gainwell avers that Relators have not established "a causal mechanism linking

Gainwell's actions with the submission of false claims" because a third party, ESH,

independently submitted the allegedly false claims.[9]  Doc. No. 88 at 21-22.  This approach

ignores the reality of the claims process.  ESH submitted proposed claims to Gainwell.  Under

CMS's State Medicaid Manual, Gainwell was required to examine every Medicaid claim to

ensure that it conformed with various Medicaid requirements before "a decision is made as to the

dollar amount to be paid."  State Medicaid Manual § 11600; see also Doc. No. 85-1 ¶¶ 31-35.

Neither federal law nor the State Medicaid Manual permitted (1) the reliance on extra-plan

procedures conflicting with the terms of the State Plan or federal law, or (2) the approval of

---

[9] Gainwell cites two non-binding cases to support this proposition, but neither is analogous to this case.  In one, the District Court for the Southern District of New York held that a credit rating agency could not be held liable under the FCA for its fraudulent credit ratings because independent third parties chose to rely on those ratings when submitting claims to the FDIC. United States ex rel. Kolchinsky v. Moody's Corp., 162 F. Supp. 3d 186, 196 (S.D.N.Y. 2016). Gainwell also cites a Third Circuit case concluding that a real estate broker—who misrepresented the conditions of residential properties in certifications to the FHA before the FHA agreed to insure mortgages on those properties—could not be held liable under the FCA when mortgagors later defaulted on those loans because "the same loss would have been suffered by the government had the certification been accurate and truthful." United States v. Hibbs, 568 F.2d 347, 351 (3d Cir. 1977).  Both cases involved third parties that caused the government's loss independently from any action by the defendants.  By contrast, Relators allege that Gainwell had a direct role in the submission of ESH's Medicaid claims; Gainwell was responsible for reviewing every Medicaid claim for proper enrollment and billing and subsequently approved ESH's false claims as a nursing home for several years.  Indeed, Hibbs might have presented a different case—and one more closely akin to this one—if the realtor had certified to the government that the mortgagee was financially sound at the time of the loan.

claims not conforming to the requirements of the State Plan or federal law.  But Gainwell

processed and approved ESH's non-compliant claims on an ongoing basis, thereby representing

that it "reviewed [the claims] and agreed that they were proper and appropriately chargeable" to

the Medicaid program.  Harvard Coll., 323 F. Supp. 2d at 187; see also United States ex rel.

Martino-Fleming v. S. Bay Mental Health Ctrs., No. 15-CV-13065-PBS, 2021 WL 2003016, at

*131 (D. Mass. May 19, 2021) (quoting Commonwealth ex rel. Martino-Fleming v. S. Bay

Mental Health Ctr., Inc., 334 F. Supp. 3d 394, 410 (D. Mass. 2018)) ("The causation element

may be satisfied where a defendant with the 'power, authority, and duty to stop the submission of

false claims' does not intervene after learning about the existence of false claims.").  Thus, at this

stage of the proceedings, the Court finds that Relators have sufficiently pled that Gainwell's

approval of ESH's non-compliant Medicaid claims caused the submission of false claims to the

federal government.

        Based on the foregoing, the Court finds that the proposed Second Amended Complaint is

not futile.  But before concluding the Court's analysis, three more points bear mention.  First, the

record before the Court shows that the various violations noted above rendering ESH's claims

false were all violations arising, on the present record, from Gainwell following the directions of

the state.  It is a state official's email on the Medicaid application enrolling ESH as a nursing

home.  Doc. No. 85-1 ¶ 64.  It is a state policy document making clear that ESH was a nursing

home for certain purposes by exempting it from some nursing-home-specific requirements.  It is

a state directive establishing a special interim reimbursement rate just for ESH.  And, of course,

Gainwell's contract made the state (not Gainwell) the author of the governing reimbursement

criteria.  State of Rhode Island, Request for Proposals for Transition, Enhancement, Operation,

and Maintenance of the Medicaid Management Information System 194 (2011),

https://purchasing.ri.gov/rivip/stateagencybids/7449255.pdf [https://perma.cc/YJ78-LPRC]
(directing Gainwell to "[p]rocess claims according to new reimbursement methodologies as
directed by EOHHS").

Nonetheless, Relators have alleged that "Gainwell was responsible for rejecting claims
not meeting the federal screening criteria set forth in the [State Medicaid Manual] and elsewhere
by CMS."  Doc. No. 85-1 ¶ 34.  Relators have also alleged that large numbers of false claims
survived review under Gainwell's claims processing system despite Gainwell's substantial
experience in Medicaid administration.  Id. ¶¶ 5, 19-20.  In light of these circumstances, the mere
issuance of extra-plan guidance documents by the state for ESH does not, under the specific
allegations of the proposed Second Amended Complaint, undermine the Court's scienter and
causation conclusions as to Gainwell.

Second, as discussed above, the record shows that CMS approved ESH's billing method
retroactively to April 1, 2020.  Id. ¶ 78.  Even if that approval carried with it an implied
exemption for ESH from the federal and State Plan requirements noted above governing
hospitals and nursing homes, that approval cannot support, at this stage of the proceeding, the
conclusion that the United States authorized the approval during earlier periods of time.

Third, the Court did not fully appreciate the foregoing theory of false claims initially.
Nor is this theory comprehensively fleshed out and addressed by the parties in their briefs.
Accordingly, the Court withdraws the limitation on any Rule 12 motion practice directed toward
the Second Amended Complaint.  Thus, following the filing of the Second Amended Complaint,
Gainwell may file a Rule 12 motion addressing whatever it wishes to challenge, including the
Court's foregoing basis for finding this proposed amendment not futile.  Alternatively, Gainwell
may file an answer.  That choice belongs to Gainwell under the Rules.

IV.    <u>CONCLUSION</u>

For the foregoing reasons, the Court finds that the proposed Second Amended Complaint is not unduly delayed nor futile, and the motion for leave to amend, Doc. No. 85, is ALLOWED. Relators shall file the same version of the proposed Second Amended Complaint within seven days of this Order.  Gainwell shall respond to that Complaint within fourteen days of its filing.[10]

SO ORDERED.

 /s/ Leo T. Sorokin
United States District Judge

---

[10] The Court previously raised to the parties the issue of whether this case should be transferred to the District of Rhode Island in the interest of justice and convenience pursuant to 28 U.S.C. § 1404.  Prior to any Rule 16 conference in this case, the Court intends to ask the parties to address this issue through additional briefing before allowing the case to proceed in this District, but not before Gainwell files an answer.