UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA <u>ex rel.</u> JENNIFER WHITE, BRIAN DALY, M.D., and ANDREW STONE, M.D., M.P.H., <br><br> Plaintiff-Relators, <br><br> v. <br><br> GAINWELL TECHNOLOGIES LLC, f/k/a HEWLETT PACKARD ENTERPRISES, LLC, and DXC TECHNOLOGY CO., <br><br> Defendant. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | Civil No. 22-10953-LTS |

<u>MEMORANDUM AND ORDER ON MOTION TO DISMISS (DOC. NO. 101)</u>

June 29, 2026

SOROKIN, J.

Plaintiff-Relators Jennifer White, Brian Daly, and Andrew Stone (collectively, "Relators") bring a qui tam action against Gainwell Technologies LLC, alleging that Gainwell violated the False Claims Act ("FCA") in its role as the fiscal agent for Rhode Island's Medicaid program. Relators allege that Gainwell facilitated a years-long scheme by Eleanor Slater Hospital ("ESH"), a Rhode Island state hospital, to submit false and inflated bills for Medicaid reimbursement.

This case has had an extensive procedural history, which the Court briefly summarizes. Relators filed their original complaint on June 17, 2022. Doc. No. 1. Two years later, the United States declined to intervene. Doc. No. 21. Relators subsequently filed their first amended

complaint, Doc. No. 31, which Gainwell moved to dismiss, Doc. No. 63.  The Court dismissed the first amended complaint upon finding that Relators had not sufficiently pled claims of fraud. Doc. No. 81.  Nonetheless, the Court permitted Relators to seek leave to amend their complaint within thirty days.  Id. at 19.  Relators did so, filing their motion for leave to file a second amended complaint on May 1, 2025, Doc. No. 85, which Gainwell opposed, Doc. No. 88.

The Court allowed Relators' motion to amend based on one viable theory of fraud articulated in the second amended complaint.  Doc. No. 97 at 13.  That theory goes as follows. The contours of Rhode Island's Medicaid program are defined by the State Plan, which receives federal approval from the Centers for Medicare & Medicaid Services ("CMS").  Doc. No. 98 ¶ 24.  The State Plan sets out various requirements for medical providers participating in Medicaid.  Id.  For hospitals, the State Plan establishes that inpatient hospital care must be billed using a fixed amount calculated under the "DRG" method and requires prior authorization for hospital admissions.  Id. ¶¶ 36, 73.  For nursing homes, the State Plan mandates billing under the "RUG" per diem method, which adjusts the daily rates the nursing home can charge for a patient based on that patient's medical needs and circumstances.  Id. ¶¶ 74–75.  Federal statutes additionally require nursing homes to undergo certain pre-screening processes before admitting long-term patients.  Id. ¶ 95.

Relators allege that EHS defied all these requirements for several years.  It enrolled in Medicaid as a nursing home even though it was licensed as a hospital.  Id. ¶¶ 56, 58, 94–95.  It also bypassed the official Medicaid requirements for hospitals and nursing homes.  Despite housing many long-term psychiatric patients, ESH did not screen these patients using the prior authorization method required for hospitals under the State Plan or the pre-screening requirements for nursing homes established by federal law.  Id. ¶¶ 43–55, 95.  Moreover, ESH

did not bill under either the DRG or RUG methods established by the State Plan and instead used an "all-cost" per diem billing method, "under which all ESH's annual operating costs . . . were divided by the number of Medicaid-enrolled patients and then by 365 to produce a daily billing rate." Id. ¶¶ 72, 76.  Until CMS approved an amendment to the State Plan codifying this billing method for ESH starting in 2020, id. ¶ 78, the federal government did not approve or authorize ESH to bill Medicaid in this manner.

As the fiscal agent for Rhode Island's Medicaid program, Gainwell was responsible for processing Medicaid claims from Rhode Island providers and ensuring that they met certain criteria before paying them. Id. ¶¶ 30–37.  Nonetheless, Gainwell "processed for payment thousands of non-reimbursable Medicaid claims submitted by ESH . . . between 2016 and 2021." Id. ¶ 5.  Based on these allegations, the Court found that Relators had plausibly alleged Gainwell acted with at least reckless disregard of ESH's fraudulent Medicaid claims and caused the presentation of ESH's false claims to the federal government. Doc. No. 97 at 20–23.  However, the Court rejected Relators' conclusory assertion that Gainwell was the mastermind behind ESH's fraudulent scheme, noting that "the facts point to the state of Rhode Island, not Gainwell, as the source of ESH's fraud." Id. at 19.[1]  In particular, the Court noted that the factual allegations suggested that Rhode Island was the one that "enabled ESH to operate outside of the official rules" by promulgating documents outside of the State Plan excluding ESH from mandatory pre-screening requirements for nursing homes and directing ESH to bill Medicaid using special per diem rates. Id. at 16–18.

---

[1] During the hearing on the pending motion to dismiss, counsel for Relators continued to insist that Gainwell was the one who chose to falsely enroll ESH as a nursing home in the Medicaid program.  However, the Court previously rejected this theory as unsupported by the complaint's factual allegations in its Order on the motion to amend.  See Doc. No. 97 at 9–11, 23.

Because this theory of fraud was not "comprehensively fleshed out and addressed by the parties in their briefs," the Court permitted Gainwell to file a Rule 12 motion challenging the second amended complaint. Id. at 24. Pending before the Court is Gainwell's motion to dismiss, which was filed on January 6, 2026. Doc. No. 101. Relators opposed the motion on February 2, 2026, Doc. No. 104, and Gainwell replied on February 13, 2026, Doc. No. 106. Upon invitation from the Court, the federal government also submitted a statement of interest addressing the legal issues arising from Gainwell's motion to dismiss. Doc. No. 111. Both parties filed responses to the government's memorandum on April 10, 2026. Doc. Nos. 112, 113. The Court held a hearing on the motion on June 22, 2026. For the reasons that follow, Gainwell's motion to dismiss the second amended complaint, Doc. No. 101, is ALLOWED.[2]

## I.    LEGAL STANDARD

To survive a motion to dismiss, a complaint must contain sufficient factual matter to "state a claim to relief that is plausible on its face." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009). Courts must "take all factual allegations [in the complaint] as true and . . . draw all reasonable inferences in favor of the plaintiff." Rodriguez-Ortiz v. Margo Caribe, Inc., 490 F.3d 92, 96 (1st Cir. 2007). But "[t]he court need not accept a plaintiff's assertion that a factual allegation satisfies an element of a claim, . . . nor must a court infer from the assertion of a legal conclusion that factual allegations could be made

---

[2] For the reasons explained in the text, the Court now concludes that Relators have not stated a claim for relief. The Court acknowledges that this outcome differs from its prior determination in the Order allowing the motion to amend. The Court arrives at this conclusion based on its careful consideration of the more fulsome arguments raised in the parties' briefing and during the motion hearing.

that would justify drawing such a conclusion." Cordero-Hernandez v. Hernandez-Ballesteros, 449 F.3d 240, 244 n.3 (1st Cir. 2006).

II.    DISCUSSION

A.    Public-Disclosure Bar

The Court begins with Gainwell's contention that the remaining theory of fraud is foreclosed by the public-disclosure bar.  The FCA requires courts to "dismiss an action or claim . . . if substantially the same allegations or transactions as alleged in the action or claim were publicly disclosed" in one of three categories of sources: (i) "a Federal criminal, civil, or administrative hearing in which the Government or its agent is a party"; (ii) "a congressional, Government Accountability Office, or other Federal report, hearing, audit, or investigation"; or (iii) "the news media."  31 U.S.C. § 3730(e)(4)(A).  The policy rationale behind the public-disclosure bar is to counteract "perverse incentives for opportunists to seek compensation based on fraud already apparent from information in the public domain." United States ex rel. Winkelman v. CVS Caremark Corp., 827 F.3d 201, 206 (1st Cir. 2016).  Gainwell asserts that five documents, which it has attached as exhibits to its motion, revealed "that the DRG method was not used at and did not apply to ESH, and that ESH had a large number of mental health patients under long-term care" before any of the Relators worked at ESH.  Doc. No. 102 at 25.[3]

_____

[3] The Court notes that Relators failed to respond to Gainwell's assertion that their claims are precluded by the public-disclosure bar.  Their opposition largely copies and pastes their arguments about the public-disclosure bar from their prior opposition to Gainwell's motion to dismiss the first amended complaint.  Compare Doc. No. 104 at 17–19, with Doc. No. 69 at 12–14.  In doing so, Relators argue that their claims are not barred because the Relators were "the original sources of the disclosures Gainwell identifies"—that is, "several 2021 news articles about the problems at ESH" and "CMS's 2021 audit of ESH."  Doc. No. 104 at 18.  Relators appear to have missed the fact that Gainwell's pending motion to dismiss relies on entirely different disclosures published in 2013, 2018, and 2019.  Doc. Nos. 103-1 to -5.  With that in mind, the Court evaluates whether Gainwell has sufficiently demonstrated that the second amended complaint should be dismissed due to the public-disclosure bar.

Gainwell's argument is unavailing.  As an initial matter, one of the five documents Gainwell relies upon does not arise from the types of sources permitted under the FCA's public-disclosure provision.  Exhibit D is a "Rhode Island Medicaid APR-DRG Frequently Asked Questions" document published by Rhode Island's Executive Office of Health and Human Services ("EOHHS") in May 2019.  Doc. No. 103-4.  However, reports published by a state government cannot be used to invoke FCA's public-disclosure bar.  The text of the FCA provision—which lists "Federal" reports, hearings, audits, and investigations—does not encompass documents published by state-government sources.[4]  31 U.S.C. § 3730(e)(4)(A)(ii).  Nor does Gainwell argue or cite to any legal authority suggesting that a "Frequently Asked Questions" document issued by a state entity amounts to "news media" under the FCA.  Therefore, the Court concludes Exhibit D may not serve as a basis to invoke the public-disclosure bar.

The remaining four exhibits fail to trigger the public-disclosure bar.  Exhibits A and B are news articles from March 2013 summarizing the findings of a report published by the Center for Freedom and Prosperity about ESH's high costs.  Doc. Nos. 103-1, -2.  Exhibit A reports that nine staff members at ESH "took home more than $100,000 in overtime pay in fiscal year 2011."  Doc. No. 103-1 at 3.  It also describes that ESH "plays a unique role among hospitals in Rhode Island because so many of its beds are devoted to psychiatric care and complex medical cases," with "[m]ost of its patients . . . eligible for Medicaid."  Id. at 4.  The article proceeds to state that

---

[4] In interpreting a prior version of the FCA, the Supreme Court held that the FCA's reference to "administrative" reports, audits, and investigations "encompasses disclosures made in state and local sources as well as federal sources."  Graham Cnty. Soil & Water Conservation Dist. v. United States ex rel. Wilson, 559 U.S. 280, 283 (2010).  As a direct response to this ruling, Congress amended the language of the FCA to expressly cabin reports, hearings, audits, or investigations to "Federal" sources (thereby excluding state sources).  31 U.S.C. § 3730(e)(4)(A)(ii).

ESH charges higher costs for treatment than other long-term healthcare facilities, relying on a recent Waste and Fraud Report published by Simpatico Software Systems.  Id.  Exhibit B is another news article that discloses much of the same information, including the significant overtime payments for ESH staff and the hospital's high daily costs for treating patients.  See Doc. No. 103-2 at 2–3.

Exhibit C is the Waste and Fraud Report cited in both articles; the portion of the report discussing ESH states in its entirety:

> The Eleanor Slater Hospital is an extremely expensive option for long term care when compared to the State's nursing homes.
>
> In the Medicaid data that we examined, Eleanor Slater had an average cost of $957 per day per patient, compared with an average nursing home cost of $155 per day per patient. While we understand that certain of Slater's patients require care that is more expensive than most, we are also aware that Slater runs far below maximum patient capacity and that fact contributes greatly to the higher per patient cost at the hospital.
>
> We believe that Rhode Island should investigate whether closing Slater hospital and moving those patients into other nursing homes or hospital settings when necessary can yield substantial cost savings for the state. We have hospitals in this state that are severely under capacity, and making this move might not only save the state money but also stabilize a necessary community hospital at the same time.

Doc. No. 103-3 at 16.  And finally, Exhibit E is a letter from CMS's Acting Director to EOHHS's Medicaid Director confirming CMS's approval of two proposals submitted by EOHHS, one of which notes that ESH is "a state hospital that treats patients with acute and long term medical illnesses, as well as patients with psychiatric disorders."[5]  Doc. No. 103-5 at 90. Exhibit E contains no other information about ESH.

---

[5] It is uncertain from the record before the Court whether Exhibit E was "publicly disclosed" for the purposes of the FCA's public-disclosure bar.  31 U.S.C. § 3730(e)(4)(A).  Gainwell does not indicate whether this letter between federal and state officials was published online or in any other public domain.  Without any such indication, it is unclear whether the letter amounts to a public disclosure.  See U.S. ex rel. Maxwell v. Kerr-McGee Oil & Gas Corp., 540 F.3d 1180, 1184–85 (10th Cir. 2008) (finding information transferred between federal and state officials not

None of these exhibits publicly disclose "substantially the same allegations or transactions" as the underlying claim of fraud advanced by Relators in this action.  31 U.S.C. 3730(e)(4)(A).  For the purposes of the FCA, a "public disclosure occurs when the essential elements exposing the particular transaction as fraudulent find their way into the public domain." United States ex rel. Ondis v. City of Woonsocket, 587 F.3d 49, 54 (1st Cir. 2009).  "[T]he disclosure must reveal both the misrepresented state of facts and the true state of facts so that the inference of fraud may be drawn."  Id. (quoting United States ex rel. Mistick PBT v. Hous. Auth. of Pittsburgh, 186 F.3d 376, 385 (3d Cir. 1999)).  Exhibits A, B, C, and E do not disclose the essential elements of the alleged fraud.  These exhibits—which discuss ESH's high staffing and patient costs as well as the existence of psychiatric patients at ESH—at most suggest that ESH imposed significant (and arguably inefficient) costs on state taxpayers and the Medicaid program.  However, they do not disclose sufficient facts to compel an inference of the alleged fraud at the heart of this matter—namely, that ESH evaded official Medicaid requirements for nursing homes and hospitals and employed a unique, per diem billing method to inflate its reimbursements from Medicaid.  Furthermore, none of the exhibits discuss Gainwell's role in ESH's billing scheme.  For these reasons, the Court declines to dismiss this action based on the FCA's public-disclosure bar.

Having resolved that issue, the Court evaluates whether the second amended complaint must be dismissed for failing to state violations of the FCA.  Gainwell argues that the second

publicly disclosed "insofar as the communication does not release the information into the public domain such that it is accessible to the general population"); U.S. ex rel. Wilson v. Graham Cnty. Soil & Water Conservation Dist., 777 F.3d 691, 698 (4th Cir. 2015) ("The mere fact that local, state, and federal agencies share official information in the course of a cooperative endeavor cannot, without more, trigger the public disclosure bar.").  This question need not be resolved, however, as the Court finds that the substance of Exhibit E does not trigger the public-disclosure bar for the reasons explained in the text.

amended complaint must be dismissed because (1) it does not adequately allege that ESH's

Medicaid claims were false; (2) "it contains no particularized facts showing a scheme to defraud

by *Gainwell*, rather than ESH or the State"; (3) "it pleads no non-conclusory facts about

Gainwell's subjective knowledge of the adequacy of ESH's billing procedures"; and (4) "as the

recipient of ESH's claims with no substantive input therein, Gainwell could not have 'caused'

ESH to submit false claims."  Doc. No. 102 at 6.  The Court addresses these arguments in turn.

      B.     False Claims

Gainwell contends that ESH's Medicaid claims were not false as alleged in the complaint

because the RFP for Gainwell's contract with Rhode Island "specifically allowed ESH claims to

be categorized as 'Nursing Home Claims' and required Gainwell to use ESH billing rates set by

EOHHS."  Id. at 18.  It also argues ESH's per diem billing method could not have violated any

federal law because CMS eventually approved this billing method starting in 2020.  Id.

These arguments are unpersuasive.  The second amended complaint sufficiently pleads

that ESH submitted Medicaid claims that did not comply with either the nursing home

requirements or the hospital requirements established under the CMS-approved State Plan and

federal law.  Regardless of what Rhode Island directed ESH or Gainwell to do, the complaint

sufficiently lays out that ESH's claims did not abide by any method laid out in the State Plan

prior to 2020.  While CMS's eventual approval of ESH's billing method suggests that the

method did not affirmatively violate any existing federal law, this does not mean that ESH was

permitted to use this method to collect Medicaid reimbursements before 2020.  That ESH's

billing practices deviated from the existing billing methods approved by CMS through the State

Plan indicates that these claims were not authorized for Medicaid reimbursement from the

federal government and were, therefore, false.

Gainwell further contends that the second amended complaint fails to plead particularized facts showing a scheme by Gainwell, rather than by ESH or Rhode Island.  Id. at 19–20. However, the FCA does not limit liability to the architects of the fraudulent scheme.  United States v. President & Fellows of Harvard Coll., 323 F. Supp. 2d 151, 187 (D. Mass. 2004) (noting that defendant can be held liable under FCA for "ostrich-like behavior" that "itself becomes a course of conduct that allowed fraudulent claims to be presented to the federal government" (citation modified)).  Here, Relators allege that Gainwell—Rhode Island's fiscal agent tasked with processing, reviewing, and approving ESH's Medicaid claims—played at least "some role in the claim process."  Id.  While Gainwell complains that the second amended complaint fails to plead facts about the specific Gainwell employees who engaged in the fraudulent scheme and the circumstances surrounding those individuals' participation in the scheme, such details are not required to plead fraud with particularity.[6]  As explained in the Court's Order on the motion to amend, the second amended complaint contains enough factual details to satisfy Rule 9(b)'s heightened pleading standard.  Doc. No. 97 at 13–24.  And, to the extent that Gainwell's arguments about its lack of involvement in ESH's submission of false claims bleed into its points about scienter and causation, the Court addresses those issues below.

---

[6] The cases cited by Gainwell do not require Relators to plead such details.  In Karvelas, the First Circuit noted that alleging details such as "the individuals involved in the billing" "may help a relator to state his or her claim with particularity."  U.S. ex rel. Karvelas v. Melrose-Wakefield Hosp., 360 F.3d 220, 233 (1st Cir. 2004).  At the same time, the First Circuit declined to prescribe "a checklist of mandatory requirements that must be satisfied by each allegation included in a complaint."  Id.  In Depuy Orthopaedics, the court explained that "several judges in this district have held that in cases where the defendant directly presents the claim to the government, the plaintiff must provide details identifying particular false claims submitted, including who filed the claims."  United States v. Depuy Orthopaedics, Inc., 159 F. Supp. 3d 226, 250 (D. Mass. 2016) (emphasis added).  That reasoning does not establish that Relators must allege facts about particular individuals in a case, such as this one, involving a defendant who processed, rather than directly presented, the false claim.

10

C.     Scienter

To satisfy the FCA's scienter requirement, Relators must plausibly allege that Gainwell acted with "actual knowledge of the information," "in deliberate ignorance of the truth of the information," or "in reckless disregard of the truth or falsity of the information."  31 U.S.C. § 3729(b)(1).  At this stage of the proceedings, Relators need only plead scienter generally.  Fed. R. Civ. P. 9(b).

Gainwell contends that Relators have not sufficiently pled scienter because the second amended complaint contains no facts about Gainwell's subjective beliefs and knowledge concerning the falsity of ESH's claims.  To form this point, Gainwell relies on the Supreme Court's guidance in Supervalu.  There, the Court reviewed a lower court's holding that the FCA's scienter requirement turned on an objective standard—that is, what a hypothetical, reasonable person in defendant's position would have thought and understood as to the truth or falsity of a given claim.  United States ex rel. Schutte v. SuperValu Inc., 598 U.S. 739, 748 (2023).  The Court rejected this interpretation, holding that the "FCA's scienter element refers to respondents' knowledge and subjective beliefs—not to what an objectively reasonable person may have known or believed."  Id. at 749.  The Court elaborated on the standards for meeting the scienter requirement under the FCA:

> First, the term "actual knowledge" refers to whether a person is "aware of" information. . . . Second, the term "deliberate ignorance" encompasses defendants who are aware of a substantial risk that their statements are false, but intentionally avoid taking steps to confirm the statement's truth or falsity. . . . And, third, the term "reckless disregard" similarly captures defendants who are conscious of a substantial and unjustifiable risk that their claims are false, but submit the claims anyway.

Id. at 751.  Citing this ruling, Gainwell argues that the second amended complaint "contains no facts showing that anyone at Gainwell subjectively thought ESH's billing violated, or *could have* violated, state or federal requirements" and fails to raise a reasonable inference that "Gainwell

11

had that knowledge when it was contractually obligated to use the rates and billing procedures that the *State*—not Gainwell—directed."  Doc. No. 102 at 21.

The Court agrees that the second amended complaint is sparse on factual details pointing toward Gainwell's subjective understanding or beliefs about the falsity of ESH's claims.  While the complaint alleges that "Gainwell processed for payment thousands of non-reimbursable Medicaid claims submitted by ESH," Doc. No. 98 ¶ 5, there are no allegations directly showing that at the time Gainwell approved these claims, it subjectively knew—or was conscious of a substantial, unjustifiable risk—that ESH's claims were false.  Beyond conclusory allegations asserting that Gainwell "knew" about ESH's fraudulent billing scheme (see, e.g., id. ¶¶ 37, 85, 107), the operative pleading contains no allegations pointing to actual awareness of the falsity of ESH's claims.

Nor does the second amended complaint provide any basis for inferring that Gainwell was conscious of (yet ignored) red flags or glaring inconsistencies in ESH's claims.  With regard to ESH's enrollment as a nursing home, Relators point to nothing from the RFP or otherwise that barred ESH from enrolling in Medicaid as a nursing home, let alone notified Gainwell that such enrollment was fraudulent.[7]  Indeed, the United States' statement of interest explains that federal law "does not prohibit a provider from having multiple classifications, i.e., as a hospital and a nursing home."  Doc. No. 111 at 8.  Thus, ESH's enrollment as a nursing home alone would not have sufficed to apprise Gainwell of the fraud.

---

[7] During the motion hearing, Relators' counsel contended that federal and state laws and regulations required ESH to be licensed as a nursing home, not a hospital, in order to enroll in Medicaid as a nursing home.  However, the statutes and regulations cited by counsel indicate that nursing homes must be licensed in some manner to participate in Medicaid but do not specify that they must be licensed as nursing homes.  See 42 U.S.C. § 1396r(d)(2)(A); 42 C.F.R. § 483.70(a); 216 R.I. Code R. § 40-10-1.5(A).  Here, there is no dispute that ESH was licensed at all relevant times, albeit as a hospital.  Doc. No. 98 ¶ 56.

Furthermore, the complaint does not allege that Gainwell received and disregarded notice that ESH was billing in a fraudulent manner.  Cf. United States ex rel. Nunnelly v. Regeneron Pharms., Inc., 780 F. Supp. 3d 336, 348 (D. Mass. 2025) (finding complaint plausibly alleged scienter where defendant allegedly "ignored a Deloitte report indicating that the reimbursements" were false).  By contrast, the factual allegations indicate that the state directed ESH to bill and enroll in the manner it did, and that Gainwell followed its contractual duty to process ESH's claims according to the direction of the state.  Doc. No. 97 at 23–24; see also State of Rhode Island, Request for Proposals for Transition, Enhancement, Operation, and Maintenance of the Medicaid Management Information System 194 (2011) [hereinafter RFP], https://purchasing.ri.gov/rivip/stateagencybids/7449255.pdf [https://perma.cc/YJ78-LPRC] (directing Gainwell to "[p]rocess claims according to new reimbursement methodologies as directed by EOHHS").

For similar reasons, there is no basis for inferring that Gainwell would have been aware of potential fraud based on ESH's all-cost, per diem billing method.  As mentioned above, there is no indication that ESH's billing method violated or conflicted with any federal law in light of the fact that CMS later approved the billing method.  One possible theory of scienter is that Gainwell, by nature of its position as Rhode Island's fiscal agent, was at least conscious of a substantial risk that ESH's billing method did not conform with any established reimbursement method in the State Plan prior to 2020.  But the second amended complaint falls short of plausibly alleging this theory.  It points to no express requirements of federal law, state law, or the RFP directing Gainwell to review claims to ensure compliance with a reimbursement methodology appearing in the State Plan.  Under the RFP, Gainwell was required to "[p]rocess claim data against defined service, policy, and payment parameters," detect "inappropriate

13

billings and over payments," "[r]eturn claims not meeting State approved screening criteria to providers," "[p]erform exceptional adjudication of claim edits and audits in accordance with State approved guidelines," and "[n]otify State if potential fraud is suspected."  RFP at 102, 474, 478.  All of these enumerated responsibilities indicate that Gainwell's job was to review and process claims based on criteria set by the state.[8]  Relators fail to explain how Gainwell could have had subjective awareness about the potential falsity of ESH's claims when the state explicitly signed off on ESH's billing method.

Moreover, the allegations about ESH's lack of prior authorizations do not raise a reasonable inference of Gainwell's scienter.  The second amended complaint alleges that Gainwell did not check ESH's claims for prior authorizations even though CMS's State Medicaid Manual required it to review claims for "any required prior authorizations."  Doc. No. 98 ¶¶ 48–50.  Relators point out that the State Plan required hospitals to obtain prior authorization for inpatient admissions.  See Doc. No. 98-1 at 7.  But as alleged in the complaint, ESH was enrolled in Medicaid as a nursing home.  Doc. No. 98 ¶ 64.  The complaint does not suggest that nursing homes were required to receive prior authorizations before billing for inpatient admissions.  Indeed, as the Court explained in its prior Order, the facts suggest that the state explicitly exempted ESH from complying with various pre-screening requirements for nursing homes.  Doc. No. 97 at 17.  All these facts fail to raise the reasonable inference that

---

[8] The only other document provided by Relators that delineates Gainwell's responsibilities as Rhode Island's fiscal agent is CMS's State Medicaid Manual.  That document similarly tasks Gainwell with verifying "that charges submitted by providers are reasonable and within acceptable limits" and investigating "misutilization of the State's Medicaid program by individual participants."  SMM §§ 11325(A), 11335(A).  Relators point to no provision in the State Medicaid Manual instructing Gainwell to check claims for compliance with the State Plan.

14

Gainwell—which abided by the state's top-down instructions on how to treat and process ESH claims—possessed the requisite scienter about any deficiencies in those claims.

As the United States explained in its statement of interest, the "operative question" is "whether Gainwell 'knew' (within the meaning of the FCA) that Rhode Island's instructions to process ESH's claims as a nursing home for reimbursement purposes were incorrect, or violated state and federal law, but nevertheless continued to cause the submission of false claims."  Doc. No. 111 at 8.  For all the reasons discussed, the second amended complaint fails to plausibly allege that Gainwell possessed the requisite scienter under the subjective standard established by the Supreme Court in SuperValu.[9]  The Court reaches this conclusion after a searching process of litigation over the claims advanced by Relators with recognition that scienter under Rule 9(b) can be alleged generally.  Still, the general assertions must find some support in the complaint's factual allegations and the reasonable inferences drawn from them.  Lacking such support,

---

[9] While upholding the subjective standard for scienter, the Supreme Court in SuperValu simultaneously declined to resolve whether an objective standard may be applied to a theory of reckless disregard under the FCA:

> In some civil contexts, a defendant may be called "reckless" for acting in the face of an unjustifiably high risk of illegality that was so obvious that it should have been known, even if the defendant was not actually conscious of that risk. . . . We need not consider how (or whether) that objective form of "recklessness" relates to the FCA today because, as noted above, it is enough to say that the FCA's standards can be satisfied by a defendant's subjective awareness of the claim's falsity or an unjustifiable risk of such falsity.

SuperValu, 598 U.S. at 751 n.5.  At this juncture, this Court also declines to address whether reckless disregard under the FCA permits an objective analysis for several reasons.  First, Relators' papers do not ask the Court to apply an objective standard for evaluating whether Gainwell acted with reckless disregard.  Second, the operative complaint does not plausibly allege an objective theory of reckless disregard for the same reasons it fails to raise a reasonable inference of scienter under a subjective standard.  Given Gainwell's contractual duty to follow the state's directives, Relators have not pled that a reasonable fiscal agent in Gainwell's position would have known or suspected the falsity of ESH's claims.

Relators advance nothing but conclusory assertions about Gainwell's knowledge of the fraudulent scheme, which are insufficient to plead scienter under the FCA.

D.   Causation

While the Court's finding on scienter warrants dismissal of Relators' claims, the Court addresses causation for the sake of thoroughness. "The FCA reaches 'any person who knowingly assisted in causing the government to pay claims which were grounded in fraud, without regard to whether that person had direct contractual relations with the government.'" In re Pharm. Indus. Average Wholesale Price Litig., 491 F. Supp. 2d 12, 16 (D. Mass. 2007) (quoting United States ex rel. Marcus v. Hess, 317 U.S. 537, 544–45 (1943)). "To cause the presentation of false claims . . . some degree of participation in the claims process is required." Harvard Coll., 323 F. Supp. 2d at 186–87. "The causation element may be satisfied where a defendant with the power, authority, and duty to stop the submission of false claims does not intervene after learning about the existence of false claims." United States ex rel. Martino-Fleming v. S. Bay Mental Health Ctrs., 540 F. Supp. 3d 103, 131 (D. Mass. 2021) (citation modified).

Relators fail to plead that Gainwell caused the submission of false claims for many of the same reasons they fail to plead scienter. As discussed above, nothing in the RFP or otherwise required Gainwell to review claims against the State Plan or to reject claims diverging from the State Plan. And, it is not plausible that Gainwell had the "power, authority, and duty" to prevent ESH from billing in the manner that the state explicitly permitted. Id. The RFP required Gainwell to process claims pursuant to the requirements and methods established by the state, RFP at 118, 194, 195, and Gainwell complied with the state's directives with respect to ESH's Medicaid claims. Under these circumstances, the second amended complaint fails to plausibly allege that Gainwell knowingly caused the submission of ESH's false claims.

16

III.    <u>CONCLUSION</u>

For the foregoing reasons, Gainwell's motion to dismiss, Doc. No. 101, is ALLOWED. Relators have not sought a further opportunity for leave to amend, nor is such opportunity warranted on the record of this case.  Accordingly, the Clerk shall enter judgment dismissing this case with prejudice.  Each side shall bear its own fees and costs.


SO ORDERED.


 /s/ Leo T. Sorokin
United States District Judge

17